## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

SUEZ WATER NEW YORK INC.,                          :

               Plaintiff,                    :

     -against-                                       :

                                 Case No. 20-10731

E.I. DUPONT DE NEMOURS AND                         :
COMPANY; DUPONT DE NEMOURS, INC.
(F/K/A DOWDUPONT, INC.); DUPONT                    :
SPECIALTY PRODUCTS USA, LLC;
CORTEVA, INC.; THE CHEMOURS                        :
COMPANY; and THE CHEMOURS
COMPANY FC, LLC,

               Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

## COMPLAINT

Plaintiff SUEZ Water New York Inc. (hereinafter, "SUEZ") hereby files this Complaint against Defendants E.I. DuPont de Nemours and Company, Inc., DuPont de Nemours, Inc., DuPont Specialty Products USA, LLC, Corteva, Inc., The Chemours Company, and The Chemours Company FC, LLC (collectively, the "Defendants"), and alleges as follows:

## INTRODUCTION

1.     SUEZ brings this action against Defendants jointly and severally for damages sustained as a direct and proximate result of Defendants' releases of per- and polyfluoroalkyl substances ("PFAS"), including without limitation perfluorooctanoic acid ("PFOA") and perfluorooctanesulfonic acid ("PFOS"), into New York's environment.  For more than six decades, Defendants, as manufacturers and distributors of PFAS and PFAS-containing commercial and consumer products, have knowingly and willfully discharged PFAS into the air, water, and soil, and placed PFAS and PFAS-containing products into the stream of commerce, resulting in

widespread and long-lasting contamination to natural resources within and throughout New York State—including, pertinently, the water sources that SUEZ relies upon to provide safe drinking water to its more than 500,000 customers in New York.

2.      On August 26, 2020, after several years of studying the long-term effects of PFAS, the New York State Department of Health adopted Maximum Contaminant Levels for public water systems.  The Maximum Contaminant Levels ("MCLs") are among the most stringent in the United States, and SUEZ, as the owner and operator of multiple public water systems in New York, must begin testing for PFAS immediately.  As a result, and based upon technical analyses of SUEZ's various sources of public drinking water, SUEZ has been, and will continue to be, required to make significant and costly upgrades to the water treatment infrastructure for its public water systems and will incur significant ongoing costs required to operate and maintain those upgrades, as well as to engage in the regular monitoring of PFAS levels in all water sources necessitated by New York's adoption of these standards.

3.      Defendants were, or reasonably should have been, aware that their acts and omissions directly and proximately caused the release of PFAS into New York's environment and that such releases could pose hazards to the State's natural resources, but chose profits over safety and continued to contaminate the environment for more than a half-century.  Only recently has the full scope of Defendants' actions begun to come to light.  Moreover, the emerging costs of remedying Defendants' long-running contamination of New York's environment are substantial, and those costs have fallen disproportionately upon those whose responsibility it is to provide safe drinking water to New York residents.  Therefore, SUEZ brings this action against Defendants in an effort to hold them accountable for the significant harms done to New York's public water

supplies and to ensure that SUEZ has the resources necessary to continue to provide its customers with drinking water that meets and exceeds New York's newly adopted MCLs.

## PARTIES, JURISDICTION, AND VENUE

4.      SUEZ is a New York corporation with its principal place of business in West Nyack, New York.  SUEZ was established in 1893 and currently has five operating units in New York State which serve customers across Orange, Putnam, Rockland, Tioga, and Westchester Counties.  Collectively, these water systems service approximately 123,000 unique connections and provide water to approximately 505,000 individual customers across New York.

5.      Defendant E.I. DuPont de Nemours and Company ("DuPont") is a Delaware corporation with its principal place of business in Wilmington, Delaware.  DuPont does business throughout the United States, including in this District.

6.      Defendant DuPont de Nemours, Inc. (f/k/a DowDuPont) ("New DuPont") is a Delaware corporation with its principal place of business in Wilmington, Delaware.  New DuPont does business throughout the United States, including in this District.

7.      Defendant DuPont Specialty Products USA, LLC ("DuPont LLC") is a Delaware limited liability company with its principal place of business in Wilmington, Delaware.  DuPont LLC does business throughout the United States, including in this District.

8.      Defendant Corteva, Inc. ("Corteva") is a Delaware corporation with its principal place of business in Wilmington, Delaware.  Corteva does business throughout the United States, including in this District.  Corteva is the parent corporation of DuPont and holds certain of New DuPont's assets and liabilities, as well as its agricultural and nutritional businesses.

9.      Defendant The Chemours Company ("Chemours") is a Delaware corporation with its principal place of business in Wilmington, Delaware.  Chemours does business throughout the

United States, including in this District. Chemours was incorporated as a subsidiary of DuPont on April 30, 2015. On July 1, 2015, DuPont spun off Chemours and created a separate corporate entity to hold its "performance chemicals" business lines, along with certain of DuPont's environmental liabilities.

10.     Defendant The Chemours Company FC, LLC ("Chemours FC") is a Delaware limited liability company with its principal place of business in Wilmington, Delaware. Chemours FC does business throughout the United States, including in this District. Chemours FC is a subsidiary of Chemours.

11.     Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332(a) because it is an action between citizens of different states and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

12.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in the Southern District of New York.

### FACTUAL BACKGROUND

### Per- and Polyfluoroalkyl Substances (PFAS)

13.     PFAS are a group of manufactured fluorinated organic chemicals that are used in a wide variety of industrial and commercial products. Previously, PFAS were commonly referred to as perfluorinated compounds.

14.     Due to their unique properties that resist heat, oil, stains, grease, and water, PFAS have played a central role in the manufacture and development of many consumer products since their introduction in the 1940s. Notably, PFAS have been used to produce many consumer and industrial products including carpets, clothing, fabrics for furniture, food packaging, a variety of

cookware, and Defendant-affiliated name brands such as Stainmaster®, Teflon®, Gore-Tex®, and Tyvek®.  PFAS have also been put to wide industrial use due to their unique ability to resist harsh chemicals and high temperatures.

15.     Two of the most prevalent PFAS are perfluorooctanoic acid (PFOA) and perfluorooctanesulfonic acid (PFOS), both of which have been widely used and applied in the manufacturing industry. Although the uses of PFOA and PFOS have been gradually phased out in recent years, both chemicals remain prevalent, and consumer products, food, and drinking water continue to be primary sources of exposure to PFAS.

16.     The United States Environmental Protection Agency ("EPA") has found widespread PFAS contamination in the environment, and that the substances have likely been released into the environment in several different ways.  For example, EPA found that PFAS can be released during the manufacture, normal use, disposal, and/or biodegradation of consumer products containing PFAS.  PFAS may also be released into the air, soil, and water during the manufacture, use, and disposal of PFAS themselves.

17.     Once present in the environment, PFAS are extremely persistent and often have degradation periods of years, decades, or longer under natural conditions.  PFAS are also highly resistant to chemically aided degradation processes.  For these reasons, PFAS are often referred to as "forever chemicals."

18.     Additionally, PFAS are soluble and mobile in water, which greatly amplifies the spread of PFAS beyond the initial sources of introduction into the environment.  And, because PFAS, and particularly PFOA, are water-soluble, they can migrate readily from soil to groundwater.  Therefore, once PFAS are released into the environment, they are extremely difficult to remove and even more difficult to contain.

**Federal and State Regulation of PFOA and PFOS**

19.     In light of emerging scientific evidence regarding the potential long-term effects that PFAS, including PFOA and PFOS, may have on the environment, EPA has designated the substances as "emerging contaminants."

20.     In 2016, EPA issued drinking water health advisories for PFOA and PFOS. Specifically, EPA guidance provided that a combined level of PFOA or PFOS in excess of 70 parts per trillion ("ppt") in drinking water may pose increased risks for people who consume such water.

21.     In February 2019, EPA announced an Action Plan to address PFAS contamination that includes initiating steps to establish federal MCLs for PFOA and PFOS in drinking water. EPA's Action Plan is ongoing.

22.     Pending the establishment of federal MCLs for PFOS and PFOA, several states have taken steps to establish their own state-based MCLs.

23.     In 2017, New York State identified PFOA and PFOS as "emergent contaminants" in drinking water, and established the Drinking Water Quality Council to further study the effects of these "emergent contaminants" on the environment and the public, with the ultimate goal of adopting MCLs for both substances in the public drinking water.

24.     Also in 2017, the New York State Department of Environmental Conservation ("NYDEC") amended N.Y. Comp. Codes R. & Regs. tit. 6, § 597.3 to include PFOA and PFOS on the list of hazardous substances.  This decision was made, in part, based upon a Department ecotoxicologist's identification of these compounds as potential hazards to the environment and a parallel finding that proper management of these compounds was needed to protect both public health and the environment.

25.     On July 30, 2020, the New York State Department of Health's Public Health and Health Planning Committee approved the adoption of specific MCLs for PFOA and PFOS in New York's public water systems.

26.     On August 26, 2020, a Notice of Adoption of the new MCL regulations was published in the New York State Register, at which point the regulations took immediate effect. *See* 42 N.Y. Reg. 6 (Aug. 26, 2020).

27.     Pursuant to the new rules, all public water systems will be required to begin regularly testing and monitoring for PFOA and PFOS. *See* 42 N.Y. Reg. 15 (proposed Jan. 22, 2020) (to be codified at N.Y. Comp. Codes R. & Regs. tit. 10, §§ 5-1.51(b), 5-1.53 tbl. 9C). Water systems serving 10,000 or more people will be required to begin doing so within 60 days, while systems serving between 3,300 and 9,999 people will have 90 days to comply and systems serving fewer than 3,300 people will have six months to begin testing and monitoring. *Id.*

28.     Under the adopted MCLs, public water systems must supply drinking water with less than 10 ppt of either PFOS or PFOA. *See* 42 N.Y. Reg. 13 (proposed Jan. 22, 2020) (to be codified at N.Y. Comp. R. & Regs. tit. 10, § 5-1.53 tbl. 3); *see also* N.Y. Comp. Codes R. & Regs. tit. 10, §§ 5-1.50 to 5-1.53. If the results of any monitoring sample exceed these limits, the public water system must collect one to three more confirmation samples from the same sampling point within 30 days; the MCL will be exceeded if any of these three confirmation samples is positive and the average of the initial sample and all confirmation samples exceeds 10 ppt. *See* N.Y. Comp. R. & Regs. tit. 10, § 5-1.53 tbl. 3. If a water system exceeds an MCL, it must take corrective action, including the installation of a suitable treatment process. *Id.* § 5-1.51(a).

**Defendants' Knowledge of the Inherent Dangers of PFAS**

29.     Beginning in the 1960s and 1970s and continuing to present, Defendants have identified the potential risks that PFAS exposure posed to both humans and the environment and have documented such potential risks in numerous internal memoranda and scientific research studies.

30.     No later than the early 1980s, Defendants became aware that PFAS could enter the environment during the manufacture and use of PFAS and PFAS-containing products and that once PFAS were released into the environment, they could freely spread beyond the points of initial contamination due to their unique solubility characteristics.  Defendants also became aware during this time period that PFAS were highly resistant to the natural chemical degradation process and could persist in the environment indefinitely.

31.     Moreover, Defendants knew or reasonably should have known that the PFAS-containing commercial and consumer products placed into the stream of commerce would be used, and ultimately disposed of, in a reasonably foreseeable manner, and that such disposal into landfills and other waste treatment facilities and the ensuing biodegradation would further amplify and exacerbate the spread of PFAS into the environment far beyond the location of products' original manufacture and distribution.

**Defendants' Releases of PFAS in New York**

32.     Upon information and belief, Defendants have caused the release of significant amounts of PFAS into the soil, groundwater, surface waters and waterways, and air of New York State through their use, handling, management, distribution, sale, marketing, and/or disposal of PFAS and PFAS-containing materials and products since at least the late 1950s.

33.     These releases of PFAS, including PFOS and PFOA, into the soil, groundwater, surface waters and waterways, and air of New York State have been continuous and long running.

34.     Beginning in the late 1950s, Defendants used PFOA to manufacture, among other things, fluoroelastomers, perfluoroelastomers, and specialty fluoroelastomers, which were then used in the production of a variety of consumer products.  This process resulted in both significant discharge and disposal of PFAS as a byproduct of the manufacturing process itself, as well as the creation of products that would later be found to contain significant levels of PFAS.

35.     Additionally, in or around 2002, Defendants began to produce their own PFOA, rather than relying on outside sources of the substances for their unique needs.  Thereafter, Defendants used PFAS, including the PFOA produced in their own facilities, to produce many of the commercial and consumer products discussed above.  Defendants also sold raw PFOA to other industrial users for their own use, including numerous industrial manufacturers in New York State.

36.     In addition to PFAS themselves, Defendants have also manufactured and sold PFAS-containing commercial and consumer products to industrial customers, downstream distributors, and individual consumers in New York State for more than six decades.

37.     The sale of PFAS and PFAS-containing commercial and consumer products to Defendants' customers and the customers' foreseeable use and ultimate disposal of Defendants' products, has resulted in the direct and indirect release of PFAS to the soil, groundwater, surface waters and waterways, and air of New York State.

38.     Industrial customers, for example, have directly and indirectly discharged PFAS to publicly owned wastewater treatment systems incapable of removing those compounds.  As a result, PFAS have been further discharged to surface waters or released to soil and groundwater

after passing through the treatment systems, thereby exponentially amplifying the environmental spread of PFAS.

39.     Similarly, many consumers who have purchased and used Defendants' PFAS-containing products have unknowingly proliferated the environmental contamination caused by Defendants' hazardous products by disposing of such products to waterways, publicly owned treatment works, and landfills, where the PFAS have been steadily and continuously released into the environment as a result of the natural and/or chemically-aided degradation process over the course of many years.

40.     Moreover, because of the solubility of PFAS, the mobility of PFAS, and the ability of PFAS to resist the natural degradation process and many now-existing water treatment solutions, the reach of Defendants' PFAS contamination has extended far beyond the locations where the initial manufacturing, use, and disposal of the PFAS and PFAS-containing products took place.

41.     Defendants have known for decades that PFAS could harm the environment but failed to take meaningful steps to prevent or mitigate the foreseeable contamination to New York's natural resources.

42.     Likewise, Defendants knew that they were releasing potentially toxic PFAS into the environment through their manufacture and use of PFOA and PFOS, and Defendants failed to take any action to remedy such harm or to disclose the risks to regulators or the New York public.

43.     Defendants also knew, or reasonably should have known, that the purchasers of their PFAS and PFAS-containing products would release, discharge and/or dispose of such products into New York's waterways, publicly owned treatment works, and landfills, and that

these foreseeable actions would further amplify the spread of PFAS contamination into the soil, groundwater, surface waters and waterways, and air of New York State.

44.     Defendants' manufacture, use and disposal of PFAS, as well as their sale of PFAS and PFAS-containing products to industrial customers, downstream distributors, and individual consumers and users in New York, and their foreseeable use and disposal of such substances and products, has directly and proximately caused significant contamination to SUEZ's sources of public drinking water.

45.     By causing the release of PFAS into the environment for more than a half-century, during which time such contaminants were commingled with one another and combined into the natural resources they infiltrated, Defendants have inflicted an indivisible injury upon SUEZ that has caused unitary harm.

46.     Therefore, because Defendants' own actions have caused harm that is not capable of division, Defendants are jointly and severally responsible for all damages SUEZ has incurred, as well as those that SUEZ imminently will incur, as a direct and proximate result of Defendants' use, handling, management, distribution, sale, marketing, and/or disposal PFAS and PFAS-containing materials and products.

**The Presence of PFAS in Public Water Systems Across New York**

47.     Between 2015 and 2018, the New York State Department of Health conducted targeted sampling of 278 public water systems across the State, during which time the Department tested for the presence of both PFOA and PFOS.  The sampling revealed that 34 public water systems (12.2%) had levels of PFOA exceeding 10 ppt, and 24 public water systems (8.6%) had levels of PFOS exceeding 10 ppt.

48.     Increased levels of PFOA and PFOS have also been detected in the surface waters and monitoring wells near commercial and residential landfills in New York State, with some samples revealing levels of PFOA exceeding 1,900 ppt in surrounding surface waters and 4,200 ppt in leachate samples taken from points adjacent to the landfills.  Elevated levels of PFAS were also identified in downgradient stream and sediment samples, with sampling revealing downstream levels of PFOA exceeding 73 ppt.

49.     In July 2020, the New York State Department of Health estimated that approximately 21% of all public water systems had levels of PFOA and/or PFOS currently exceeding 10 ppt.

**Impact of Defendants' Long-Running PFAS Releases on SUEZ's Water Systems**

50.     SUEZ owns and operates five public water systems in New York that consist of surface water intakes, wells, and water treatment facilities.  SUEZ's water supply services more than 123,000 unique water service connections and provides water service to approximately 505,000 New York residents.

51.     SUEZ is committed to supplying its customers with safe drinking water that meets the federal and state guidelines and restrictions, including New York's stringent new MCLs for PFOA and PFOS.  SUEZ must therefore implement significant enhancements to its existing treatment infrastructure to assure that the water it supplies to its New York customers meets New York's MCLs.

52.     In anticipation of the adoption and implementation of New York's final MCLs, SUEZ began a monitoring initiative whereby SUEZ proactively monitored its existing water systems for the presence of PFOA and PFOS.

53.     At various times in 2019 and 2020, SUEZ conducted sampling in accordance with its monitoring initiative at several water systems across New York State.  At several separate sites, testing of the source water revealed levels of PFOA and/or PFOS exceeding the newly implemented MCLs.

54.     At SUEZ's Rockland Water System in Rockland County, New York, testing revealed concentrations of PFOA as high as 19 ppt and concentrations of PFOS as high as 11 ppt. Moreover, as recently as October 2020, sampling revealed concentrations of PFOA and/or PFOS above 10 ppt in at least 16 of SUEZ's source water wells or water systems in SUEZ's Rockland Water System.  Sampling at several other wells or systems during the same time period indicated concentrations of PFOS or PFOA approaching 10 ppt, with the possibility that the MCLs might be exceeded in the near future.

55.     At SUEZ's Lake Deforest Water Treatment Plant in Clarkstown, New York, testing revealed concentrations of PFOA as high as 16 ppt and concentrations of PFOS as high as 15 ppt, and additional exceedances have been recorded as recently as October 14, 2020.

56.     At SUEZ's Forest Park Water System in Putnam and Westchester Counties, New York, testing revealed concentrations of PFOA as high as 22 ppt and concentrations of PFOS as high as 20 ppt.  Moreover, as recently as October 2020, sampling indicated concentrations of PFOA and/or PFOS above 10 ppt in at least 15 of Plaintiff's source water wells in SUEZ's Forest Park Water System.  Sampling at several other wells during the same time period revealed concentrations of PFOS or PFOA approaching 10 ppt, with the possibility that the MCLs might be exceeded in the near future.

57.     Upon information and belief, Defendants' actions in releasing or causing the release of PFAS, including but not limited to PFOA and PFOS, into the soil, groundwaters, surface waters

and waterways, and air of New York and in designing, manufacturing, marketing, and distributing PFAS and PFAS-containing commercial and consumer products to industrial users, downstream distributors, and individual consumers in New York has directly and proximately caused the contamination of SUEZ's water sources.

58.     As a result, SUEZ has incurred, and will continue to incur, significant expense related to PFAS contamination and the remedial steps that must be taken to comply with New York State's MCLs and to monitor for such compliance in the future, as well as numerous other costs necessitated by, associated with, or related to compliance with New York State's MCLs.

59.     Specifically, SUEZ has identified three prudent, reliable, and cost-effective drinking water treatment options for PFAS removal: granular activated carbon ("GAC"), closed circuit reverse osmosis ("CCRO"), and ion exchange ("IX").  The efficacy of these options depends on source water quality, existing treatment technology, site layout, waste stream options, and other site-specific conditions.

60.     Regarding SUEZ's Rockland Water System, initial analysis indicates that either GAC or IX will be the most effective treatment for the removal of PFAS, including PFOA and PFOS, to meet New York State's MCLs.

61.     Regarding SUEZ's Lake Deforest Water Treatment Plant, initial analysis indicates that GAC will be the most effective treatment for the removal of PFAS, including PFOA and PFOS, to meet New York State's MCLs.

62.     Regarding SUEZ's Forest Park Water System in Putnam and Westchester Counties, initial analysis indicates that either GAC or IX will be the most effective treatment for the removal of PFAS, including PFOA and PFOS, to meet New York State's MCLs.

63.     SUEZ is currently analyzing the costs associated with the installation and operation of each of the drinking water treatment options under consideration at SUEZ's Rockland Water System, Lake Deforest Water Treatment Plant, and Forest Park Water System.  Initial estimates show that the implementation of such treatments will cost millions of dollars per location.

## CAUSES OF ACTION

### COUNT ONE
**(Public Nuisance)**

64.     The allegations of Paragraphs 1 through 63 above are incorporated by reference as if fully set forth herein.

65.     Defendants' acts and omissions, including Defendants' failure to exercise due care in their use, handling, management, distribution, sale, marketing, and/or disposal of PFAS, including without limitation PFOS and PFOA, as well as PFAS-containing commercial and consumer products, have resulted in the release of significant amounts of PFAS into the environment and natural resources of New York State.

66.     Defendants' acts and omissions have substantially and unreasonably interfered with, and continue to interfere with, SUEZ's right to the use and enjoyment of New York's natural resources and SUEZ's right to the use of New York's groundwater and surface water as sources of public drinking water, rights which SUEZ holds in common with members of the public, and have had the effect of endangering or injuring the property, health, safety or comfort of a considerable number of persons, thus creating a public nuisance.

67.     The public nuisance created by Defendants' acts and omissions is continuing, and Defendants have failed to take steps to abate this public nuisance.

68.     Moreover, SUEZ has suffered, continues to suffer, and will in the future suffer, a special injury different in kind from, and of a greater magnitude than, that suffered by the public

as a whole.  As the owner and operator of public water systems, SUEZ is required to provide drinking water that complies with New York State's MCLs.  In order to meet these MCLs and as a direct and proximate result of Defendants' acts and omissions, SUEZ will be required to design, install and operate new and/or additional drinking water treatment systems.

69.     Therefore, as a direct and proximate result of the continuing public nuisance created by Defendants' acts and omissions, including Defendants failure to exercise due care in their use, handling, management, distribution, sale, marketing, and/or disposal of PFAS and PFAS-containing commercial and consumer products, SUEZ has suffered, is currently suffering, and will continue to suffer a special injury, separate and apart from that shared by the public as a whole, and is therefore entitled to damages equal to the costs associated with the creation or acquisition, as well as installation and implementation, of drinking water treatment systems necessary to comply with the new MCLs, as well as the additional ongoing costs for the operation and maintenance of those systems and the regular monitoring of PFAS levels in all water sources necessitated by New York's adoption of these standards.

70.     Defendants' creation and maintenance of a public nuisance have directly and proximately caused indivisible harm to SUEZ, and Defendants are therefore jointly and severally liable for all such damages incurred by SUEZ in an amount to be proved at trial.

## COUNT TWO
### (Private Nuisance)

71.     The allegations of Paragraphs 1 through 63 above are incorporated by reference as if fully set forth herein.

72.     SUEZ owns and has the right to the possession and use of its wells, surface water intakes, and drinking water treatment and supply systems that make up SUEZ's five water systems in New York, which span Orange, Putnam, Rockland, Tioga, and Westchester Counties.

73.     Defendants' acts and omissions, including Defendants' failure to exercise due care in their use, handling, management, distribution, sale, marketing, and/or disposal of PFAS, including without limitation PFOS and PFOA, as well as PFAS-containing commercial and consumer products, have resulted in the release of significant amounts of PFAS into the environment and natural resources of New York State, including its groundwater and surface water.

74.     These intentional acts and omissions have directly and proximately caused environmental contamination that has substantially and unreasonably interfered with, and continues to interfere with, SUEZ's right to use the groundwater and surface water sources that supply its public water systems, thereby constituting a private nuisance.

75.     The private nuisance created by Defendants' intentional acts and omissions is continuing, and Defendants have failed to abate this private nuisance.

76.     Therefore, as a direct and proximate result of the continuing private nuisance created by Defendants' acts and omissions, including Defendants' failure to exercise due care in their use, handling, management, distribution, sale, marketing, and/or disposal of PFAS, as well as PFAS-containing commercial and consumer products, SUEZ has suffered, is currently suffering, and will continue to suffer damages equal to the costs associated with the creation or acquisition, as well as installation and implementation, of the drinking water treatment systems necessary to comply with the new MCLs, as well as the additional ongoing costs for the operation and maintenance of those systems and the regular monitoring of PFAS levels in all water sources necessitated by New York's adoption of these standards.

77.     Defendants' creation and maintenance of a private nuisance have directly and proximately caused indivisible harm to SUEZ, and Defendants are therefore jointly and severally liable for all such damages incurred by SUEZ in an amount to be proved at trial.

**COUNT THREE**
**(Negligence)**

78.     The allegations of Paragraphs 1 through 63 above are incorporated by reference as if fully set forth herein.

79.     Defendants had, and continue to have, a duty to exercise due care in their use, handling, management, distribution, sale, marketing, and/or disposal of PFAS, including without limitation PFOS and PFOA, as well as PFAS-containing commercial and consumer products, so as to prevent foreseeable harm to SUEZ and all others who share the right to the use and enjoyment of New York's natural resources.

80.     Defendants knew, or reasonably should have known, that their failure to exercise due care would have long-lasting negative impacts on the environment and would pose an unreasonable danger to New York State's sources of drinking water, including those owned and used by SUEZ.

81.     By engaging in a decades-long practice of using, handling, managing, selling, marketing, and/or disposing of PFAS, including without limitation PFOS and PFOA, as well as PFAS-containing commercial and consumer products, without implementing necessary safety precautions to prevent foreseeable releases of PFAS which Defendants knew or should have known would cause harm to the environment, Defendants failed to exercise due care.

82.     As a direct and proximate result of the Defendants' failure to exercise due care, New York's groundwater, surface water, and other natural resources have been contaminated with PFAS, including without limitation PFOS and PFOA.  As a result, SUEZ has suffered, is currently

suffering, and will continue to suffer damages equal to the costs associated with the creation or acquisition, as well as installation and implementation, of the drinking water treatment systems necessary to comply with the new MCLs, as well as additional ongoing costs for the operation and maintenance of those systems and the regular monitoring of PFAS levels in all water sources necessitated by New York's adoption of these standards.

83. Defendants' negligent acts and/or omissions have directly and proximately caused indivisible harm to SUEZ, and Defendants are therefore jointly and severally liable for all such damages incurred by SUEZ in an amount to be proved at trial.

**COUNT FOUR**
**(Trespass)**

84. The allegations of Paragraphs 1 through 63 above are incorporated by reference as if fully set forth herein.

85. SUEZ owns and has the right to the possession and use of its wells, surface water intakes, and drinking water treatment and supply systems that make up SUEZ's five water systems in New York, which span Orange, Putnam, Rockland, Tioga, and Westchester Counties.

86. Defendants' failure to exercise due care in their use, handling, management, distribution, sale, marketing, and/or disposal of PFAS, including without limitation PFOS and PFOA, as well as PFAS-containing commercial and consumer products, directly and proximately caused the release of PFAS into the air, soil, groundwaters and surface waters of New York, where such contaminants freely migrated onto and into SUEZ's property, including SUEZ's sources of public drinking water.

87. Since 2018, testing has revealed widespread PFAS contamination to SUEZ's water sources in New York, including at levels that exceed the newly-implemented MCLs.

88.     SUEZ did not consent to Defendants' releases of PFAS onto and into SUEZ's property, including SUEZ's sources of public drinking water.

89.     Defendants knew, or reasonably should have known, that the release and disposal of PFAS into the environment, as well as the sale and distribution of PFAS and PFAS-containing commercial and consumer products that would be foreseeably used and disposed of in such a manner that would further amplify the release of PFAS, would have the propensity to infiltrate groundwater and surface water sources, including SUEZ's.

90.     As long as SUEZ's wells and drinking water supply systems remain contaminated by PFAS, Defendants' trespasses are continuing.

91.     As a direct and proximate result of the continuing trespasses created by Defendants' negligent acts and/or omissions, SUEZ has suffered, is currently suffering, and will continue to suffer damages equal to the costs associated with the creation or acquisition, as well as installation and implementation, of the drinking water treatment systems necessary to comply with the new MCLs, as well as additional ongoing costs for the operation and maintenance of those systems and the regular monitoring of PFAS levels in all water sources necessitated by New York's adoption of these standards.

92.     Defendants' continuing trespasses have directly and proximately caused indivisible harm to SUEZ, and Defendants are therefore jointly and severally liable for all such damages incurred by SUEZ in an amount to be proved at trial.

## COUNT FIVE
### (Strict Liability—Abnormally Dangerous Activity)

93.     The allegations of Paragraphs 1 through 63 above are incorporated by reference as if fully set forth herein.

94.     Under New York law, those who engage in abnormally dangerous activities on their property which pose a sufficiently high risk of harm to others are strictly liable for any resultant damages caused by such activities.

95.     New York has classified PFOS and PFOA as "Hazardous Substances" due to the harmful and long-lasting effects that such contaminants have on both the environment and those who ingest or otherwise come into contact with them.  Moreover, Defendants knew, or reasonably should have known, that PFAS may be harmful to the environment since at least the early 1960s.

96.     Therefore, Defendants' knowing and voluntary use, handling, management, distribution, sale, marketing, and/or disposal of PFAS, including without limitation PFOS and PFOA, as well as PFAS-containing commercial and consumer products, constitute abnormally dangerous activities which posed a sufficiently high risk of harm to others.

97.     As a direct and proximate result of Defendants' abnormally dangerous activities, SUEZ has suffered, is currently suffering, and will continue to suffer damages equal to the costs associated with the creation or acquisition, as well as installation and implementation, of the drinking water treatment systems necessary to comply with the new MCLs, as well as additional ongoing costs for the operation and maintenance of those systems and the regular monitoring of PFAS levels in all water sources necessitated by New York's adoption of these standards.

98.     Defendants' abnormally dangerous activities have directly and proximately caused indivisible harm to SUEZ, and Defendants are therefore jointly, severally, and strictly liable for all such damages incurred by SUEZ in an amount to be proved at trial.

### COUNT SIX
### (Strict Liability—Defective Design)

99.     The allegations of Paragraphs 1 through 63 above are incorporated by reference as if fully set forth herein.

100.    Beginning in the 1950s and continuing to present, Defendants have designed, manufactured, and sold PFAS and PFAS-containing commercial and consumer products to purchasers in New York.

101.    As designers, manufacturers, and sellers of PFAS and PFAS-containing commercial and consumer products, Defendants had, and continue to have, a strict duty to avoid placing products into the stream of commerce that are unreasonably dangerous or pose an unnecessary risk to the products' purchasers or others who may foreseeably come into contact with the products.

102.    Defendants knew, or reasonably should have known, that PFAS may be harmful to the environment since at least the early 1960s, and that once introduced into the environment, PFAS had the propensity to spread and resist natural or chemically-aided removal and degradation processes.  Defendants further knew, or reasonably should have known, that PFAS were readily released during the manufacture, use, and disposal of PFAS-containing products.

103.    The environmental risks inherent with the manufacture and use of products containing or consisting of PFAS outweighed any possible utility of the final products to consumers and the public as a whole.

104.    By designing, manufacturing, and selling products that consisted of or contained PFAS, which Defendants' knew or reasonably should have known were substantially likely to contaminate and freely spread in the environment once introduced therein, Defendants knowingly and voluntarily placed into the stream of commerce products that were not reasonably fit, suitable and safe for their intended or reasonably foreseeable purposes when they left Defendants' possession.

105.    At all relevant times hereto, Defendants knew, or reasonably should have known, that feasible alternatives to PFAS existed and that it was feasible for Defendants to design their PFAS-containing commercial and consumer products in a safer manner, and the failure to employ such feasibly alternative designs rendered Defendants' products unsafe.

106.    The PFAS and PFAS-containing commercial and consumer products purchased by industrial users, downstream distributors, and individual consumers in New York were used, and ultimately disposed of, in a reasonably foreseeable manner and without substantial change in or modification to the condition of such substances and products, thereby resulting in the foreseeable release of PFAS into New York's environment.

107.    As a direct and proximate result of Defendants' defective design of PFAS-containing products and Defendants' introduction of such products into the stream of commerce, SUEZ has suffered, is currently suffering, and will continue to suffer damages equal to the costs associated with the creation or acquisition, as well as installation and implementation, of the drinking water treatment systems necessary to comply with the new MCLs, and SUEZ will continue to incur additional costs for the operation and maintenance of those systems and the regular monitoring of PFAS levels in all water sources necessitated by New York's adoption of these standards.

108.    Defendants' design, manufacture, and distribution of defective products have directly and proximately caused indivisible harm to SUEZ, and Defendants are therefore jointly, severally, and strictly liable for all such damages incurred by SUEZ in an amount to be proved at trial.

## COUNT SEVEN
### (Strict Liability—Failure to Warn)

109.    The allegations of Paragraphs 1 through 63 above are incorporated by reference as if fully set forth herein.

110.    Beginning in the 1950s and continuing to present, Defendants have designed, manufactured, and sold PFAS and PFAS-containing commercial and consumer products to purchasers in New York, which Defendants knew, or reasonably should have known, would be discharged, disposed of or otherwise released into the environment.

111.    As designers, manufacturers, and sellers of PFAS and PFAS-containing commercial and consumer products, Defendants had, and continue to have, a strict duty to warn foreseeable users against the latent dangers inherent with the foreseeable use and disposal of their products.

112.    Defendants knew, or reasonably should have known, that PFAS may be harmful to the environment since at least the early 1960s, and that once introduced into the environment, PFAS had the propensity to spread and resist natural or chemically-aided removal and degradation processes.  Defendants further knew, or reasonably should have known, that PFAS were readily released during the manufacture, use and disposal of PFAS-containing products.

113.    Despite knowing of the foreseeable environmental hazards brought about by the use and disposal of PFAS, Defendants failed, and continue to fail, to provide warnings or precautionary instructions sufficient to notify the reasonably foreseeable users of the substances and products of the dangers inherent with the use and disposal of PFAS and PFAS-containing commercial and consumer products and the adverse impact that the use and disposal of such substances and products may have on the environment.

114.    In particular, Defendants failed to describe the known or reasonably foreseeable hazards inherent with the use of their products or to provide any precautionary statements regarding such hazards on the labeling of their products.

115.    Defendants' failure to provide warnings or precautionary instructions regarding the reasonably foreseeable dangers to the environment posed by PFAS has rendered Defendants' products unreasonably dangerous for their intended or reasonably foreseeable purposes at the time that they left Defendants' possession.

116.    The PFAS and PFAS-containing commercial and consumer products that Defendants sold to industrial users, downstream distributors, and individual consumers in New York were used, and ultimately disposed of, in a reasonably foreseeable manner and without substantial change in the condition of such substances and products.

117.    As a direct and proximate result of Defendants' failure to provide warnings or precautionary instructions sufficient to notify foreseeable users of the inherent dangers of PFAS and PFAS-containing commercial and consumer products, PFAS were released, and continue to be released, into New York's environment, whereby such releases have directly and proximately caused widespread contamination to SUEZ's sources of drinking water.

118.    Therefore, SUEZ has suffered, is currently suffering, and will continue to suffer damages equal to the costs associated with the creation or acquisition, as well as installation and implementation, of the drinking water treatment systems necessary to comply with the New York State's MCLs, as well as additional ongoing costs for the operation and maintenance of those systems and the regular monitoring of PFAS levels in all water sources necessitated by New York's adoption of these standards.

119.    Defendants' failures to warn foreseeable users against the dangers inherent with the use and disposal of their products have directly and proximately caused indivisible harm to SUEZ, and Defendants are therefore jointly, severally, and strictly liable for all such damages incurred by SUEZ in an amount to be proved at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff SUEZ Water New York Inc. respectfully requests that this Court

(a)    enter judgment against Defendants finding them jointly and severally liable for Plaintiff's indivisible harm;

(b)    award Plaintiff monetary damages including, but not limited to, the present and future costs associated with:

(i)    the creation or acquisition, as well as installation and implementation, of the drinking water treatment systems necessary to comply with New York State's MCLs;

(ii)    the operation and maintenance of the drinking water treatment systems;

(iii)    the ongoing monitoring of PFAS levels in all of Plaintiff's water sources;

(iv)    the PFAS-related public notice requirements and related communications mandated by federal and state regulation of public water systems; and

(v)    all other costs necessitated by, associated with, or related to compliance with New York State's MCLs;

(c)    award Plaintiff its reasonable costs and attorneys' fees incurred in pursuing this action; and

(d)    award Plaintiff such other and further relief as this Court deems just and proper under the circumstances.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b)(2), Plaintiff demands a trial by jury of

all issues so triable.

Dated: New York, New York  
        December 18, 2020

By: */s/Richard P. O'Leary*

**TROUTMAN PEPPER HAMILTON SANDERS LLP**

Richard P. O'Leary, NY Bar No. 1786748  
875 Third Avenue  
New York, NY  10022  
Telephone:  212.704.6000  
richard.oleary@troutman.com

Brooks M. Smith  
(*pro hac vice* application forthcoming)  
Troutman Sanders Building  
1001 Haxall Point  
P.O. Box 1122 (23218-1122)  
Richmond, VA  23219  
Telephone:  804.697.2200  
brooks.smith@troutman.com

Lindsey B. Mann  
(*pro hac vice* application forthcoming)  
600 Peachtree Street NE, Suite 3000  
Atlanta, GA  30308-2216  
Telephone:   404.885.3000  
lindsey.mann@troutman.com

*Attorneys for Plaintiff*  
*SUEZ Water New York Inc.*