UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:__1/4/2022___
```

-------------------------------------------------------------------X
                :

SUEZ WATER NEW YORK INC.,          :

           Plaintiff,       :

                :       20-cv-10731 (LJL)

      -v-           :

                :     OPINION AND ORDER

E.I. DU PONT DE NEMOURS AND COMPANY;  :
DUPONT DE NEMOURS, INC. (f/k/a/DOWDUPONT, :
INC.); CORTEVA, INC.; and THE CHEMOURS   :
COMPANY,             :

           Defendants.     :

                :
-------------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

SUEZ Water New York Inc. ("SUEZ" or "Plaintiff") brings this action against

Defendants E.I. du Pont de Nemours and Company, Inc. ("Old DuPont"); The Chemours

Company ("Chemours"); DuPont de Nemours, Inc. (f/k/a DowDuPont, Inc.) ("New DuPont");

and Corteva, Inc. ("Corteva") (collectively, "Defendants") for various tort claims related to water

contamination.  *See* Dkt. No. 51.  Each defendant moves to dismiss SUEZ's first amended

complaint (the "Complaint" or "Compl."):  New DuPont and Corteva move to dismiss under

Federal Rule of Civil Procedure 12(b)(2), asserting that the Court lacks personal jurisdiction over

them, *see* Dkt. No. 57; Old DuPont and Chemours also move to dismiss under Rule 12(b)(2),

asserting that the Court lacks personal jurisdiction over them, *see* Dkt. No. 61; and all

Defendants move to dismiss under Rule 12(b)(6) for failure to state a claim upon which relief

can be granted, *see* Dkt. No. 53.

For the reasons stated below, Corteva's and New DuPont's motion to dismiss for lack of

personal jurisdiction is granted, Old DuPont's and Chemours' motion to dismiss for lack of

personal jurisdiction is denied, and Old DuPont's and Chemours' motion to dismiss for failure to state a claim is granted.

## BACKGROUND

For the purposes of these motions, the Court takes the well-pleaded allegations of the Complaint as true.

Per- and polyfluoroalkyl substances ("PFAS") are a class of man-made chemicals. Compl. ¶ 11.  Since the 1940s, PFAS have been used in a wide variety of industrial and commercial products, such as carpets, food packaging, cookware, and fabrics used in furniture. *Id.* ¶¶ 11–12.  They have also been used in Defendant-affiliated name-brand chemical additives, including Teflon® and Tyvek®, that other industrial manufacturers use and incorporate into their own products.  *Id.* ¶ 12.

The United States Environmental Protection Agency ("EPA") has identified widespread PFAS contamination in the environment, concluding that PFAS have likely been released into the environment in various ways.  *Id.* ¶ 15.  PFAS are persistent chemicals and often take many years to degrade, earning the moniker "forever chemicals."  *Id.* ¶¶ 18, 20.  EPA has found that PFAS can be released during the manufacture, use, and disposal of PFAS and PFAS-containing products, as well as during the biodegradation of products that contain PFAS.  *Id.* ¶ 16.

Many consumer goods that contain PFAS are disposed of as municipal solid waste, and PFAS may leach from solid waste over the long term and be released from landfills and waste treatment facilities through leachate, gas emissions, and other discharges.  *Id.* ¶ 18.  Leachate from landfills is often sent to wastewater treatment plants, where, due to ineffective conventional wastewater treatment methods, PFAS may pass through the treatment plant and end up in surface waters.  *Id.* ¶ 19.  PFAS are water-soluble, which allows them to migrate from soil into groundwater, and mobile, which allows them to spread beyond the initial locations where they

are introduced in the environment.  *Id.* ¶ 21.  Once PFAS are released into the environment, their properties make them very difficult to remove or contain.  *Id.*

People are exposed to PFAS primarily through consumer products, food, and drinking water.  *Id.* ¶ 14.

Two of the most prevalent PFAS are the chemicals perfluorooctanoic acid ("PFOA") and perfluorooctanesulfonic acid ("PFOS"), both of which have been widely used and applied in the manufacturing industry.  *Id.*  Of the chemicals that fall within the classification PFAS, PFOA is particularly water-soluble.  *Id.* ¶ 21.  Although the uses of PFOA and PFOS have been gradually phased out in recent years, both chemicals remain prevalent.  *Id.* ¶ 14.

Scientific evidence indicates that PFOA and PFOS may be hazardous to the environment, *id.* ¶¶ 22, 27, and both EPA and the New York State Department of Environmental Conservation ("DEC") have taken action to address risks that PFAS pose to the public, *id.* ¶¶ 22–24, 27–31.  In 2016, EPA issued drinking-water health advisories for PFOA and PFOS, explaining that the level of 70 parts per trillion ("ppt") of PFOA and PFOS (combined) in drinking water may pose risks to people consuming that water.  *Id.* ¶ 23.  The following year, New York State established the Drinking Water Quality Council to study the effects of "emerging contaminants," including PFOA and PFOS, on the environment and the public, *id.* ¶ 26, and DEC added PFOA and PFOS to a regulatory list of hazardous substances, *id.* ¶ 27.

In 2020, the New York State Department of Health's ("NYSDOH") Public Health and Health Planning Committee approved the adoption of Maximum Contaminant Levels ("MCLs") for PFOA and PFOS in New York State's public water systems.  *Id.* ¶ 28.  These MCL regulations took effect in August 2020, and they require all public water systems to regularly test and monitor for PFOA and PFAS.  *Id.* ¶ 30.  Water systems serving 10,000 or more people, of

which SUEZ is one, were required to begin testing and monitoring for these chemicals within sixty days of August 26, 2020. *Id.* The MCLs also require public water systems to supply drinking water that contains less than 10 ppt of either PFOS or PFOA, a level significantly below the federal advisory level. *Id.* ¶ 31 (citing N.Y. Comp. R. & Regs. tit. 10, §§ 5-1.50–.53). If the water system exceeds an MCL, as determined by multiple monitoring samples, it must take corrective action, including installing a suitable treatment process. *Id.* (citing N.Y. Comp. R. & Regs. tit. 10, § 5-1.51(a)).

Testing by the NYSDOH between 2015 and 2018 showed that 12.2% of the state's public-water systems had levels of PFOA that exceeded 10 ppt, and 8.6% had levels of PFOS that exceeded 10 ppt. *Id.* ¶ 61. In July 2020, NYSDOH estimated that around 21% of public-water systems had levels of PFOA and/or PFOS in excess of 10 ppt. *Id.* ¶ 63.

Plaintiff SUEZ is a New York corporation that owns and operates five public water systems in New York, providing water to approximately 505,000 customers across Orange, Putnam, Rockland, Tioga, and Westchester Counties. *Id.* ¶¶ 4, 64. SUEZ's water systems are comprised of wells, surface water intakes, and drinking water treatment and supply systems. *Id.* ¶ 114. Recent monitoring at SUEZ's water systems revealed that multiple of its systems contain water with concentrations of PFOA and PFOS above New York's MCL of 10 ppt. *Id.* ¶¶ 67–70. For example, in October 2020, there were concentrations of PFOA and/or PFOS exceeding 10 ppt in at least sixteen of the source-water wells or water systems in SUEZ's Rockland Water System in Rockland County, New York. *Id.* ¶ 68. As a result of this contamination, SUEZ alleges that it has incurred, and will continue to incur, significant expenses related to remedying the PFAS contamination to comply with the relevant MCLs for PFOA and PFOS and related to monitoring for PFOA and PFOS. *Id.* ¶ 72; *see also id.* ¶¶ 73–77.

Defendants are all Delaware corporations with principal places of business in Wilmington, Delaware, and all do business in the Southern District of New York. *Id.* ¶ 5–8. They are alleged to be manufacturers, sellers, licensors, and distributors of PFAS and PFAS-containing products. SUEZ alleges that Defendants have knowingly and willfully placed PFAS and products that contain PFAS into the stream of commerce. *Id.* ¶¶ 1, 5–8. According to Plaintiff, Defendants have directed their activities toward New York State, where products and solutions that contain PFAS have been used and disposed of by manufacturers, distributors, and consumers, resulting in contamination to natural resources throughout New York State. *Id.* This contamination has affected the water sources that SUEZ uses to provide drinking water to its customers throughout New York. *Id.*

Old DuPont sold, marketed, licensed, and distributed PFAS, as well as products and solutions that contain PFAS, to purchasers and licensees in New York. *Id.* ¶ 5. Chemours, initially incorporated as a subsidiary of Old DuPont and then spun off as a separate corporate entity to hold its "performance chemicals" business lines and certain of Old DuPont's environmental liabilities,[1] has sold, licensed, marketed, and distributed PFAS, as well as products and solutions that contain PFAS, to purchasers and licensees in New York. *Id.* ¶ 8. Corteva is the parent corporation of Old DuPont and, as alleged on information and belief in the Complaint, contractually assumed other of Old DuPont's environmental liabilities related to PFAS. *Id.* ¶ 7. Plaintiff alleges on information and belief that New DuPont contractually assumed certain of Old DuPont's environmental liabilities related to PFAS. *Id.* ¶ 6.

---

[1] The Complaint gives different dates for the creation of Chemours as a subsidiary of Old DuPont. *Compare* Compl. ¶ 8 ("Chemours was incorporated as a subsidiary of Old DuPont on April 30, 2015) *with id.* ¶ 79 ("In or around 2014, Old DuPont created Chemours as a wholly-owned and operated subsidiary.").

## I.     Old Dupont and Chemours

Old Dupont and Chemours are identified in the Complaint as the "Manufacturing Defendants," Compl. ¶ 36, and the Court will refer to them as such throughout this Opinion.

Plaintiff alleges that Old DuPont and Chemours sold, licensed, and distributed PFAS and PFAS-containing products and solutions, including but not limited to PFOA and PFOS, to New York-based purchasers and licensees. *Id.*  Beginning in the late 1950s, Old DuPont used PFOA as a processing aid in the manufacture of a variety of polymers. *Id.* ¶ 37.  In or around 2002, Old DuPont began to manufacture its own PFOA. *Id.* ¶ 39.  From the early 1950s until at least 2015, Old DuPont manufactured and sold PFAS, and products and solutions containing PFAS, to manufacturers, distributors, and customers in New York. *Id.* ¶ 40.  Old DuPont also sold raw PFAS, including PFOA, to industrial manufacturers in New York and within SUEZ's source watersheds for those manufacturers to use at their own manufacturing facilities. *Id.* ¶ 48.  During this same time period, Old DuPont licensed the use of its PFAS-containing name-brand chemical additives and solutions, such as Teflon®, Viton®, and Tyvek®, to industrial manufacturers for use in their own products which were then sold to customers and distributors in New York. *Id.* ¶ 41; *see also id.* ¶¶ 45–47.  In the 1960s, Old DuPont launched a "Licensed Industrial Applicator" ("LIA") program, which gave members recognition for their use in their own products of Old DuPont's chemical products and solutions, including PFAS-containing Teflon®. *Id.* ¶ 42.  Upon information and belief, members of Old DuPont's LIA program included numerous manufacturers based in New York and within SUEZ's source watersheds. *Id.* ¶ 43.

From at least 2015, at the time of its incorporation, *but see supra* note 1; Compl. ¶ 79, until the present, Chemours has continued to manufacture and sell PFAS and PFAS-containing products and solutions to manufacturers, distributors, and customers in New York.  Compl. ¶ 40. When Old DuPont spun off Chemours, it transferred its Teflon® product line to Chemours,

which continued the LIA program and continued to license Teflon®'s use to industrial

manufacturers.  *Id.* ¶ 44.  Since 2015, Chemours has also licensed the use of its PFAS-containing

name-brand chemical additives and solutions to industrial manufacturers in New York, including

those within SUEZ's source watersheds.  *Id.* ¶ 47.  Manufacturers have, in turn, incorporated

Chemours' PFAS-containing compounds into the manufacturers' own products, which they then

sold to distributors and end-use customers in New York, including entities within SUEZ's source

watersheds.  *Id.* ¶ 44.  Chemours has further sold raw PFAS, including PFOA, to industrial

manufacturers for use at their own manufacturing facilities, including to manufacturers located in

New York and within SUEZ's source watersheds.  *Id.* ¶ 48.

       Plaintiff alleges that, as a result of the sale, licensing, and distribution of PFAS and

PFAS-containing products and solutions to New York-based customers and licensees by Old

Dupont and Chemours and those customers' and licensees' foreseeable use and ultimate disposal

of PFAS and PFAS-containing products and solutions, PFAS has been released, directly and

indirectly, to various environmental media in New York, including within SUEZ's source

watersheds.  *Id.* ¶ 49.  Plaintiff identifies two means by which PFAS that originated with the

Manufacturing Defendants have resulted in the contamination of SUEZ's source watersheds.

First, the Manufacturing Defendants sold, licensed, and distributed PFAS and PFAS-containing

products and solutions to New York-based industrial manufacturers and licensees who, in turn

applied the Manufacturing Defendants' PFAS and PFAS-containing products and solutions to

their own products, directly and indirectly discharging PFAS and PFAS byproducts, resulting in

PFAS contamination in surface waters or soil and groundwater in New York.  *Id.* ¶ 50.  Plaintiff

alleges that such discharge by the industrial customers was inadvertent.  *Id.*  Plaintiff alleges that

there are several current and former industrial sites located near SUEZ's surface water intakes,

wells, and water treatment facilities across New York that are likely to have contributed to the release of PFAS from the use and disposal of the Manufacturing Defendants' products and solutions. *Id.* ¶ 51.

Second, the Manufacturing Defendants' PFAS made its way into end-products used by many New York-based end-use customers who disposed of the products containing Manufacturing Defendants' PFAS into waterways, publicly owned treatment works ("POTWs"), and landfills around New York, including within SUEZ's source watersheds. *Id.* ¶ 52. Plaintiff alleges that there are several waterways, POTWs, and landfills near SUEZ's surface water intakes, wells and water treatment facilities in New York that are likely to have contributed to the release of PFAS from the use and disposal of products that incorporate Manufacturing Defendants' products. *Id.* ¶ 53.

According to the Complaint, the Manufacturing Defendants knew, or reasonably should have known, that: (1) PFAS could harm the environment, *id.* ¶ 55; (2) purchasers, licensees, and users of their PFAS or PFAS-containing products and solutions would release, discharge, or dispose of these items in the waterways, POTWs, and landfills and that such foreseeable release, discharge, or disposal would amplify the spread of PFAS contamination into New York's environment, *id.* ¶ 56; and (3) end-use customers purchasing products that were treated with the Manufacturing Defendants' chemical products and solutions would foreseeably dispose of these products into New York's waterways, POTWs, and landfills and that this foreseeable disposal would amplify the spread of PFAS contamination into New York's environment, including within SUEZ's source watersheds, *id.* ¶ 57. Therefore, the Complaint alleges, by failing to take meaningful steps to prevent or mitigate foreseeable contamination and through their actions and the foreseeable actions of their purchasers and licensees, the Manufacturing Defendants directly

and proximately caused contamination to New York's water sources, including the water sources that make up SUEZ's New York operating units, and have inflicted an indivisible injury upon SUEZ.  *Id.* ¶¶ 55, 58–59.

## II.   Restructuring and the Formation of New DuPont and Corteva

As part of Chemours' spin-off from Old DuPont in 2015, Chemours assumed certain of Old DuPont's environmental liabilities arising out of its manufacture, use, sale, licensing, and disposal of PFAS and agreed to indemnify Old DuPont against all such liabilities.  *Id.* ¶ 80. Later in 2015, what remained of the Old DuPont (after the transfer of assets and assumption of liabilities to, and spin-off of, Chemours) merged with The Dow Chemical Company to form a new company, DowDuPont, Inc. (now known as DuPont de Nemours, Inc. and referred to in this Opinion as "New DuPont"); New DuPont is the parent company to two subsidiaries into which Old DuPont and The Dow Chemical Company each merged.  *Id.* ¶ 81.

In 2019, after a series of corporate restructurings, New DuPont incorporated Corteva to hold certain of its business lines.  *Id.* ¶ 82.  As part of the restructuring, Corteva assumed certain of the business lines of Old DuPont and acquired 100% of its outstanding common stock, while New DuPont retained other of Old DuPont's business lines.  *Id.* ¶¶ 82–83.  After the restructuring, New DuPont spun off Corteva into a separate public company.  *Id.* ¶ 82.  As part of New DuPont's restructuring, and pursuant to an April 2019 agreement among Corteva, New Dow, and New DuPont, defendants Corteva and New DuPont assumed certain direct financial liabilities of Old DuPont including, the Complaint alleges upon information and belief, the portion of Old DuPont's PFAS liabilities that was not assumed by Chemours in 2015.  *Id.* ¶ 84.[2]

---

[2] The parties strenuously dispute whether Corteva and New DuPont assumed financial liabilities of Old DuPont, *see, e.g.*, Dkt. No. 92 at 8–13, submitting agreements that were referenced in the Complaint and which Corteva and New DuPont assert do not establish that they assumed relevant financial liabilities of Old DuPont.  Because it is not necessary to the Court's decisions

New DuPont and Corteva agreed to each assume 50% of the first $300 million of Old DuPont's remaining PFAS liabilities, with New DuPont assuming 71% of Old DuPont's PFAS liability over that amount and Corteva assuming the remaining 29% of the liability. *Id.* In January 2021, Chemours, New DuPont, and Corteva announced that they entered into a binding memorandum of understanding, allocating among themselves PFAS liabilities that arose out of Old DuPont's pre-July 1, 2015, conduct. *Id.* ¶ 86. Under the agreement, the parties agreed to split certain qualified expenses, with 50% to be borne by Chemours and 50% to be borne by New DuPont and Corteva, and to create and fund an escrow account to fund post-July 1, 2015 PFAS liabilities. *Id.*

## DISCUSSION

"A court facing challenges as to both its jurisdiction over a party and the sufficiency of any claims raised must first address the jurisdictional question" and must dismiss the action against a defendant if it concludes it does not have personal jurisdiction over that defendant. *Lugones v. Pete & Gerry's Organic, LLC*, 2020 WL 871521, at *2 (S.D.N.Y. Feb. 21, 2020) (citing *Arrowsmith v. United Press Int'l*, 320 F.2d 219, 221 (2d Cir. 1963)); *see also* Fed. R. Civ. P. 12(b)(2); *TACG Management, LLC v. Lehman*, 2011 WL 3796350, at *3 (S.D.N.Y. 2011); *but see, e.g.*, *Alaska Dep't of Revenue, Treasury Div. v. Manku*, 2021 WL 3027170, at *4 (2d Cir. 2021) (summary order) (affirming dismissal of claims under Rule 12(b)(6) and explaining that the court therefore "need not reach the issue[] of personal jurisdiction"). The Court will thus begin its analysis by considering whether it has personal jurisdiction over the Defendants.

---

on the pending motions, the Court assumes, without deciding, the truth of the allegations regarding liabilities, which is made on information and belief.

I.      **Motions to Dismiss for Lack of Personal Jurisdiction**

"On a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, the plaintiff bears

the burden of showing that the court has jurisdiction over the defendant." *Metro. Life Ins. Co. v.*

*Robertson-Ceco Corp.*, 84 F.3d 560, 566 (2d Cir. 1996).  "The showing a plaintiff must make to

defeat a defendant's claim that the court lacks personal jurisdiction over it varies depending on

the procedural posture of the litigation." *Dorchester Fin. Secs., Inc. v. Banco BRJ, S.A.*, 722

F.3d 81, 84 (2d Cir. 2013) (internal quotation marks omitted).  "Prior to trial . . . when a motion

to dismiss for lack of jurisdiction is decided on the basis of affidavits and other written materials,

the plaintiff need only make a prima facie showing[]" of jurisdiction.  *MacDermid, Inc. v. Deiter*,

702 F.3d 725, 727 (2d Cir. 2012) (quoting *Seetransport Wiking Trader Schiffarhtsgesellschaft*

*MBH & Co., Kommanditgesellschaft v. Navimpex Centrala Navala*, 989 F.2d 572, 580 (2d Cir.

1993)).  Where, as here, the parties have not engaged in discovery, a plaintiff may generally

make a prima facie showing of jurisdiction "by pleading in good faith, legally sufficient

allegations of jurisdiction." *Dorchester Fin. Secs., Inc.* at 84 (quoting *Ball v. Metallurgie*

*Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990)).  In considering whether a plaintiff

has made this showing, a court "will not draw argumentative inferences in the plaintiff's favor

nor . . . accept as true a legal conclusion couched as a factual allegation." *In re Terrorist Attacks*

*on September 11, 2001*, 714 F.3d 659 (2d Cir. 2013) (internal quotation marks and citations

omitted).

Personal jurisdiction may be established over a defendant in a diversity action if: (1) "the

exercise of jurisdiction is appropriate under [the forum state's long-arm] statute"; and (2) "such

exercise comports with the requisites of due process." *Friedman v. Bloomberg L.P.*, 884 F.3d

83, 90 (2d Cir. 2017) (internal quotation marks omitted) (quoting *Whitaker v. Am. Telecasting,*

*Inc.*, 261 F.3d 196, 208 (2d Cir. 2001)); *see also* Fed. R. Civ. P. 4(k)(1)(A) ("Serving a summons

. . . establishes personal jurisdiction over a defendant [] who is subject to the jurisdiction of a court of general jurisdiction in the state where the district court is located.").[3]

Personal jurisdiction takes two forms: general jurisdiction and specific jurisdiction. *See Ford Motor Co. v. Mont. Eighth Jud. District Ct*, 141 S. Ct. 1017, 1024 (2021); *see also Chatwal Hotels & Resorts LLC v. Dollywood Co.*, 90 F. Supp. 3d 97, 103 (S.D.N.Y. 2015) ("In New York, there are two ways to establish personal jurisdiction over a defendant: (1) 'general jurisdiction' under N.Y. C.P.L.R. § 301; and (2) 'specific jurisdiction' under N.Y. C.P.L.R. § 302."). Application of New York's general-jurisdiction statute, section 301 of the Civil Practice Law and Rules ("N.Y. C.P.L.R."), is appropriate where a corporation has "continuous and systematic" business affiliations with the state. *See Aybar v. Aybar*, 37 N.Y.3d 274, 289 (2021) ("Following *Goodyear* [*Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915 (2011)] and *Daimler* [*AG v. Bauman*, 571 U.S. 117 (2014)], a court may assert general jurisdiction over foreign (sister-state or foreign-country) corporations to hear any and all claims against them when their affiliations with the state are so continuous and systematic as to render them essentially at home in the foreign state." (internal quotation marks omitted and alterations adopted) (quoting *Goodyear*, 564 U.S. at 919)); *see also id.* at 289 n.6 (explaining that New York's general-jurisdiction statute, N.Y. C.P.L.R. § 301, allows a court to "exercise such jurisdiction over persons, property, or status as might have been exercised heretofore" and noting that, before *Goodyear* and *Daimler*, a foreign corporation could be sued in New York courts under N.Y. C.P.L.R. § 301, if the corporation "has engaged in such a continuous and systematic course of doing business [in New York] that a finding of its presence in this jurisdiction is

---

[3] Defendants do not contest that service upon them was procedurally proper. *Cf. Allianz Global Investors GmbH v. Bank of Am. Corp.*, 457 F. Supp. 3d 401, 407 (S.D.N.Y. 2020) ("A prima facie showing of personal jurisdiction requires . . . procedurally proper service of process.").

warranted." (citations omitted)).  Plaintiff does not argue that the Court has general jurisdiction

over Defendants.  *See* Dkt. No. 68 at 5.

New York's long-arm statute allows a court to exercise specific jurisdiction over a non-

domiciliary when a plaintiff's cause of action arises from a non-domiciliary that:

1. transacts any business within the state or contracts anywhere to supply goods or services in the state; or
2. commits a tortious act within the state, except as to a cause of action for defamation of character arising from the act; or
3. commits a tortious act without the state causing injury to person or property within the state, except as to a cause of action for defamation of character arising from the act, if he
    (i) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or
    (ii) expects or should reasonably expect to act to have consequences in the state and derives substantial revenue from interstate or international commerce; or
4. owns, uses or possesses any real property situated within the state.

N.Y. C.P.L.R. § 302(a).

In its opposition to Defendants' motions to dismiss for lack of personal jurisdiction,

Plaintiff argues that the Court's exercise of personal jurisdiction over the Manufacturing

Defendants is appropriate under "at least" sections 302(a)(1) and 302(a)(3), Dkt. No. 68 at 5, and

that the jurisdictional contacts of Old DuPont can be imputed to Chemours, Corteva, and New

DuPont, Dkt. No. 68 at 17–18.

In order to establish jurisdiction under N.Y. C.P.L.R. § 302 (a)(1), Plaintiff must allege

that: (1) a defendant has transacted business in New York or contracted to supply goods or

services in New York, and (2) the claim asserted arises from that business transaction or

contract.  *See D&R Global Selections, S.L. v. Bodega Olegario Falcon Pineiro*, 29 N.Y.3d 292,

297 (2017).  A non-domiciliary defendant may transact business in New York without being

physically present where that defendant "projects himself or herself into this state to engage in a

sustained and substantial transaction of business." *Id.* at 298 (internal quotation marks omitted). The "primary consideration" in determining whether a non-domiciliary defendant has transacted business in New York is "the quality of the non-domiciliary' s New York contacts." *D&R Global Selections*, 29 N.Y.3d at 298.  Whether a claim arises from a business transaction is a "relatively permissive" inquiry and requires "at least one element [to] arise[] from the New York contacts." *Id.* at 299.  "[C]ausation is not required," but there must be "at a minimum, a relatedness between the transaction and the legal claim such that the latter is not completely unmoored from the former." *Licci v. Lebanese Canadian Bank, SAL*, 20 N.Y.3d 327, 339 (2012).[4]

Jurisdiction under N.Y. C.P.L.R. § 302(a)(3) may be exercised over a non-domiciliary who: (1) commits a tortious act outside of the state; (2) which causes injury within the state; and either (3) "*regularly* does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered" in New York, or (4) "expects or should reasonably expect the *act to have to have consequences* in the state and derives *substantial revenue* from *interstate* or international *commerce*." *Ingraham v. Carroll*, 90 N.Y.2d 592, 596 (1997) (quoting N.Y. C.P.L.R. § 302(a)(3)).  The limitations under this provision are intended to be more stringent than any constitutional requirement on jurisdiction. *See Ingraham*, 90 N.Y.2d at 597.

A court's exercise of personal jurisdiction over a defendant under New York law must also comport with constitutional due process; because New York's long-arm statute is not

---

[4] Plaintiff does not argue that jurisdiction is proper under the second, alternative part of N.Y. C.P.L.R. § 302(a)(1)—that Defendants "contract[ed] anywhere to supply goods or services in the state"—and the Court therefore does not consider whether Plaintiff's allegations would satisfy this part.

coextensive with the limits of the Due Process Clause, this requires a separate inquiry. *See D&R Global Selections*, 29 N.Y.3d at 299; *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 244 (2d Cir. 2007). Whether personal jurisdiction is consistent with due process is guided by a two-part analysis:

> First, courts evaluate the quality and nature of the defendant's contacts with the forum state under a totality of the circumstances test. Where the claim arises out of, or relates to, the defendant's contacts with the forum—*i.e.*, specific jurisdiction is asserted—minimum contacts necessary to support such jurisdiction exist where the defendant purposefully availed itself of the privilege of doing business in the forum and could foresee being haled into court there. Second, once minimum contacts are established, a court considers those contacts in light of other factors to determine whether the assertion of personal jurisdiction would comport with fair play and substantial justice.

*Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 82 (2d Cir. 2018); s*ee also Ford Motor Co.*, 141 S. Ct. at 1024 (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316–17 (1945)) (explaining that, to satisfy due process concerns, a defendant must have "such 'contacts with the forum State that 'the maintenance of the suit' is 'reasonable, in the context of our federal system of government,' and 'does not offend traditional notions of fair play and substantial justice.'"). A court will look to the "totality of [d]efendants' contacts with the forum state" in determining whether the exercise of jurisdiction is proper. *Chloé v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 164 (2d Cir. 2010).

### A.    Old DuPont's and Chemours' Rule 12(b)(2) Motion

The Manufacturing Defendants move to dismiss the Complaint against them, arguing that the Court's exercise of jurisdiction over them would not comport with New York's long-arm statute or due process. Because Plaintiff does not argue that the Court has general jurisdiction over the Manufacturing Defendants, *see* Dkt. No. 68 at 5, the Court will consider only the Manufacturing Defendants' arguments that it lacks specific jurisdiction over them and that exercising personal jurisdiction over them would not comport with due process.

First, the Manufacturing Defendants argue that Plaintiff has not established that they have sufficient minimum contacts with New York and that the Court therefore cannot constitutionally exercise personal jurisdiction over them.  *See* Dkt. No. 62 at 10.  The Manufacturing Defendants contend that there are no well-pleaded allegations that they "purposefully availed themselves of the New York market," asserting that there are no references to any specific transactions "that took place within New York or with an identifiable New York customer" and that Plaintiff's conclusory allegations and allegations made upon information and belief are inappropriate to establish personal jurisdiction.  *Id.* at 11.  The Manufacturing Defendants also argue that the Complaint contains "no specific factual allegations" about Chemours other than that they "continued to sell, license, and distribute PFAS and PFAS-containing products."  *Id.* at 15. Without the conclusory allegations, they continue, there is just "an attenuated chain of causation from highly generalized descriptions of generic sales practices to the release of PFAS into the environment," and they assert that more than "but-for" causation between a product's introduction to the stream of commerce and an injury to a forum resident is required. *Id.* at 13. According to the Manufacturing Defendants, because Plaintiff has not articulated any state-specific or systematic contacts that would connect the Manufacturing Defendants' business practices to New York, due process does not allow the Court to exercise personal jurisdiction over them.

Second, the Manufacturing Defendants argue that the Court's exercise of personal jurisdiction over them would not comport with New York's specific-jurisdiction statute.  They contend that Plaintiff has made no well-pleaded allegations that they "transacted business in New York within the meaning of [N.Y. C.P.L.R.] section 302(a)(1), regularly do[] or solicit[] business in New York within the meaning of section 302(a)(3)(i), or reasonably expected [their] acts to

have consequences within the State within the meaning of section 302(a)(3)(ii)." *Id.* at 21. The Manufacturing Defendants argue that because Plaintiff failed to allege how they *specifically* transacted with or targeted New York such that they "could have reasonably expected consequences" in New York, and because the Complaint offers no grounds to infer an articulable nexus or a substantial relationship between their actions and Plaintiff's claims, the Court cannot exercise specific jurisdiction over them. *Id.* at 22.

The Court concludes that Plaintiff has made the requisite prima facie showing of personal jurisdiction over them, albeit just barely. According to Plaintiff's well-pleaded allegations, the Manufacturing Defendants sold, "licens[ed], and distribut[ed] PFAS and PFAS-containing products and solutions, including . . . PFOA and PFOS, to New York-based purchasers and licensees since at least the late 1950s." Compl. ¶ 36. In particular, Plaintiff alleges that, from the early 1950s through at least 2015 for Old DuPont, and from at least 2015 to the present for Chemours, the Manufacturing Defendants "manufactured and sold raw PFAS and PFAS-containing products and solutions to industrial manufacturers, downstream distributors, and individual customers" in New York. *Id.* ¶¶ 40, 48. Plaintiff alleges that the Manufacturing Defendants' sale, licensing, and distribution of PFAS and PFAS-containing products and solutions was "continuous" "since at least the late 1950s," which the Court takes to mean that it was continuous for Old DuPont from the early 1950s through at least 2015 and for Chemours from at least 2015 to present. *Id.* ¶ 36; *see also id.* ¶ 40. And Plaintiff also alleges that Old Dupont licensed the use of PFAS-containing name-brand chemical additives and solutions to industrial manufacturers in New York, who then sold their own PFAS-containing products to end-use customers and downstream distributors in New York. *Id.* ¶¶ 41–47. These allegations of repeated direct sales into New York to New York customers, over a lengthy and continuous

period of time, taken as true for the purposes of the motions before the Court, demonstrate that

the Manufacturing Defendants "purposefully availed" themselves of "the privilege of conducting

business in New York," *D&R Global Selections*, 29 N.Y.3d at 297, thereby "transact[ing]

business" for the purposes of N.Y. C.P.L.R. § 302(a)(1).  *Cf. Licci*, 20 N.Y.3d at 339 (holding

that "a foreign bank's repeated use of a correspondent account in New York on behalf of a client

. . . show[s] purposeful availment" sufficient to meet the transacting-business prong of New

York's long-arm statute).

　　　As explained above, whether a claim arises from a defendant's transaction of business in

New York, and thus whether the second prong of the jurisdictional inquiry under N.Y. C.P.L.R.

§ 302(a)(1) is satisfied, is a "relatively permissive" inquiry.  *Id.* at 339.  Concluding that a claim

arises from the transaction for jurisdictional purposes does not require a court to find causation,

*id.*, in that there does not need to be is "a causal link between the defendant's New York business

activity and a plaintiff's injury," *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d

161, 168–69 (2d Cir. 2013).  Rather, it only requires a showing that the legal claim is not

"completely unmoored" from the business transaction.  *Id.* (quoting *Licci*, 20 N.Y.3d at 339,

341); *see also Franklin v. X Gear 101, LLC*, 2018 WL 3528731 at *7 (S.D.N.Y. July 23, 2018)

("The Second Circuit has warned district courts against narrowly construing this nexus

requirement, 'which merely requires the cause of action to "relate to" the defendant's minimum

contacts with the forum.'" (quoting *Chloé*, 616 F.3d at 167)), *report and recommendation

adopted Franklin v. X Gear 101, LLC*, 2018 WL 4103492 (S.D.N.Y. Aug. 28, 2018).  If a claim

is "arguably connected" to the business transaction that forms the basis for jurisdiction,

jurisdiction under the long-arm statute is proper, even if only "one element arises from the New

York contacts."  *Licci*, 20 N.Y.3d at 340–41; *see also Pearson Educ. v. ABC Books LLC*, 2020

WL 3547217, at *7 (S.D.N.Y. June 30, 2020) (concluding that the "arise from" prong had been

sufficiently alleged where defendant's transaction of business through interactive websites,

including to New York customers, was the same business through which he allegedly sold

counterfeit textbooks, which gave rise to copyright and trademark infringement claims, even

absent allegations that defendant sold a counterfeit book to a customer in New York).  But if

not—if it is "merely coincidental" that a defendant conducts business in New York—the

requirements of N.Y. C.P.L.R. § 302(a)(1) are not satisfied.  *Kerman v. Intercontinental Hotels

Grp. Res. LLC*, 2021 WL 930235, at *4 (E.D.N.Y. Mar. 11, 2021) (quoting *Licci*, 20 N.Y.3d at

340).

Here, there is "a relatedness between" Plaintiff's claims and the Manufacturing

Defendants' actions supplying PFAS and PFAS-containing products, including PFOA and

PFOS, to entities in New York, that makes them "not completely unmoored" from each other

and sufficient to permit personal jurisdiction.  *Licci ex rel. Licci*, 732 F.3d at 168 (quoting *Licci*,

20 N.Y.3d at 339); *see also In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liability Litig.*,

2005 WL 1529594 (S.D.N.Y. June 28, 2005) ("Plaintiffs' causes of action arise from or relate to

[defendant's] sales of MTBE because plaintiffs' claim that their property and drinking water

wells are contaminated with MTBE.").  Plaintiff's claim is, in part, that its water systems were

contaminated with PFOA and PFOS that the Manufacturing Defendants sold directly to

industrial manufacturers in New York who caused PFAS to leak into their water systems.

Plaintiff thus alleges that the Manufacturing Defendants' conduct—sale, licensing, and

distribution—in New York State gave rise to their claim.  *See, e.g.*, Compl. ¶¶ 49, 50, 88, 97–98,

101, 106–109, 115, 118, 126–127, 132, 136, 138, 143 (alleging, *inter alia*, that the sale,

licensing, and distribution of PFAS and PFAS-containing products to the Manufacturing

Defendants' customers and licensees in New York has resulted in the release of PFAS to New York's environment, including within Plaintiff's source watersheds, and describing the mechanisms of that contamination).  The claim of contamination is at least "arguably connected" to the Manufacturing Defendants' activities—which are alleged to give rise to that contamination—in New York.  *Licci*, 20 N.Y.3d at 340.  That Plaintiff has not sufficiently pleaded that the Manufacturing Defendants' activities were a substantial factor in their injuries, *see infra* Section II.A, does not mean that they have not met the more permissive standard of pleading an "articulable nexus" between their claims and the Manufacturing Defendants' New York-based activities.

The Manufacturing Defendants try to avoid this result by calling Plaintiff's allegations as to their actions in New York "conclusory" and not specific enough to support jurisdiction or establish that they purposefully availed themselves of the New York market.  *See* Dkt. No. 62 at 11–14.  It is true that "[m]ere conclusory allegations are not enough to establish jurisdiction." *See HSM Holdings, LLC v. Mantu I.M. Mobile Ltd.*, 2021 WL 918556, at *10 (S.D.N.Y. 2021) (citing *Gmurzynska v. Hutton*, 257 F. Supp. 2d 621, 625 (S.D.N.Y. 2003), *aff'd*, 355 F.3d 206 (2d Cir. 2004)).  But Plaintiff's allegations regarding the Manufacturing Defendants' actions in New York are not "legal conclusion[s] couched as . . . factual allegation[s]," *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal quotation marks omitted), or "threadbare recitals of a cause of action's elements, supported by mere conclusory statements," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Plaintiff does not simply allege that the Manufacturing Defendants "availed" themselves of the New York market or even that they just sold products to New York customers, but rather, they offer factual content regarding the length of time of the sales and that it was continuous, as well as the type of customers to whom the Manufacturing Defendants sold

20

their products.  Plaintiff alleges that the Manufacturing Defendants "continuous[ly] s[old],

license[d], and distribut[ed] PFAS and PFAS-containing products and solutions, including

without limitation PFOA and PFOS, to New York-based purchasers and licensees since at least

the late 1950s," Compl. ¶ 36, and specifically that they: sold PFAS and PFAS-containing

products "to industrial manufacturers, downstream distributors, and individual customers" in

New York, *id.* ¶ 40; licensed the use of PFAS-containing compounds to industrial manufacturers

in New York, who then sold products containing these compounds to other customers and

distributors in New York, *id.* ¶¶ 40, 44; *see also id.* ¶¶ 45–47; and that "continuously sold raw

PFAS" to "industrial manufacturers for use at [those manufacturers'] own manufacturing

facility," *id.* ¶ 48.  It also is alleged that PFOA and PFOS, though gradually phased out, are two

of the most prevalent PFAS.  *Id.* ¶ 14.  Putting the allegations together, they are well-pleaded, in

that they contain a factual basis for jurisdiction, and suggest that the Manufacturing Defendants

themselves took advantage of New York's market by transacting business continuously and with

multiple customers there.[5]  *See* Dkt. No. 62 at 11 (citing *Walden v. Fiore*, 571 U.S. 277, 285

(2014)); *see also Walden*, 571 U.S. at 285 ("[W]e have upheld the assertion of jurisdiction over

defendants who have purposefully reached out beyond their State and into another by, for

---

[5] The Manufacturing Defendants also take issue with Plaintiff's failure to "point to a single
discrete transaction that took place within New York or with an identifiable New York
customer" or "point to a time, place, or the parties to any specific sale or licensure agreement."
Dkt. No. 62 at 12.  The Manufacturing Defendants cite no law for the requirement that such
specifics are required at this stage of the litigation.  *See Arista Records, LLC v. Doe 3*, 604 F.3d
110, 120 (2d Cir. 2010) (stating that, at the motion-to-dismiss stage, a plaintiff is not required to
plead "specific evidence or extra facts beyond what is needed to make the claim plausible");
*Dorchester Fin. Securities, Inc.*, 722 F.3d at 84–85 ("Prior to discovery, a plaintiff challenged by
a jurisdiction testing motion may defeat the motion by pleading in good faith, legally sufficient
allegations of jurisdiction.  At that preliminary stage, the plaintiff's *prima facie* showing may be
established solely by allegations.  After discovery, the plaintiff's *prima facie* showing, necessary
to defeat a jurisdiction testing motion, must include an averment of facts that, if credited by the
trier, would suffice to establish jurisdiction over the defendant.").

example, entering a contractual relationship that envisioned continuing and wide-reaching contacts in the forum State or by circulating magazines to deliberately exploit a market in the forum State." (internal quotation marks and citations omitted and alterations adopted)).[6]

Because the Court holds that the elements of N.Y. C.P.L.R. § 302(a)(1) are met here, it need not consider whether there is personal jurisdiction under section 302(a)(3). *See, e.g.*, *Spin Master Ltd. v. 158*, 463 F. Supp. 3d 348 (S.D.N.Y. 2020) (declining to analyze whether personal jurisdiction under N.Y. C.P.L.R. § 302(a)(3) is appropriate for defendants that properly pleaded personal jurisdiction pursuant to section 302(a)(1)).

The question of whether personal jurisdiction may be exercised in accordance with due process is related to the question of whether the elements of section 302(a)(1) of New York's long-arm statute have been met. *See* Dkt. No. 62 at 10–11 n.3; Dkt. No. 68 at 13 n.4; *Best Van Lines, Inc.*, 490 F.3d at 247 ("It may be that the meaning of transacting business for the purposes of section 302(a)(1) overlaps significantly with the constitutional minimum contacts doctrine" (internal quotation marks omitted)).  However, because New York's specific-jurisdiction long-arm statute is not coextensive with due process, the Court will consider separately whether it can constitutionally exercise personal jurisdiction over the Manufacturing Defendants.  *Cf. D&R Global Selections*, 29 N.Y.3d at 299–300 (explaining that, while "CPLR [§] 302 and due process

---

[6] The Court's determination that the above-cited allegations are sufficient at this stage of the proceedings for it to exercise personal jurisdiction over Old Dupont and Chemours should not be read to suggest that Plaintiff's allegations on information and belief do not also support the finding of personal jurisdiction.  The Second Circuit has made clear that a plaintiff may "plead[] facts alleged upon information and belief where the facts are peculiarly within the possession and control of the defendant or where the belief is based on factual information that makes the inference of culpability plausible."  *Arista Records, LLC*, 604 F.3d at 120.  Where, as here, the relevant allegations made upon information and belief contain facts that are within the control of the Manufacturing Defendants, such as the membership of Old DuPont's LIA program, Compl. ¶ 43, Plaintiff's allegations are not deficient by nature of their being made on information and belief.

are not coextensive . . . [and] personal jurisdiction permitted under the long-arm statute may

theoretically be prohibited under due process analysis, [the New York Court of Appeals] would

expect such cases to be rare" (internal quotation marks omitted)).

For many of the same reasons that Plaintiff's allegations are sufficient, at this stage of the

proceedings, to demonstrate that the Manufacturing Defendants "transacted business" in New

York, they also show that the Manufacturing Defendants have the requisite "minimum contacts"

with New York.  "The inquiry whether a forum State may assert specific jurisdiction over a

nonresident defendant focuses on the relationship among the defendant, the forum, and the

litigation" and requires that the relationship "arise out of contacts that the defendant *himself*

creates with the forum state."  *Walden*, 571 U.S. at 284 (internal quotation marks omitted); *see*

*Ford Motor Co.*, 141 S. Ct. at 1026 (stating that "requirement of a connection between a

plaintiff's suit and a defendant's activities" does not require "a strict causal relationship between

the defendant's in-state activity and the litigation" (internal quotation marks omitted)).  Where a

global company "serves a market for a product in a State and that product causes injury in the

State to one of its residents, the State's courts may entertain the resulting suit."  *Ford Motor Co.*,

141 S. Ct. at 1022.

According to the Complaint's well-pleaded allegations, the Manufacturing Defendants

manufactured and sold, licensed, and distributed PFAS and PFAS-containing products, including

PFOA and PFOS, to customers and licensees in New York.  *See* Compl. ¶ 36.  The conduct was

not just episodic or random but continuous and deliberate.  Through these actions—which the

Manufacturing Defendants themselves created and from which, as described above, Plaintiff's

claims arise—Old DuPont and Chemours "purposefully availed" themselves of the privilege of

doing business in New York and "could foresee being haled into court []here."  *Bank Brussels*

*Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 127 (2d Cir. 2002) (internal quotation

marks omitted) ("Where the claim arises out of, or relates to, the defendant's contacts with the

forum—i.e., specific jurisdiction—minimum contacts exists where the defendant purposefully

availed itself of the privilege of doing business in the forum and could foresee being haled into

court there." (internal quotation marks omitted)); *see also D&R Global Selections*, 29 N.Y.3d at

300 ("[D]efendant availed itself of the privilege of doing business in New York by taking

purposeful action, motivated by the entirely understandable wish to sell its products here.

Having done so, defendant could reasonably foresee having to defend a lawsuit in New York."

(internal quotation marks omitted)).  The Manufacturing Defendants' alleged conduct here in

selling, licensing, and distributing products to New York purchasers and licensees does not

constitute "the kind of 'random, fortuitous, or attenuated contacts' or 'unilateral activity of

another party' or a third person that the purposeful availment requirement is designed to

eliminate as a basis for jurisdiction." *Bank Brussels Lambert*, 305 F.3d at 128 (quoting *Burger

King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)); *cf. Walden*, 571 U.S. at 285 (explaining

that the assertion of jurisdiction is proper where a defendant circulated goods to "deliberately

exploit a market in the forum [s]tate" and that physical entry into the state through foods is a

relevant contact for the minimum contacts analysis (internal quotation marks omitted)).

Plaintiff's allegations establish that the Manufacturing Defendants have "minimum contacts"

with New York.[7]

---

[7] The Court does not find persuasive the Manufacturing Defendants' citation to *Golden State
Water Co. v. 3M*, 2021 WL 221787 (C.D. Cal. 2021).  Dkt. No. 62 at 16.  In that case, the court
concluded that the plaintiffs failed to plead facts sufficient to establish that a court in California
had personal jurisdiction over the defendants where the "most direct allegation concerning
[d]efendants' contacts with California" alleged what the defendants in that case knew or foresaw,
or should have known or foreseen, that certain actions "including in California" would result in
contamination of the plaintiffs' source groundwater.  *Golden State Water*, 2021 WL 221787, at

"Where a plaintiff makes the threshold showing of the minimum contacts required [for personal jurisdiction], a defendant must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Bank Brussels Lambert*, 305 F.3d at 129 (internal quotation marks omitted) (quoting *Metro. Life Ins. Co.*, 84 F.3d at 568)).  Five considerations guide the reasonableness inquiry: (1) "the burden on the defendant"; (2) "the forum State's interest in adjudicating the dispute"; (3) "the plaintiff's interest in obtaining convenient and effective relief"; (4) "the interstate judicial system's interest in obtaining the most efficient resolution of controversies"; and (5) "the shared interest of the several States in furthering fundamental substantive social policies." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 292 (1980); *see also Bank Brussels Lambert*, 305 F.3d at 129 (same).  The Manufacturing Defendants have not argued that it would be unreasonable to exercise jurisdiction over them, contending instead that minimum contacts do not exist; they have therefore not presented a "compelling case" that would render the Court's exercise of jurisdiction inappropriate.  Nor does the Court independently see any reason that the burden on the Manufacturing Defendants in litigating a case based in New York would outweigh the interest of New York and SUEZ water in adjudicating this New York-based dispute in New York or otherwise offend "traditional notions of fair play and substantial justice." *Int'l Shoe Co.*, 326 U.S. at 316 (internal quotation marks omitted).

**B.     New DuPont's and Corteva's Rule 12(b)(2) Motion**

Corteva and New DuPont move to dismiss the Complaint against them, arguing that they are not subject to either general or specific jurisdiction in New York and that the Manufacturing

---

*1.  Here, unlike in *Golden State Water*, Plaintiff has alleged specific facts about the Manufacturing Defendants' forum-related conduct. *Cf. id.* at *3 ("Plaintiff has alleged no facts whatsoever about Defendants' forum-related conduct.").

Defendants' jurisdictional contacts cannot be imputed to Corteva and New DuPont.  Plaintiff

contends that the Court may exercise personal jurisdiction over Chemours, Corteva, and New

DuPont "because they contractually assumed Old DuPont's PFAS liabilities and Old DuPont's

contacts with New York are therefore imputed to them."  Dkt. No. 68 at 15.  Because the Court

has determined that Plaintiff has made a prima facie showing of jurisdiction over Chemours, it

need not consider whether Plaintiff has adequately pleaded a "successor-jurisdiction" theory as

to Chemours.

      Corteva and New DuPont assert that Plaintiff's allegations are insufficient to conclude,

even at this stage of the proceedings, that they have assumed any of the relevant environmental

liabilities.  Dkt. No. 58 at 6–7; Dkt. No. 71 at 2–3.  In response, Plaintiff argues that its

allegations are not only sufficient but also supported by the language of DowDuPont's separation

agreement.  Dkt. No. 68 at 19–20; Dkt. No. 68-3.  Whether Corteva and New DuPont assumed

PFAS liabilities from Old DuPont is relevant for the jurisdictional analysis only if that

assumption would result in successor jurisdiction, imputed from Old DuPont to Corteva and New

DuPont.

      "A successor-in-interest may be subject to jurisdiction based on the activities of its

predecessor, but only under certain conditions."  *Linzer v. EMI Blackwood Music, Inc.*, 904 F.

Supp. 207, 213 (S.D.N.Y. 1995) (internal quotation marks omitted).  One such condition is

where a successor's status is based on a merger—in that circumstance, "the merged entity is

subject to jurisdiction wherever its merger partner's actions would have made the merger partner

subject in a suit based on the merger partner's liability."  *U.S. Bank Nat'l Ass'n v. Bank of Am.

N.A.*, 916 F.3d 143, 156 (2d Cir. 2019); *see also Abbacor, Inc. v. Miller*, 2001 WL 1006051, at

*4 (S.D.N.Y. Aug. 31, 2001) ("New York Courts have frequently held that the pre-incorporation

acts of a predecessor corporation can be attributed to a successor corporation for the purpose of establishing long arm jurisdiction where the predecessor and the successor are one and the same." (internal quotation marks omitted)).  Plaintiff asserts that "successor jurisdiction inheres not only by a merger, but also by 'a scheme to avoid jurisdiction,' and by 'an assumption of the predecessor's liabilities,'" Dkt. No. 68 at 16 (quoting *Schenin v. Micro Copper Corp.*, 272 F. Supp. 523, 526 (S.D.N.Y. 1967)).

Plaintiff's argument misstates the law.  Multiple courts in this District have held that, under New York law, successor jurisdiction is appropriate only where a predecessor and successor remain one and the same after some corporate-restructuring event (i.e., a merger or its equivalent).  *See, e.g.*, *Linzer*, 904 F. Supp. at 213 ("A successor-in interest may be subject to jurisdiction based on the activities of its predecessor, but only under certain conditions.  Those conditions are that the predecessor and successor be one and the same and that the predecessor continue to exist as part of the successor." (internal quotation marks and citations omitted)); *Viacom Intern., Inc. v. Melvin Simon Prods., Inc.*, 774 F. Supp. 858 (S.D.N.Y. 1991) ("The limited circumstances where 'attribution' [of jurisdictional acts] is appropriate set forth in *Schenin* and *Fehl* [*v. S.W.C. Corp.*, 433 F. Supp. 939, 947 (D. Del. 1977)] is where the two parties have merged.  In that circumstance, there is in reality no attribution of acts, because the 'predecessor' and the 'successor' are one and the same; the 'predecessor' continues to exist as part of the 'successor.'").  Plaintiff cites a single in-Circuit case, *Schenin v. Micro Copper Corp.*, for the proposition that successor jurisdiction attaches when one corporation assumes another's liabilities.  In *Schenin*, however, the court declined to exercise personal jurisdiction on a successor-corporation theory where there was no merger between the alleged predecessor and successor but merely an acquisition of assets.  272 F. Supp. at 526; *see also U.S. Bank Nat'l*

*Ass'n*, 916 F.3d at 156 ("The fair inference of [New York] precedents is that, while successor liability based on acquisition of a predecessor's assets does not necessarily make the defendant also amenable to jurisdiction where the predecessor's actions would have made the predecessor subject to specific jurisdiction, the rule is different where the successor liability of the defendant derives from a merger with the predecessor."). The *Schenin* court went on to explain that, because there was no merger between the corporations:

> any claim against [the purchaser of assets] on an alleged obligation of [the seller of assets] must rest on an assumption of [the seller's] liabilities by [the purchaser]. Whether or not plaintiff could sue [the purchaser] directly . . . would depend on the applicable law, *but he could sue [the purchaser] only where it could be found*. Plaintiff's novel approach to the jurisdictional issue rests, in effect, on an untenable theory of involuntary, retroactive attribution.

*Schenin*, 272 F. Supp. at 526 (emphasis added). The Court does not read this language to mean that an entity's assumption of another company's liabilities is sufficient to impute that company's jurisdictional contacts to the assuming entity, but rather that a plaintiff could sue the assuming entity on claims arising from the assumed liabilities only where that entity would otherwise be subject to personal jurisdiction. Far from endorsing successor jurisdiction in a circumstance where the entity assumed the relevant liabilities, *Schenin* simply reaffirms that successor liability may be available as to tort claims so long as jurisdiction is independently found.

The Second Circuit recently articulated the rationale for imputing jurisdiction from a predecessor to a successor after a merger: After a merger, "each of the merger partners is deemed to survive in the merged entity, and the surviving entity is therefore liable for the liabilities of the corporations that joined in the merger." *U.S. Bank Nat'l Ass'n*, 916 F.3d at 155. Following *U.S. Bank*, other courts in this Circuit have declined to recognize successor jurisdiction even where the alleged successor corporation assumed all of a corporation's

liabilities through a purchase of assets and liabilities.  *See, e.g.*, *Lelchook v. Société Générale de Banque au Liban Sal*, 2021 WL 4931845, at \*2–3 (E.D.N.Y. Mar. 31, 2021), *appeal filed*, *Lelchook v. Société Générale de Banque au* (2d Cir. Apr. 20, 2021); *Bartlett v. Société Générale de Banque au Liban SAL*, 2020 WL 7089448, at \*16–17 (E.D.N.Y. Nov. 25, 2020).  In *Bartlett*, the court explained that liability transfer is only one aspect of a merger, and that the "essence of a merger" is "continuity of ownership"—a point that the Second Circuit in *U.S. Bank* repeatedly referenced in explaining why a successor would incur a predecessor's jurisdictional status following a merger.  2020 WL 7089448, at \*16–17 (internal quotation marks omitted); *see also U.S. Bank Nat'l Ass'n*, 916 F.3d at 156.  Since the transaction at issue in *Bartlett* was an acquisition of assets and liabilities, not a merger or its equivalent, and there was no continuity of ownership, the successor did not inherit its predecessor's jurisdictional status.

The Court is persuaded by the analysis of the *Bartlett* court and agrees that declining to exercise jurisdiction over Corteva and New DuPont under a successor-jurisdiction theory is consistent with the Second Circuit's analysis in *U.S. Bank*.  *See Bartlett*, 2020 WL 7089448, at \*16–17.  Plaintiff does not allege that Corteva or New DuPont are "mere continuation[s]" of Old DuPont.  *Id.* at \*17.  According to the Complaint, Old DuPont survives to this date, albeit as a subsidiary of Corteva.  Indeed, Old DuPont is involved in this very litigation as an entity separate and apart from Corteva, New DuPont, and Chemours.  Because there is no "continuity of ownership" between Old DuPont and Corteva or New Dupont, the rationales for successor jurisdiction set forth in *U.S. Bank*—preventing corporations from avoiding jurisdiction in an unwanted forum by arranging a convenient merger and aligning jurisdiction doctrine with the legal realities of corporations resulting from a merger—do not apply.

Because the limited circumstances where it is appropriate to recognize successor jurisdiction are not present in this case, the Court concludes that Corteva and New DuPont did not inherit Old DuPont's jurisdictional status.  As Plaintiff offers no alternative basis for the Court to exercise personal jurisdiction over Corteva and New DuPont, the Court will grant their motion to dismiss for lack of personal jurisdiction.

## II.    Motion to Dismiss for Failure to State a Claim

Because the Court has sustained Plaintiff's claim of personal jurisdiction as to the Manufacturing Defendants, it must turn to the motion to dismiss for failure to state a claim for relief.

Defendants move, pursuant to Rule 12(b)(6), to dismiss Plaintiff's Complaint for failure to state a claim upon which relief can be granted.  To survive a Rule 12(b)(6) motion to dismiss, a complaint must include "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* at 678.  This "does not impose a probability requirement at the pleading stage" but rather "calls for enough fact to raise a reasonable expectation that discovery will reveal evidence [supporting the claim]."  *Twombly*, 550 U.S. at 556.  A complaint need not allege "detailed factual allegations," but "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Id.* at 555.  "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.  *Iqbal*, 556 U.S. at 679.  "[A]t the outset of a lawsuit," a plaintiff ordinarily must plead "what the plaintiff must prove in the trial at its end."  *Lively v. WAFRA Inv. Advisory Grp.,*

*Inc.*, 6 F.4th 293, 303 (2d Cir. 2021) (quoting *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 140 S. Ct. 1009, 1014 (2020)).

For completeness, the Court examines Plaintiff's allegations of causation, and it then examines each of Plaintiff's separate causes of action.  The Complaint fails to state a claim for relief for numerous reasons.

### A.     Causation

In their motion to dismiss, Defendants contend that, through Plaintiff's "threadbare allegations," Plaintiff has not adequately pleaded causation, which is "fundamental to each claim that Plaintiff asserts."  Dkt. No. 64 at 4; *see, e.g.*, *Voss v. Black & Decker Mfg. Co.*, 59 N.Y.2d 102, 107 (1983) ("In order to establish a prima facie case in strict products liability for design defects, the plaintiff must show . . . that the defective design was a substantial factor in causing plaintiff's injury.");  *Billsborrow v. Dow Chemical, U.S.A.*,177 A.D.2d 7, 16 (2d Dep't 1992) ("For there to be recovery for damages stemming from a product defective because of the inadequacy or absence of warnings, the failure to warn must have been a substantial cause of the events which produced the injury."); *Copart Indus., Inc. v. Consolidated Edison Co.*, 41 N.Y.2d 564, 569 (1977) (explaining that "one is subject to liability for a private nuisance if his conduct is a legal cause of the invasion of the interest" and other factors are met); *Hamilton v. Beretta U.S.A. Corp.*, 96 N.Y.2d 222, 240 (2001) (describing as "the general rule that in common-law negligence actions, a plaintiff must prove that the defendant's conduct was a cause-in-fact of the injury"); *Phillips v. Sun Oil Co.*, 307 N.Y. 328, 331 (1954) (noting, for a trespass claim to lie, "the intrusion must be at least the immediate or inevitable consequence" of a defendant's action).[8]

---

[8] Plaintiff does not dispute that the identical causation inquiry applies to each of its causes of action and that the test requires it to show that Defendant's actions were a substantial factor in

In New York, "an act or omission is regarded as a legal cause of an injury 'if it was a substantial factor in bringing about the injury.'" *In re Methyl Tertiary Butyl Ether (MTBE) Prod. Liab. Litig.*, 725 F.3d 65, 116 (2d Cir. 2013) (quoting *Schneider v. Diallo*, 14 A.D.3d 445 (1st Dep't 2005)).  "The test recognizes that often many acts can be said to have caused a particular injury, and requires only that defendant's actions be a substantial factor in producing the injury." *Locust Valley Water Dist. v. Dow Chem. Co.*, 465 F. Supp. 3d 235, 240 (E.D.N.Y. 2020) (internal quotation marks omitted).  For the purposes of this standard, "'substantial' means that the act or omission 'had such an effect in producing the injury that reasonable people would regard it as a cause of the injury.'" *In re MTBE*, 725 F.3d at 116 (quoting *Rojas v. City of New York*, 208 A.D.2d 416, 420 (1st Dep't 1994) (Carro, J., dissenting)).  An "act or omission may be considered a substantial factor in causing an injury even if a jury assigns a relatively small percentage of fault to it, so long as the alleged cause is not slight or trivial." *N.Y. Am. Water Co., Inc. v. Dow Chem. Co.*, 2020 WL 9427226, at *5 (E.D.N.Y. Dec. 11, 2020) (internal quotation marks and alterations omitted).  "The plaintiff must also allege facts indicating 'that it is reasonably probable, not merely possible or evenly balanced, that the defendant was the source of the offending product,'" which can mean just one source of multiple sources.  *Andrick v. Saint-Gobain Performance Plastics Corp.*, 2018 WL 3068056, at *9 (N.D.N.Y. June 21, 2018) (quoting *Healy v. Firestone Tire & Rubber Co.*, 87 N.Y.2d 596 (1996)).

Defendants view Plaintiff's pleading as it relates to causation as deficient in two regards. First, Defendants point out that Plaintiff has not alleged that Defendants themselves manufactured, produced, or discharged PFAS-containing materials *in* New York or the

---

causing its injury.  Accordingly, there is no occasion for the Court to explore whether any different test should apply to one or more of the causes of action.

watersheds from which SUEZ draws its water supply.  Dkt. No. 64 at 6.  Second, Defendants argue that Plaintiff pleads only in generalizations that Defendants caused the release of PFAS and does not specify: which PFAS-containing products Defendants placed in the stream of commerce; who of the licensees, manufacturers, distributors, or users disposed of Defendants' PFAS-containing materials; or how, where, when, and to what extent the contamination for which Defendants are allegedly responsible occurred.  *See id.* at 5–8.  Therefore, according to Defendants, "Plaintiff's theory of causation remains wholly speculative," and "Plaintiff has not adequately pleaded a causal link between its purported injuries and the purported conduct of each of the Defendants" sufficient to support tort liability under New York law.  *Id.* at 9.

The seminal case from the Second Circuit regarding groundwater contamination is *In re MTBE*.  725 F.3d 65.  In *In re MTBE*, the Second Circuit held there was sufficient evidence to support the jury's finding that Exxon was a cause of contamination, and therefore injury, to a set of well clusters located in Jamaica, Queens due to its role "as a manufacturer, refiner, or seller of" gasoline containing the additive methyl tertiary butyl ether ("MTBE"), a toxic chemical, which was delivered to and placed in underground storage tanks near to the well.  *Id.*  MTBE is highly soluble in ground water, is highly prone to spreading widely from a spill point, and was placed in tanks that leaked regularly.  *Id.* at 82.  In upholding the jury verdict, the court noted there was evidence: that Exxon sold its MTBE-containing gasoline directly to customers in Queens or delivered it to underground storage tanks Exxon itself owned in Queens; that approximately 25% of the gasoline sold in Queens in the relevant time period was sold by Exxon; and that there was evidence of regular leaks from the underground storage tanks (including those owned by Exxon) into the groundwater.  *Id.* at 116.

In the wake of the MTBE litigation, the courts in the Eastern District of New York have sustained claims of groundwater contamination against causation challenges when those claims have been brought against manufacturers who either operated facilities within the plaintiff's water district or who sold contaminants to customers who operated proximately to the contaminated water. Although in those cases the courts used broad language that causation "is generally a question for the finder of fact," *Locust Valley Water Dist.*, 465 F. Supp. 3d at 240 (quoting *Hicksville Water Dist. v. Philips Elecs. N.A. Corp.*, 2018 WL 1542670 (E.D.N.Y. March 29, 2018)), the facts upon which the courts based the conclusion that causation was adequately alleged were more extensive and robust than those alleged here. In *Hicksville Water District*, for example, the court declined to dismiss the complaint for lack of causation where the plaintiff alleged that defendants either (1) operated a manufacturing site within plaintiff's water district and used a toxic chemical that could migrate rapidly into groundwater and was found in the water district's water supply, or (2) owned that site after manufacture had ceased but failed to remediate it. 2018 WL 1542670 at *1–2. Likewise, in *Suffolk County Water v. Dow Chemical Company*, 17-cv-6980 (E.D.N.Y. 2017) ("SCWA"), then-District Judge Bianco concluded that the plaintiff, a water district in Suffolk County, New York, had adequately pled that the defendants' conduct in manufacturing, marketing, and promoting a chemical product was a substantial factor in contaminating the plaintiff's wells when plaintiff alleged that the defendants marketed, sold, and distributed the product "to customers in Suffolk County"; "[t]hat the defendants are the primary producers of the contaminant and hold dominant shares of the markets"; and "that the defendants advised users to dispose of the [chemical] waste to the environment." *See* SCWA Transcript, Dkt. No. 67-2 at 6–7. In *Locust Valley Water District*, the court considered "nearly identical allegations regarding causation as . . . in the SCWA case" and,

like Judge Bianco did, rejected the defendants' argument that substantial-factor causation had not been adequately pleaded "for substantially the same reasons as Judge Bianco found." 465 F. Supp. 3d at 240–41. Additional allegations that the contaminant was fungible, and thus the exact manufacturer of the contaminant in the plaintiffs' wells could likely not be established using only physical analysis, did not alter the court's conclusion that dismissal was not warranted. *Id.* at 241. In *New York American Water Company Inc. v. Dow Chemical Company*, the court declined to dismiss contamination claims brought by the owner and operator of public supply well systems in certain counties in New York who alleged that their systems had been contaminated by the synthetic industrial and highly toxic chemical, 1,4-dioxane ("dioxane"). 2020 WL 9427226 (E.D.N.Y. Dec. 11, 2020). In *New York American Water*, plaintiffs brought claims against the two primary manufacturers of dioxane in the United States as well as a licensor of technology from one of those manufacturers, alleging that "defendants handled, discharged, and were otherwise responsible for the release of dioxane in the vicinity of plaintiffs' wells." *Id.* at *3; *see also id.* at *5 (noting allegation that defendants "handled, discharged and were otherwise responsible for release of dioxane into the environment near plaintiffs' supply well sources"). The fact that plaintiff was not able at the pleading stage to pinpoint the contamination of dioxane from any one specific defendant and that there might exist other unnamed non-party manufacturers who also contributed to the contamination did not require the complaint to be dismissed for lack of causation where the relevant question was whether each defendant's conduct was a substantial factor in plaintiff's injury. *Id.* at *5.

Federal Rule of Civil Procedure 8(a)(2) only requires a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). It does not "require detailed factual allegations." *Iqbal*, 556 U.S. at 678 (internal quotation marks omitted), and, as

already noted, a plaintiff is not required to plead "specific evidence or extra facts beyond what is needed to make the claim plausible." *Arista Records, LLC*, 604 F.3d at 120. Dismissal is not justified because certain things are unknown at the motion-to-dismiss stage, such as "[w]hether plaintiffs ultimately will be able to prove that [fungible contaminants from] defendants' products are in their wells," *Locust Valley Water Dist.*, 465 F. Supp. 3d at 241; *see also In re MTBE*, 725 F.3d at 116–17 (affirming jury finding of substantial-factor causation despite plaintiff not tracing individual chemical particles back to defendant), or whether "any mishandling or improper disposal of the products by end users is sufficient to overcome or to defeat the allegations of causation," SCWA Transcript, Dkt. No. 67-2 at 7.

Though detailed factual allegations are not required to survive a motion to dismiss, the allegations still must be sufficient to make a Plaintiff's claim plausible. The allegations in the Complaint as to causation do not meet this threshold. Plaintiff does not allege facts, based on either the chemicals the Manufacturing Defendants sold, their market share of the polluting chemicals, or the location to which Manufacturing Defendants sold and delivered the chemicals, that would establish that the conduct of the Manufacturing Defendants was a substantial factor in the alleged injury.

As a preliminary matter Plaintiff's injury is alleged to have resulted from the presence of only two types of PFAS, PFOA and PFOS, in its water systems. Those are the only chemicals within the PFAS classification that currently have MCLs with which SUEZ must comply. *See* Compl. ¶¶ 30–31, 65–72. But Plaintiff's allegations that the Manufacturing Defendants sold PFOA to New York-based customers and licensees are both general and sparse. Most of the allegations relate to PFAS as a class and not to the specific chemicals that are alleged to have caused SUEZ harm. According to the Complaint: The Manufacturing Defendants—the only

defendants against whom claims remain given the Court's ruling on the 12(b)(2) motions—
"continuous[ly] [sold], license[d], and distribut[ed] PFAS and PFAS-containing products and
solutions, including without limitation PFOA and PFOS, to New York-based purchasers and
licensees since at least the late 1950s," *id.* ¶ 36; Old DuPont used PFOA, including PFOA that it
produced at its own facilities (presumably outside of New York), to manufacture products and
solutions, *id.* ¶¶ 37, 39; and the Manufacturing Defendants sold raw PFOA to industrial
manufacturers in New York State and "within SUEZ's source watersheds," *id.* ¶ 48. Plaintiff
does not allege facts about the Manufacturing Defendants' use or sale of PFOS, merely alleging
*that* they sold, licensed, and distributed PFAS and products and solutions containing PFAS,
"including without limitation PFOA and PFOS," *id.* ¶ 36, and that these actions have "caused the
release of PFAS" into the environmental media of New York and "proximately caused the
contamination of SUEZ's water sources," *id.* ¶ 71; *see also id.* ¶¶ 109, 127.

Notably, almost all the allegations most closely associated with the complained-of
contamination reference third-party actions with respect to PFAS generally—not with respect to
PFOA or PFOS. For example, the Manufacturing Defendants are alleged to have licensed the
use of their chemical additives and solutions to New York-based industrial manufacturers, "who
incorporated the *PFAS-containing compounds* into their own products and then sold such
products to end-use customers and other downstream distributors in New York." *Id.* ¶¶ 41, 44
(emphasis added). While Plaintiff alleges that the Manufacturing Defendants "continuously sold
raw PFAS, including PFOA, to other industrial manufacturers for use at their own manufacturing
facilities, including numerous industrial manufacturers in New York State and within SUEZ's
source watersheds," *id.* at ¶ 48, it alleges more generally that New York-based industrial
manufacturers and licensees "have directly and indirectly discharged *PFAS and PFAS*

*byproducts* during their use of the Manufacturing Defendants' products and solutions . . . ,

including by releasing *PFAS* directly into the environment and sending *PFAS-contaminated*

wastewater to [POTWs] incapable of removing those compounds," *id.* ¶ 50 (emphasis added).

Plaintiff alleges that there are "several current and former industrial sites located near SUEZ's

[systems] that are likely to have contributed to the release of *PFAS* from the use and disposal of

the Manufacturing Defendants' products and solutions." *Id.* ¶ 51 (emphasis added).

Plaintiff's failure to allege that the industrial manufacturers discharged a polluting

substance they received from the Manufacturing Defendants is conspicuous and telling.  Even

assuming that some of the PFAS the Manufacturing Defendants sold, licensed, and distributed to

industrial manufacturers and other downstream entities were PFOA or PFOS, and that some of

the complained-of releases of PFAS contained PFOA or PFOS that was sold to the industrial

manufacturers by the Manufacturing Defendants, there is no basis to conclude that the quantities

of PFOA or PFOS sent into New York by the Manufacturing Defendants and disposed of by

third parties were sufficient to be a "substantial factor" in any pollution of Plaintiff's water

systems.  Moreover, even accepting that some portion of the PFAS sold, licensed, or distributed

to New York-based customers contained PFOA or PFOS, Plaintiff does not allege that the share

of PFOA or PFOS sold by Manufacturing Defendants into New York was anything but

miniscule.  *Cf.* SCWA Transcript, Dkt. No. 67-2 at 7; *Locust Valley Water Dist.*, 465 F. Supp.

3d at 240.  Plaintiff's allegations of causation are too attenuated and speculative to state a claim

for relief.

Finally, New York State covers a large geographic area;[9]  although the Complaint tacks

onto the general allegation of sales to industrial manufacturers in New York sales to

---

[9] New York State has 62 counties, Counties, New York State, ny.gov/counties; SUEZ serves

manufacturers "within SUEZ's source watersheds," there is no allegation that that these

manufacturers were "in the vicinity" of SUEZ's facilities, *In re MTBE*, 725 F.3d at 117; *Locust*

*Valley Water Dist.*, 465 F. Supp. 3d at 239–40; *N.Y. Am. Water*, 2020 WL 9427226, at *2, or that

they were "near" those facilities, *In re MTBE*, 725 F.3d at 123.  Nor are there allegations that

contaminants in SUEZ's source watersheds will invariably end up in its water systems.  In

perhaps its most specific allegation, the Complaint claims "[u]pon information and belief [that]

numerous New York-based manufacturers within SUEZ's source watersheds were members of

Old DuPont's Licensed Industrial Applicator (LIA) program between the 1960s and 2015,"

Compl. ¶ 43, but it does not allege that any of those New York-based manufacturers were

significant or anything but insignificant consumers of the Manufacturing Defendants' PFOA or

PFOS.

      Plaintiff's allegations of injury caused through the agency of the end users is even more

speculative and attenuated.  Plaintiff alleges that "end-use customers have disposed of [products

containing the Manufacturing Defendants' PFAS] into waterways, publicly owned treatment

works, and landfills throughout New York, including within SUEZ's source watersheds, where

---

customers in only five of those counties, Compl. ¶ 4.  The Court can take judicial notice that
New York State's land area is 47,216.40 square miles and that there are 17 major watersheds in
the state, many of which cover multiple counties.  *See* QuickFacts, United States Census Bureau,
https://www.census.gov/quickfacts/fact/table/NY,US/PST045221; Watersheds, New York State
Department of Environmental Conservation, https://www.dec.ny.gov/lands/26561.html.  The
land area of the five counties in which SUEZ serves customers is 2,164.65 square miles.  *See*
QuickFacts, United States Census Bureau,
https://www.census.gov/quickfacts/fact/table/westchestercountynewyork,tiogacountynewyork,ro
cklandcountynewyork,putnamcountynewyork,orangecountynewyork/PST045221.  The state is
vast; it extends from the Great Lakes and the western border of Pennsylvania in the west to the
Canadian border in North, to New Jersey in the South.  With the exception of Tioga County, the
counties served by SUEZ are concentrated in a tight geographic area near New York City.
Counties and County Subdivisions in New York State,
https://pad.human.cornell.edu/maps2010/maps/ReferenceMaps.pdf.

PFAS have been steadily and continuously released into the environment as a result of the natural and/or chemically-aided degradation of the products and solutions over the course of many years." *Id.* ¶ 52.  On that theory, a Manufacturing Defendant could be said to have "caused" SUEZ's injury if it sold PFAS to an industrial manufacturer anywhere in the world who then applied the PFAS to a product again anywhere in the world who then brought that product into the State of New York at any time from the 1950s forward and prior to the customer disposing of the product in a landfill in New York and that PFAS—that may or may not contain PFOA or PFOS— somehow made its way into SUEZ's water systems.

Conduct is not a substantial factor in causing injury if its impact is "slight" or "trivial" and thus did not have "'such an effect in producing the injury that reasonable people would regard it as a cause of the injury.'"  *In re MTBE*, 725 F.3d at 116 (quoting *Rojas*, 208 A.D.2d at 420).  Here, Plaintiff's sparse and speculative allegations fall far afield from anything that has been held sufficient in any water contamination cases cited by the parties.  The allegations are bereft of any facts regarding market share, the identity of customers, or the location where the customers resided, or that would tie Manufacturing Defendant's conduct to Plaintiff's alleged injury.  They amount to the claim that at some point in history the Manufacturing Defendants sold some (unknown) quantity of PFOA or PFOS to some (unknown) number of customers in some (unknown) part of a vast state and that because that same chemical has been found in SUEZ's water systems (located in a small part of the state), the Manufacturing Defendants somehow caused SUEZ's injury.  Those allegations are insufficient to state a claim as to causation or to "nudge[] [its] claims across the line from conceivable to plausible."  *Twombly*, 550 U.S. at 570.

B.      Nuisance

Plaintiff brings claims for public and private nuisance.  Defendants move to dismiss both claims, arguing that that Plaintiff's public-nuisance claim fails because the harm alleged—contamination of water sources—is not "different in kind" from that suffered by the remainder of the community and that Plaintiff's private-nuisance claim fails because it has not suffered a nuisance that violates only private rights and produces damages to few people. *See* Dkt. No. 64 at 11–12.

1.      General Principles

Under New York law, a cause of action for public nuisance "exists for conduct that amounts to a substantial interference with the exercise of a common right of the public, thereby . . . interfering with the use by the public of a public place or endangering or injuring the property, health, safety or comfort of a considerable number of persons." *532 Madison Ave. Gourmet Foods, Inc. v. Finlandia Center, Inc.*, 96 N.Y.2d 280, 292 (2001).  Although generally a public nuisance is subject to prosecution by a governmental authority, it may also be actionable by a private person "if it is shown that the person suffered special injury beyond that suffered by the community at large." *Id.*  The injury suffered by a private person bringing suit "must be different in 'kind,' not simply 'degree.'" *Id.* at 294 (citing Restatement (Second) of Torts § 821C, comment h).  Courts have recognized that "the seepage of chemical wastes into a public water supply constitutes a public nuisance." *Benoit v. Saint-Gobain Performance Plastics Corp.*, 959 F.3d 491, 505 (2d Cir. 2020) (quoting *Baity v. Gen. Elec. Co.*, 86 A.D.3d 948, 951 (4th Dep't 2011)).

In support of its public nuisance claims, Plaintiff alleges that the Manufacturing Defendants' acts and omissions have interfered and continue to interfere with SUEZ's right to use and enjoy New York's natural resources, as well as its right to use New York's groundwater

and surface water as sources of public drinking water.  Compl. ¶ 89.  SUEZ further alleges that it

holds these rights in common with members of the public and that the Manufacturing

Defendants' acts and omissions have endangered or injured "the property, health, safety or

comfort of a considerable number of persons," *id.*, but that its harm is different and greater than

the harm suffered by the public because of its obligation to comply with New York's MCLs, *id.*

¶ 91.

In contrast to a public nuisance, "[a] private nuisance threatens one person or a relatively

few," and "an essential feature [is] an interference with the use or enjoyment of land."  *Copart*

*Indus., Inc. v. Consolidated Edison Co.*, 41 N.Y.2d 564, 568 (1977).  Thus, a public nuisance

may also constitute a private nuisance if the public nuisance interferes with the use and

enjoyment of land by one person or a relatively few persons.  *See* N.Y. Pattern Jury Instr. – Civ.

Div. 3 B Intro.  "[O]ne is subject to liability for a private nuisance if his conduct is a legal cause

of the invasion of the interest in the private use and enjoyment of land and such invasion is (1)

intentional and unreasonable, (2) negligent or reckless, or (3) actionable under the rules

governing liability for abnormally dangerous conditions or activities."  *Copart Indus., Inc.*, 41

N.Y.2d at 569. "An invasion of another's interest in the use and enjoyment of land is intentional

when the actor (a) acts for the purpose of causing it; or (b) knows that it is resulting or is

substantially certain to result from his conduct."  *Id.* at 571 (internal quotation marks omitted).

"Where liability is premised on a failure to abate a nuisance, there must be a duty to act."

*Cangemi v. United States*, 13 F.4th 115, 137 (2d Cir. 2021) (citing Restatement (Second) of

Torts § 824).

In support of its private nuisance claim, Plaintiff alleges that it "owns and has the right to

the possession and use of its wells, surface water intakes, and drinking water treatment and

supply systems" that make up its water systems.  Compl. ¶ 96.  It further alleges that the

Manufacturing Defendants' intentional acts and omissions have foreseeably caused

environmental contamination that has interfered with,  and continues to interfere with, SUEZ's

ability to use the groundwater and surface water sources that supply its water systems.  *Id.* ¶ 98.

As a result, SUEZ alleges that it has to spend money on water-treatment systems and water

monitoring.  *Id.* ¶ 101.  The "land" the use and enjoyment with which Plaintiff claims the

Manufacturing Defendants interfered is Plaintiff's wells, surface water intakes, and drinking

water treatment and supply systems.  *See* Dkt. No. 67 at 11.

### 2.      The Liability of a Manufacturer in Nuisance for Downstream Consequences

The Complaint squarely raises the question of the liability of an upstream manufacturer

who introduces a dangerous or toxic substance into the stream of commerce for the damages

caused by that substance.  In New York, following the Restatement (Second) of Torts, *In re*

*Nassau County Consol. MTBE Prods. Liab. Litig.*, 2010 WL 4400075, at *8–9 (Sup. Ct. Nassau

Cty. Nov. 4, 2010), a defendant is liable for public or private nuisance only it if "create[d] [the]

nuisance or participate[d] in the creation or maintenance thereof," *In re MTBE*, 725 F.3d at 121

(quoting *Penn Cent. Transp. Co. v. Singer Warehouse & Trucking Corp.*, 86 A.D.2d 826, 828

(1st Dep't 1982)); *see also* Restatement (Second) of Torts § 834 ("One is subject to liability for a

nuisance caused by an activity, not only when he carries on the activity but also when he

participates to a substantial extent in carrying it on.").

Nuisance-creating activities generally fall into two categories:

those that cause harm only so long as the activity continues—such as directly
sending noise, smoke, heat or gases over neighboring land—and those that create
physical conditions that are harmful to neighboring land after the activity that
created them has ceased—such as structures, excavations, cesspools, piles of
refuse, bodies of water, oil, and other substances.

Restatement (Second) of Torts § 834 cmt. b.

Liability is based upon creation or participation in the nuisance-creating activity.  If activity results "in the creation of a physical condition that is of itself harmful after the activity created it has ceased, a person who carried on the activity that created the condition or who participated to a substantial extent in the activity" can be held liable for the continuing harm of the nuisance   *Id.* § 834 cmt. e; *see also id.* § 834 cmt. d (explaining that the substantial-participation component of liability derives from the substantial-factor test for legal causation). This is true even where the person can no longer abate the condition and stop the harm.  *Id.* § 834 cmt. e.  Similarly, where "the physical condition created is not of itself harmful, but becomes so upon the intervention of some other force," the person whose activity created the physical condition can be held liable where his activity "was a substantial factor in causing the harm, and . . . the intervening force was not a superseding cause."  *Id.* § 834 cmt. f.

The question of the liability on a nuisance theory for the lawful sales of a lawful product of an upstream manufacturer who does not carry on the nuisance-creating activity and neither controls nor directs the nuisance-creating activity has been addressed in numerous contexts by courts throughout the Nation.  Many courts, following the Restatement (Second) of Torts, have applied what appears to be an almost absolute rule.  A manufacturer who produces a substance that, after being sold, creates or contributes to a nuisance cannot be liable for the nuisance-causing activity after the sale unless the manufacturer somehow controls or directs the activity. For example, in the *City of Bloomington v. Westinghouse Elec. Corp.*, 891 F.2d 611 (7th Cir. 1989), the Seventh Circuit considered the liability of Monsanto Company for its role in manufacturing polychlorinated biphenyls ("PCBs") that ended up into the sewers and a municipal landfill of the City of Bloomington.  Monsanto did not directly deposit the PCBs into

the sewers or the municipal landfill.  It sold PCBs to a plant owned and operated by the Westinghouse Corporation, and Westinghouse then disposed of the PCBs in a manner that resulted in their entry into the water system.  In affirming dismissal of the city's nuisance claim, the court explained that "the pleadings do not set forth facts from which it could be concluded that Monsanto retained the right to control the PCBs beyond the point of sale to Westinghouse" and thus determined that there was "no basis upon which to conclude that Monsanto itself interfered with" the city's interest in land and thereby "participated in carrying on the nuisance." *Id.* at 614.  Even though Monsanto "instructed Westinghouse how to dispose of PCBs so that they would not enter water systems . . . [and] made recommendations to reduce PCB discharges by treating waters before their releases to sewers," and thus had some continuing involvement with respect to the PCBs after the point of sale, the court held that it could not be held liable to the city for the impact of the PCBs after they were in the ownership and control of Westinghouse.  *See id.* at 613.[10]

Likewise, in *In re Sygenta AG MIR 162 Corn Litig.*, 131 F. Supp. 3d 1177 (D. Kan. Sept. 11, 2015), the United States District Court for the District of Kansas dismissed a private-nuisance claim brought against a manufacturer and seller of genetically modified crop seeds for contaminating the plaintiffs' corn supply.  In dismissing the claim, the court pointed out that the defendant did not have continuing control over the product after sale and reviewed cases across jurisdictions—generally applying the Restatement (Second) of Torts—where manufacturers were

---

[10] In dissent, Judge Cudahy disagreed "that a defendant must have the 'final say' over the disposition of the harmful agent in order to face liability under . . . a nuisance . . . theory of recovery," opining that "[t]his is not the law under the Restatement."  *Id.* at 618.  In Judge Cudahy's view, under the Restatement, the operative concept for nuisance liability is "participation" in the nuisance-creating activity rather than "control" over the nuisance-causing agent and conflating these concepts would "automatically exculpate[] [a manufacturer] from liability for any event after the sale."  *Id.* at 619.

held not to have participated in the nuisance when the manufacturer no longer asserted control

over the product.  *See id.* at 1213–15 (citing *City of Bloomington*, 891 F.2d at 615; *Tioga Pub.*

*Sch. Dist. No. 15 v. U.S. Gypsum Co.*, 984 F.2d 915, 920 (8th Cir. 1993); *L'Henri, Inc. v. Vulcan*

*Materials Co.*, 2010 WL 924259, at *5–6 (D.V.I. Mar 11, 2010); *Cloverleaf Car Co. v. Phillips*

*Petroleum Co.*, 540 N.W.2d 297, 301 (Mich. 1995); and others).   The court followed what it

described as "the general rule that a seller may not be liable for a private nuisance caused by a

product absent continuing control over the product post-sale," *id.* at 1214, and in the absence of

"any cases in which a manufacturer or seller was subjected to liability for a nuisance caused by

use of a product in the absence of the seller's continuing control over the product post-sale,"

refused to "extend nuisance liability so far," *id.* at 1215.

Similarly, in *Tioga Public School District No. 15 of Williams County v. U.S. Gypsum*

*Company*, the Eighth Circuit concluded that a nuisance claim against a manufacturer of an

asbestos product was improperly submitted to a jury where the manufacturer was no longer in

control of the asbestos-containing product at the time it became a nuisance.  984 F.2d at 920.

The court reviewed cases where considering claims by owners of buildings contaminated by

asbestos against manufacturers of asbestos-containing products and noted that the courts

uniformly rejected nuisance as a theory of recovery because the manufacturer who sold the

products lacked control over it after the sale.  *Id.*  In following this trend, the court explained that

control is necessary in order to impose nuisance liability because "without control a defendant

cannot abate the nuisance."  *Id.*

The court in *L'Henri, Inc. v. Vulcan Materials Company* applied similar logic in

dismissing a private-nuisance claim against a manufacturer of a dry-cleaning chemical that was

sold to plaintiffs and used in dry-cleaning operations.  2010 WL 924259, at *5–6.  The court

concluded that allegations that defendants failed to warn plaintiffs about the dangers associated

with the chemical and continued to market and sell the chemical to plaintiffs were insufficient to

support the "proposition that the [d]efendants participated to a substantial extent in carrying on

the alleged nuisance." *Id.* at *6. Like the *Tioga* court, the court noted that the chemical was in

the control of the plaintiffs since they purchased it and that the defendants therefore "no longer

had the power to abate the nuisance." *Id.*

The New York courts (and courts applying New York law) interpreting the same

provision of the Restatement (Second) of Torts have not applied quite such an absolute rule that

would relieve the upstream manufacturing defendant of liability for nuisance in the absence of

control. Even so, they have imposed limits on the extent to which a manufacturer who has not

defectively designed or manufactured a product can nonetheless be held liable in the common

law of nuisance for the effect its product has in the hands of another to whom it has sold that

product.[11] Those courts have held that the Restatement language requiring that the defendant

have "participated to a substantial extent" in the nuisance-creating activity was also satisfied

when there was evidence that the defendant, having sold a toxic or dangerous substance to an

identified third party, continued to sell the same product to the third party for a profit knowing

that that third party would continue to use it in a manner that maintained the nuisance.

---

[11] This Opinion addresses only the Manufacturing Defendants' liability under the judge-made law of nuisance. Significantly, Congress has decided to go beyond the law of nuisance in various statutes administered by regulatory agencies such as the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9601 *et seq*. The Court notes that the Biden Administration is considering listing PFOA and PFOS as hazardous substances under that statute. *See* EPA, EPA Actions to Address PFAS, https://www.epa.gov/pfas/epa-actions-address-pfas (last updated Nov. 16, 2021) ("In June 2021, EPA restarted the process to designate PFOA and PFOS as hazardous substances."). Nothing in the Court's Opinion should be read to express a view as to whether, if the Administration takes that step, these Defendants or defendants in their position would be liable on the facts alleged or on similar facts for environmental cleanup.

In *In re MTBE*, for example, the Second Circuit held that Exxon could be held liable in public nuisance for contamination to water treated by a regional water treatment facility in Queens, New York (the "Station Six wells"), but in that case, Exxon delivered MTBE-containing gasoline to underground storage tank systems at six gasoline stations in Queens that Exxon owned and controlled and to additional tanks of service stations that, even though it did not own or control, it knew would leak.  *Id.* at 82, 88.  In affirming the jury verdict against Exxon on a nuisance count, the Second Circuit looked to the Restatement (Second) of Torts § 834 and its principle that a defendant is liable for nuisance not only when it carries on the nuisance-creating activity but also when it "participates to a substantial extent in carrying it on."  *Id.* at 121 (quoting Restatement (Second) of Torts § 834).  The court rejected Exxon's argument that its conduct as a supplier was too remote because the evidence showed that (1) "Exxon manufactured gasoline containing MTBE and supplied that gasoline to service stations in Queens"; (2) "Exxon knew station owners would store this gasoline in underground tanks that leaked, and . . . knew specifically that tanks in the New York City area leaked"; and (3) Exxon was "aware of MTBE's tendency to spread quickly once released into the groundwater."  *Id.*  The court stated that "the jury could have found that Exxon marketed gasoline to retail customers in Queens" and had "extensive involvement in the Queens gasoline market."  *Id.* at 123.  The Second Circuit explained that "all of the City's successful claims required the jury to find that Exxon both used MTBE and committed related tortious acts, such as failing to exercise reasonable care when storing gasoline that contained MTBE."  *Id.* at 104.

More recently, in *Cangemi v. United States*, 13 F.4th at 138 n.15, the Second Circuit rejected the claim, made in passing, that the role of the Town of East Hampton in advocating for the rehabilitation of jetties in Lake Montauk Harbor made it liable for public or private nuisance

when those jetties caused erosion to land that plaintiffs owned.  The court focused on both the "remote, indirect involvement" of the town and its lack of "knowledge of the potential downstream consequences of its actions."  *Id.*  In so doing, it distinguished *In re MTBE* as a case in which the defendant "directly participated in the creation of the nuisance, even [though its] relationship to the ultimate harm was relatively remote."  *Id.*[12]

Each of the cases that has postdated *In re MTBE* has followed a similar pattern.  In each, the defendant-manufacturer not only had knowledge that its product would be used in a manner that would create a nuisance, but it also sold the product directly and continuously to the person engaged in the nuisance-creating activity even after acquiring the knowledge that that person was creating a nuisance.  *See, e.g.*, *Locust Valley Water Dist.*, 465 F. Supp. 3d at 240 (concluding that plaintiffs had alleged substantial-factor causation and that its claims, including for nuisance, could proceed, in light of allegations that defendants knew or should have known that routine use of their products would lead to the release of dioxane into the environment and contaminate groundwater and water wells, that they nonetheless sold these products for use in the vicinity of the plaintiffs' wells, and that they affirmatively advised users of a product containing dioxane "to dispose of waste solvents by pouring them onto the ground or into trenches for evaporation and burning"); *Suffolk County Water*, Dkt. No. 67-2 at 6–7, 9 (holding that complaint sufficiently

---

[12] The Circuit also affirmed the district court's decision that the town was not liable for negligent nuisance because it had no duty to mitigate the effects of a nuisance that it did not control.  *Id.* at 138 n.16.  The Second Circuit also addressed *In re MTBE* in its unpublished opinion in *Sahu v. Union Carbide Corp.*, 650 F. App'x 53, 58 (2d Cir. 2016), but only in response to an argument about the court's causation analysis.  In passing, the court stated that it was "the defendant's knowledge of a risk and 'substantial[] certain[ty]' about the ultimate injury [that] constituted 'tortious conduct' that 'sufficed to demonstrate [defendant's] participation in a nuisance and trespass.'"  *Id.*  This Court does not view that dicta from the Second Circuit as a holding that all that is required for nuisance is knowledge and not substantial participation.

alleged causation where it alleged that the defendants, the primary manufacturers of a contaminant, had customers in the location of the contamination and that the defendants advised users to dispose of the contaminant-containing waste in the environment).

### 3.     Application of the Law to the Complaint

Plaintiff's allegations stretch *In re MTBE* beyond its breaking point, arguing for a theory of liability that—if accepted—would allow allegations of an entity's knowledge of the downstream effects of its product to, in itself, satisfy the substantial participation prong of nuisance liability.  Although some of the New York cases frame the analysis in terms of causation, the Court would reach the same result and dismiss the Complaint's nuisance allegations as pleaded as a matter of substantive law as well.

As noted, Plaintiff alleges two forms of nuisance-creating activity: (1) "New York-based industrial manufacturers and licensees . . . have directly and indirectly discharged PFAS and PFAS byproducts during their use of the Manufacturing Defendants' products and solutions, including during the manufacturing process by which the Manufacturing Defendants' licensed chemical additives are applied to the manufacturers' own products," Compl. ¶ 50; and (2) "many New York-based end-use customers who have purchased, used, and disposed of the Manufacturing Defendants' chemical products and solutions have unknowingly proliferated the environmental contamination caused by the Manufacturing Defendants' products," specifically by "dispos[ing] of such products into waterways, publicly owned treatment works, and landfills throughout New York, including within SUEZ's source watersheds, where PFAS have been steadily and continuously released into the environment as a result of the natural and/or chemically-aided degradation of the products and solutions over the course of many years," *id.* ¶ 52.  Plaintiff alleges that the industrial discharge by the intermediate manufacturers of PFAS into the surface waters of New York has "exponentially amplif[ied] the environmental spread of

50

PFAS in New York, including within SUEZ's source watersheds." *Id.* ¶ 50.  It also alleges that there are "waterways, publicly owned treatment works, and landfills located near SUEZ's surface water intakes, wells, and water treatment facilities across New York that are likely to have contributed to the release of PFAS from the use and disposal of the Manufacturing Defendants' products and solutions, as well as the industrial manufacturers' products that incorporate the Manufacturing Defendants' products and solutions." *Id.* ¶ 53.

As to the end-use customers, to the extent that Plaintiff intends to allege that the disposal by end users of the industrial manufacturer's products constitutes a nuisance-creating activity, Plaintiff has not alleged any conduct by the Manufacturing Defendants in that activity.  The Manufacturing Defendants did not sell to the end users.  They were not involved in the industrial manufacturers' sales to the end users.  They did not direct or have the capacity to direct how the end users disposed of their products after the expiration of the useful lives of those end products; they would not even have known who the end users were in order to inform them or have known when and whether the products had an end of useful life.  The Manufacturing Defendants' only role was to introduce into the stream of commerce through lawful sales a lawful product that was used by the Manufacturing Defendants' industrial customers in a way that when the customers of those customers wanted to dispose of the ultimate products would result in contamination.  The Manufacturing Defendants cannot be held liable on a theory of nuisance on those allegations without extending liability to anyone who contributed in some way or another to a nuisance or its maintenance "no matter how far removed from defendants' lawful business practices the harm is felt," *People ex rel. Spitzer v. Sturm, Ruger & Co., Inc.*, 309 A.D.2d 91, 104 (1st Dep't 2003), thus making the federal courts (or juries empaneled by them) responsible for the regulation of all

substances in the United States, regardless of whether those substances were lawful or were sold with any defect in design, manufacture, or warning.

The same can be said regarding the allegations about sales to the industrial manufacturers. The Manufacturing Defendants alleged involvement with those manufacturers ended when they sold PFAS or PFAS-containing solutions to industrial manufacturers. It is not alleged that the industrial manufacturers told the Manufacturing Defendants how they would use or dispose of the products, including the PFOA or PFOS, much less that they solicited or received advice from the Manufacturing Defendants. From the allegations of the Complaint, the Manufacturing Defendants' involvement ended at the point of sale. It was a matter of indifference to the Manufacturing Defendants whether the provided PFAS were applied to any products of the industrial manufacturers, or to which products, or what the industrial manufacturers did with the products, to whom they sold the products, or with what instructions. It was also a matter of indifference to the Manufacturing Defendants whether the PFAS generated byproducts and, if so, how they disposed of those byproducts. No different allegation is made with respect to the licensees.

Particularly with respect to the disposal of the Manufacturing Defendants' PFOA or PFOS or their release into the environment, Plaintiff has only pleaded general allegations about what the Manufacturing Defendants knew—or, notably, what they reasonably should have known: "that their acts and omissions directly and proximately caused the release of PFAS into New York's environment and that such releases could pose hazards to the State's natural resources," Compl. ¶ 3; "that PFAS-containing products and solutions would be . . . ultimately disposed of[] in a reasonably foreseeable manner" and that this disposal would "amplify and exacerbate the spread of PFAS into the environment," *id.* ¶¶ 34–35; "that the purchasers,

licensees, and users of [the Manufacturing Defendants'] PFAS and PFAS-containing products and solutions would ultimately directly or indirectly release, discharge, and/or dispose of such products into New York's waterways, [POTWs], and landfills," further amplifying the spread of PFAS contamination in the environmental media of New York, *id.* ¶ 56; *see also id.* ¶ 49.

Plaintiff does not allege that the Manufacturing Defendants knew how their industrial customers were disposing of or releasing PFOA or PFOS or products containing those substances.  Nor does it allege that any of these industrial customers were disposing of PFOA or PFOS in SUEZ's source watersheds or, if they were, that the Manufacturing Defendants knew of this behavior.  Plaintiff's allegations, taken as true, demonstrate simply that the Manufacturing Defendants could foresee that their customers, through manufacturing processes and/or disposal, could release PFAS, including PFOA or PFOS, in a way that could ultimately lead to contamination of groundwater and that the Manufacturing Defendants knew PFAS were dangerous.

In essence, SUEZ's claim amounts to the assertion that because Defendants introduced into the stream of commerce a product that, by its nature, would contaminate the waterways and ultimately affect the water systems of SUEZ, Defendants are liable for whatever damage caused by that contamination, regardless of where the Manufacturing Defendants directed or controlled their conduct or had specific knowledge of the mechanisms by which the product was being improperly handled.  The theory violates the principle that New York courts will not extend liability to anyone contributing in some way or another to a nuisance or its maintenance "no matter how far removed from defendants' lawful business practices the harm is felt."  *Sturm*, 309 A.D.2d at 104.  To hold otherwise would open the door to "lawsuits [being] leveled . . . against countless . . . types of commercial enterprises, in order to address a myriad of societal problems .

. . regardless of the distance between the 'causes' of the 'problems' and their alleged consequences." *Id.* at 105. As the *Sturm* court explained, "a line must eventually be drawn since there will be many instances in which a party may have contributed in some remote way and yet it is inappropriate to subject that party to tort liability." *Id.* at 104 (internal quotation marks omitted).

The Court will dismiss the claims for nuisance.[13]

### C.      Negligence Claim

Plaintiff brings a claim for negligence. "Under New York law . . . a plaintiff must establish three elements to prevail on a negligence claim: (1) the existence of a duty on defendant's part as to plaintiff; (2) a breach of this duty; and (3) injury to the plaintiff as a result thereof." *Aegis Ins. Servs., Inc. v. 7 World Trade Co., L.P.*, 737 F.3d 166, 177 (2d Cir. 2013) (quoting *Alfaro v. Wal-Mart Stores, Inc.*, 210 F.3d 111, 114 (2d Cir. 2000)).

Plaintiff alleges that the Manufacturing Defendants have "a duty to exercise due care in their sale, licensing, and distribution of PFAS and PFAS-containing products and solutions, so as to prevent foreseeable harm to both their customers and foreseeable third-parties." Compl. ¶ 105; *see also* Dkt. No. 67 at 19. Plaintiff further alleges that the Manufacturing Defendants "knew, or reasonably should have known," that "PFAS could be released during the normal use and disposal of the Manufacturing Defendants' PFAS-containing products and solutions . . . [and then] could cause widespread and long-lasting contamination of New York's natural resources," *id.* at ¶ 106, and that "their failure to exercise due care in selling, licensing, and distributing PFAS and PFAS-containing products and solutions to New York purchasers and licensees . . .

---

[13] In light of its conclusions that there are insufficient allegations as to causation and the Manufacturing Defendants' participation in the nuisance, the Court will not resolve Defendants' arguments that Plaintiff has not alleged a harm different in kind that the public at large or that it has suffered a nuisance violating its private rights. *See* Dkt. No. 64 at 11–12.

would have long-lasting negative impacts on the environment and would pose an unreasonable

danger to New York State's sources of drinking water, including those owned and operated by

SUEZ," *id.* ¶ 107.  Plaintiff alleges that, by "selling, licensing, and distributing PFAS and PFAS-

containing products without implementing safety precautions sufficient to prevent foreseeable

releases of PFAS . . . the Manufacturing Defendants failed to exercise due care," *id.* ¶ 108,

harming Plaintiff, *id.* ¶¶ 109–10.

Defendants argue that the Court should dismiss Plaintiff's negligence claim because the

Complaint fails to allege any duty of care owed by any defendant to Plaintiff and fails to allege

what specific conduct Defendants engaged in that contaminated Plaintiff's water sources.  Thus,

Defendants contend, Plaintiff did not establish that Defendants owed a duty to Plaintiff or that

they breached it.[14]

"[A] threshold question in tort cases is whether the alleged tortfeasor owed a duty of care

to the injured party."  *Espinal v. Melville Snow Contractors, Inc.*, 98 N.Y.2d 136, 138 (2002).

"[T]he existence and scope of a duty is a question of law requiring courts to balance sometimes

competing public policy considerations."  *Id.*; *see also McCarthy v. Olin Corp.*, 119 F.3d 148,

166 (2d Cir. 1997) (Calabresi, J., dissenting) ("[T]he determination of the existence of a duty is a

decision of *public policy* that the New York Court of Appeals has expressly retained for itself

(and the courts generally).").  A plaintiff bringing a claim for negligence "must show that a

---

[14] In their reply brief, Defendants also argue that the negligence claim should be dismissed
because Plaintiff "merely alleges economic losses by way of damages."  Dkt. No. 74 at 12.  The
Court will not address this argument, raised for the first time in reply, except to observe that, like
the individual defendant in *R.M. Bacon, LLC v. Saint-Gobain Performance Plastics Corp.*, 959
F.3d 509 (2d Cir. 2020), SUEZ has alleged that PFAS is present on its property and thus may
also be seeking "compensation for the physical invasion of [its] property."  *Id.* at 515; *see also*
Compl. ¶¶ 64–71.

defendant owned not merely a general duty to society but a specific duty to him or her." *Beretta*, 96 N.Y.2d at 232.

The New York Court of Appeals has made clear that "[a] defendant generally has no duty to control the conduct of third persons so as to prevent them from harming others, even where as a practical matter defendant can exercise such control." *Id.* at 233 (quoting *D'Amico v. Christie*, 71 N.Y.2d 76, 88 (1987)). This limitation is borne "out of practical concerns both about potentially limitless liability and about the unfairness of imposing liability for the acts of another." *Id.*; *see also McCarthy*, 119 F.3d at 156 ("New York courts are reluctant to impose a duty of care when there is little expectation that the defendant could prevent the actions of a third party."). There are a few exceptions to this general rule. Two such exceptions are where the defendant's relationship with a third-person tortfeasor is such that the defendant can actually control the third person's actions, or where the relationship between the plaintiff and the defendant requires the defendant to protect the plaintiff from the conduct of others. *Id.* In both cases, "the defendant is in the best position to protect against the risk of harm" and there is no "specter of limitless liability . . . because the class of potential plaintiffs to whom the duty is owed is circumscribed by the relationship." *Id.*

That principle is dispositive here and would require dismissal of Plaintiff's negligence claims even if Plaintiff had sufficiently alleged causation. Plaintiff alleges harm stemming from the conduct of others than the Manufacturing Defendants: the industrial consumers who deposited PFAS in waterways that resulted in the contamination of Plaintiff's facilities, as well as the end-use consumers who—at the end of a product's useful life—disposed of the product in such a way that it ultimately contaminated the groundwater. Plaintiff does not allege the Manufacturing Defendants had any control over the activity of either set of consumers (the

immediate consumers or the ultimate consumers).  The Complaint does not allege that, once the
Manufacturing Defendants sold their product and title passed, they had the authority or ability—
contractual or otherwise—to dictate or suggest what was done with the PFAS or PFAS-
containing product.  It would be up to the industrial manufacturer in the first instance and then up
to the end-use customer in the second instance to make sure that products which contained PFAS
were properly disposed of.

Plaintiff does not allege facts that the Manufacturing Defendants' relationship with the
third-person tortfeasor (the industrial manufacturers) was such that the Manufacturing
Defendants could control their activities.  Nor does Plaintiff allege a relationship between the
Manufacturing Defendants and itself that would require the Manufacturing Defendants to protect
SUEZ from the conduct of others, such as a relationship between landowners and visitors to the
premises, where "the defendant's relationship with either the tortfeasor or the plaintiff places the
defendant in the best position to protect against the risk of harm."  *See Beretta*, 96 N.Y.2d at 233.
In this case, by contrast, where the industrial manufacturers would have known how they were
using the compound and where and how they could dispose of it, they were in an equal if not
better position to protect the Plaintiff.

Plaintiff argues that a duty to exercise due care may be created by the fact that there was
"foreseeable harm to both their customers and foreseeable third-parties" that the Manufacturing
Defendants could have prevented.  Dkt. No. 67 at 12 (quoting Compl. ¶ 105).  Plaintiff also
argues relatedly that "a claim of negligence may be founded upon a demonstration that the
defendant, *inter alia*, failed to exercise due care in conducting the allegedly polluting activity."
*Id.* at 20 (citing *Benoit*, 959 F.3d at 502).  Neither proposition helps Plaintiff here.

The first theory sounds in design defect, manufacturing defect, or failure to warn.  Under New York law, manufacturers have a duty: (1) "to use reasonable care in designing its product so that it will be safe when 'used in the manner for which the product was intended, as well as [an] unintended yet reasonably foreseeable use,'" *Liriano v. Hobart Corp.*, 132 F.3d 124, 126 (2d Cir. 1998) (quoting *Micallef v. Miehle Co.*, 39 N.Y.2d 376, 385–86 (1976)); (2) "to warn users of foreseeable dangers inherent in their products," *id.*; and (3) "to market only those products that are reasonably safe when used for the intended purpose," *Silivanch v. Celebrity Cruises, Inc.*, 171 F. Supp. 2d 241, 253 (S.D.N.Y. 2001); *see also MacPherson v. Buick Motor Co.*, 217 N.Y. 382 (1916); *Matter of N.Y.C. Asbestos Litig.*, 27 N.Y.3d 765, 786 (2016) ("[A] manufacturer of a defective product is liable for injuries caused by the defect. . . . [A] product has a defect that renders the manufacturer liable for the resulting injuries if it (1) contains a manufacturing flaw; (2) is defectively designed; or (3) is not accompanied by adequate warnings for the use of the product." (internal quotation marks omitted)).  However, New York Courts have not said that in the absence of any defect in design, manufacture, or warning, a manufacturer has a duty not to sell a product that it knows or can foresee will cause harm to one or more potential plaintiffs. *See Sturm*, 309 A.D.2d at 102 (citing *Forni v. Ferguson*, 232 A.D.2d 176, 177 (1st Dep't 1996)). Simply put, "New York does not impose a duty upon a manufacturer to refrain from the lawful distribution of a non-defective product," *id.*; Plaintiff's argument for negligence based on an asserted duty to refrain from distributing its product because it could foreseeably cause harm thus is dependent on that product being defective.  For the reasons discussed later in this Opinion, Plaintiff has not alleged that the Manufacturing Defendants' product was defective.

The second argument misstates the law.  "[I]n cases involving the pollution of underground waters, liability may be found only upon a demonstration that the defendant 'failed

to exercise due care in conducting the allegedly polluting activity or in installing the allegedly

polluting device, and that he or she knew or should have known that such conduct could result in

. . . contamination.'"  *Strang v. Neglia*, 232 A.D.2d 907, 907 (3d Dep't 1996) (quoting *Fetter v.*

*DeCamp*, 195 A.D.2d 771, 773 (3d Dep't 1993)); see also *Murphy v. Both*, 84 A.D.3d 761, 762

(2d Dep't 2011).  In those cases, however, defendants themselves engaged in polluting activities;

they had a duty to those as to whom they directly set in motion a polluting agent.  *See, e.g.*, *In re*

*MTBE*, 725 F.3d at 117–19; *Baker v. Saint-Gobain Performance Plastics Corp.*, 232 F. Supp. 3d

233 (N.D.N.Y. 2017), *aff'd in part, appeal dismissed in part*, 959 F.3d 70 (2d Cir. 2020).

A district court in this Circuit recently explained that the rationale behind the "duty not to

pollute a plaintiff's drinking water" is that:

> Society has a reasonable expectation that manufacturers avoid contaminating the
> surrounding environment, an expectation that extends to the pollution of an area's
> water supply.  *See, e.g., In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab.*
> *Litig.*, 725 F.3d 65, 80–83, 87, 117–19 (2d Cir. 2013) (noting a duty of care to avoid
> chemical leaks and water contamination under New York law); *Leone v. Leewood*
> *Serv. Station, Inc.*, 212 A.D.2d 669, 624 N.Y.S.2d 610, 612 (1995) (per curiam)
> (finding "a duty to use reasonable care to maintain . . . underground tanks in a
> reasonably safe condition").  It is sensible public policy to require that
> manufacturers avoid polluting the drinking water of the surrounding community
> . . . .

*Baker*, 232 F. Supp. 3d at 245–46.

Plaintiff does not allege Defendants engaged in pollution or set in motion a polluting

agent.  Defendants manufactured and sold products to third parties who then engaged in

activities that polluted New York's groundwater.  Accordingly, this line of authority does not

support the imposition of a claim of negligence against the Manufacturing Defendants in the

absence of design, manufacturing, or warning defect.

### D.     Trespass Claim

Defendants contend that Plaintiff has not adequately alleged facts sufficient to support a claim for trespass for three independent reasons:  (1) Plaintiff does not, and could not, allege that it has "exclusive possession" of the water that it processes in its water systems, so there can be no trespass, Dkt. No. 64 at 14–15; (2) Plaintiff has not alleged any intentional physical entry by Defendants onto Plaintiff's land or that any intrusion, if it existed, was the "immediate or inevitable consequence" of Defendants' actions, *id.* at 15–16; and (3) Plaintiff does not allege that Defendants engaged in an unlawful act or a lawful act performed in an unlawful manner, as it argues is necessary for a trespass claim under New York law, *id.* at 16.

Plaintiff responds that its trespass claim is based on the presence of PFAS in property that it owns and to which it has the right of possession—its wells, surface water intakes, and drinking water treatment supply systems—and so it is immaterial if PFAS moved through public groundwater to get there.  Dkt. No. 67 at 14–16.  Plaintiff further argues that it did allege a physical entry into its property by alleging that Defendants' PFAS have physically entered SUEZ's water-supply systems and that it alleged facts sufficient to show that this invasion was the immediate or inevitable consequence of Defendants' acts.  *Id.* at 16–18.

"The requisite elements for a claim of trespass are (1) the intentional entry by defendants on to plaintiffs' land and (2) the wrongful uses without justification or consent."  *Kaplan v. County of Orange*, 528 F. Supp. 3d 141, 171 (S.D.N.Y. 2021) (quoting *Matthews v. Malkus*, 377 F. Supp. 2d 350, 359 (S.D.N.Y. 2005)).  For one to be liable in trespass, "the trespasser 'need not intend or expect the damaging consequences of his intrusion;' rather, he need only 'intend the act which amounts to or produces the unlawful invasion.'"  *Scribner v. Summers*, 84 F.3d 554, 557 (2d Cir. 1996) (alterations adopted) (quoting *Phillips*, 307 N.Y. at 331).  However, "[t]he intrusion itself 'must at least be the immediate or inevitable consequence of what he willfully

does, or which he does so negligently as to amount to willfulness.'"  *Id.* (quoting *Phillips*, 307
N.Y. at 331).  With respect to the intent element in water contamination cases, "the appropriate
standard is whether [the defendant] (i) 'intend[ed] the act which amounts to or produces the
unlawful invasion,' and (ii) had good reason *to know or expect* that subterranean and other
conditions were such that there would be passage [of the contaminated water] from defendant's
to plaintiff's land."  *Id.* at 558 (quoting *Phillips*, 307 N.Y. at 331); *see also In re MTBE*, 725 F.3d
at 120 ("In a trespass cases involving the 'underground movement of noxious fluids,' a plaintiff
must show that the defendant 'had good reason to know or expect that subterranean and other
conditions were such that there would be passage [of the pollutant] from defendant's to
plaintiff's land.'" (quoting *Phillips*, 307 N.Y. at 331)).

Thus, for example, the Second Circuit affirmed a jury verdict for common law trespass in
*In re MTBE* where Exxon delivered gasoline containing MTBE to tanks proximate to Plaintiff's
water wells, "knew that the gasoline containing MTBE that it manufactured, refined, sold, and/or
supplied would be spilled," and "was substantially certain that [the] gasoline containing MTBE
would leak from the gasoline distribution system and enter groundwater, including the
groundwater in the capture zone of the Station [Six] wells."  725 F.3d at 120.   In that
circumstance, Exxon's status "as a mere refiner and supplier of gasoline" did not make it "too
remote from any actual spills or lakes to be deemed an 'immediate or inevitable' cause of any
trespass."  *Id.* (cleaned up);[15] *see also Baker*, 232 F. Supp. 3d at 247 (denying motion to dismiss

---

[15] The Circuit was guided by the Appellate Division's analysis in *State v. Fermenta ASC Corp.*,
where the Second Department affirmed a denial of summary judgment to a manufacturer of an
herbicide, a natural byproduct of which contaminated the plaintiff's wells.  238 A.D.2d 400 (2d
Dep't 1997).  The *Fermenta* court explained that a trespass claim could lie where "the
defendants' actions in directing customers to apply [the herbicide] to the soil was substantially
certain to result in the entry of [the contaminating byproduct] into [the plaintiff's] wells."  *Id.* at
404.

trespass claims of owners of private wells for PFOA intrusion and explaining that "New York

courts have indicated the availability of a trespass action to remedy the contamination of a

plaintiff's private well, demonstrating that it is the possessory interest in the well itself that is

invaded").

      The Complaint does not plausibly allege either that the intrusion into SUEZ's water

systems was "the immediate" consequence of any action that was willfully done by the

Manufacturing Defendants or that it was the "inevitable consequence." *Phillips*, 307 N.Y. at

331.  First, the Complaint does not allege that the contamination of SUEZ's water supply was the

immediate consequence of Manufacturing Defendant's actions.  Manufacturing Defendants are

alleged to have delivered PFAS to industrial consumers in New York State and in SUEZ's

source watersheds and to have manufactured the PFAS that found its way onto products that

ended up in the hands of New York consumers who disposed of those products in landfills and

waterways in SUEZ's source watersheds.  If some of that PFAS also found its way into SUEZ's

water systems, and thus the water that SUEZ must remediate, that is not the immediate

consequence of any action by the Manufacturing Defendants. *See In re Nassau County*, 2010

WL 4400075, at *18 (explaining that "principles of proximate cause counsel against applying

trespass liability to entities whose immediate conduct did not produce the trespass" and holding

that "a claim in trespass ha[d] not been made against [defendants] where it is only alleged that

they committed a trespass by their participation in the chain of distribution of MTBE-containing

gasoline").  At worst, the Manufacturing Defendants are alleged to have been indifferent to what

the industrial manufacturers did with the PFAS or how end use consumers disposed of products

that contained the chemical: whether they deposited the substance in locations where it was

likely to result in contamination of SUEZ's water systems or disposed of it elsewhere where the

substance might have contaminated some other water supply.  On Plaintiff's theory, it was the conduct of the industrial manufacturers or the end-use consumers—not the Manufacturing Defendants—that was the immediate source of SUEZ's injury.

The Complaint also does not allege that the contamination of SUEZ's water was the "inevitable consequence" of the Manufacturing Defendants' conduct.  The Complaint alleges in a conclusory manner that the PFAS manufactured and distributed by the Manufacturing Defendants have ended up in SUEZ's water systems "by the foreseeable use and disposal of" PFAS-containing products.  *See* Compl. ¶ 115.  It does not provide any factual allegations to support that it was substantially certain that PFAS would end up in *Plaintiff's* water systems or from which a factfinder could conclude that the Manufacturing Defendants "had good reason to know or expect that subterranean and other conditions were such that there would be passage" to Plaintiff's water systems.  *Phillips*, 307 N.Y. at 331; *cf. Scribner*, 84 F.3d at 558 (concluding that defendant was liable in trespass where defendant had good reason to know or expect that chemical particles would enter plaintiffs' land from defendant's adjacent site after it washed and demolished chemical-containing furnaces, causing the chemical particles to flow to plaintiffs' property downhill).  Nothing about this line of reasoning is specific to SUEZ's water systems; it could apply with equal force to wells and surface-water intakes anywhere, given the propensity of PFAS to "freely spread beyond the points of initial contamination."  Compl. ¶ 33.  Plaintiff does allege that industrial customers, licensees, distributors, and end-use customers were located within SUEZ's source watersheds, *id.* ¶¶ 43–44, 46–48, but these allegations do not support a finding of substantial certainty that PFAS would end up in Plaintiff's water *systems*—which are comprised of the wells, surface water intakes, and drinking water treatment and supply systems that make up SUEZ's operating units—rather than suggesting that PFAS may appear somewhere

in its source watersheds.  Notably, SUEZ does not allege that the PFAS in its source watersheds will inevitably end up in its water systems rather than migrating outside of any capture zone.  *Cf. In re MTBE*, 725 F.3d at 119 (upholding trespass verdict where the jury found that it "was substantially certain that Exxon's gasoline containing MTBE would leak from the gasoline distribution system and enter groundwater, including the groundwater in the capture zone of the Station [Six] wells" (internal quotation marks omitted)); *Abbatiello*, 522 F. Supp. 2d at 542 (dismissing trespass claim where "the presence of PCBs on [plaintiffs'] properties can not be said to be the 'immediate or inevitable consequence' of [defendant's] manufacture, sale, and delivery of PCB-containing products to [nearby industrial site]"); *Hanna v. Motiva Enterp., LLC*, 839 F. Supp. 2d 654, 672 (S.D.N.Y. 2012) (dismissing trespass claim where there was no evidence that defendants had good reason to know or expect the invasion of plaintiff's property to occur and citing cases).

Plaintiff has not sufficiently alleged that the intrusion of PFAS into its water systems was either "the immediate or inevitable consequence" of the Manufacturing Defendants' actions. *Phillips*, 307 N.Y. at 331.  It has therefore not made out a claim for trespass.

### E.   Strict Liability Claims

In its Complaint, Plaintiff asserts strict liability claims for abnormally dangerous activities, defective design, and failure to warn.  For the reasons explained below, each of these claims fail.

#### 1.   Abnormally Dangerous Activity

Defendants argue that Plaintiff's claim for strict liability for abnormally dangerous activity fails to state a claim for relief because the manufacture, sale, and distribution of products does not constitute an abnormally dangerous activity.  Dkt. No. 64 at 18; Dkt. No. 74 at 11; Dkt. No. 91 at 11.  According to Defendants, a claim for abnormally dangerous activity arises only

when a property owner engages in abnormally or ultrahazardous activity on their property.  Dkt.
No. 74 at 11 (quoting *Andres v. Town of Wheatfield*, 2020 WL 7764833, at *6 (W.D.N.Y. Dec.
30, 2020)).  Plaintiff responds that it has alleged "facts sufficient to show that manufacturing and
selling PFAS posed a high degree of risk to the land of others, including SUEZ, that the harm
was the likely result of the conduct, that the risk of harm was exacerbated by Defendants' failure
to take reasonable steps to prevent PFAS releases despite knowing of such risks for several
decades, that PFAS have been identified as 'Hazardous Substances,' and that the risks inherent in
the distribution of PFAS outweighed any utility of the products to consumers and the public as a
whole."  Dkt. No. 67 at 21.

       Under New York law, "there are three distinct claims for strict products liability: (1) a
manufacturing defect, which results when a mistake in manufacturing renders a product that is
ordinarily safe dangerous so that it causes harm; (2) a warning defect, which occurs when the
inadequacy or failure to warn of a reasonably foreseeable risk accompanying a product causes
harm; and (3) a design defect, which results when the product as designed is unreasonably
dangerous for its intended use." *McCarthy*, 119 F.3d at 155–56.  New York law does also
"[i]mpos[e] strict liability upon landowners who undertake abnormally dangerous activities" on
the theory that "those who engage in activity of sufficiently high risk of harm to others,
especially where there are reasonable even if more costly alternatives, should bear the cost of
harm caused the innocent." *Doundoulakis v. Town of Hempstead*, 42 N.Y.2d 440, 448 (1977).
Moreover, "[j]ust as the landowner is responsible because for his own benefit he has chosen to
engage in an activity of sufficiently high risk of harm to others, so, too, those who intentionally
undertake or join in that abnormally dangerous activity must bear the consequences resulting
from harm to others." *Id.* at 451.  "The liability arises out of the abnormal danger of the activity

itself, and the risk that it creates, of harm to those in the vicinity.  It is founded upon a policy of

the law that imposes upon anyone who for his own purposes creates an abnormal risk of harm to

his neighbors, the responsibility of relieving against that harm when it does in fact occur."

Restatement (Second) of Torts § 519 cmt. d.[16]

      The rule derives from *Rylands v. Fletcher*, L.R. 3 H.L. 330 (1868).  As one court

explained:

> Dean Prosser states the rule of the English cases '(T)hat the defendant will be liable
> when he damages another by a thing or activity unduly dangerous and inappropriate
> to the place where it is maintained, in the light of the character of that place and its
> surroundings.'  Prosser, Torts (3d ed. 1964) s 77 at 522. . . . Or, as Mr. Justice
> Sutherland put it in describing a nuisance in *Euclid, Ohio v. Ambler Co.*, 272 U.S.
> 365, 388, 47 S.Ct. 114, 118, 71 L.Ed. 303, 54 A.L.R. 1016 (1926), '(It is) merely a
> right thing in the wrong place, like a pig in the parlor instead of the barnyard.'

*Yommer v. McKenzie*, 255 Md. 220, 223 (1969).

      The rule does not extend to the manufacture or sale of an "unreasonably dangerous"

product or substance:

> The rule imposing strict liability for abnormally dangerous activity applies only to
> the harm inflicted by non-natural uses of land, such as the use of atomic energy, the
> manufacture, storage or use of high explosives, the operation of oil or gas wells,
> the use of large storage tanks for gas or other flammable materials, or the operation
> of high voltage power lines.

*Melo v. Sarabia*, 2018 WL 3635043, at *5 (E.D.N.Y. May 22, 2018) (internal quotation marks

omitted) (quoting *Hamilton v. Accu-tek*, 935 F. Supp. 1307, 1323 (E.D.N.Y. 1996)).  "[T]he

doctrine of ultrahazardous activity does not apply to products; rather it is limited to activities

involving the use of land."  *McCarthy v. Sturm, Ruger, & Co.*, 916 F. Supp. 366, 371 (S.D.N.Y.

---

[16] Under the Restatement (Second) of Torts, liability is not limited to abnormally dangerous
activity on the defendant's land.  Although "[i]n most of the cases to which the rule of strict
liability is applicable the abnormally dangerous activity is conducted on land in the possession of
the defendant[, t]his, again, is not necessary to the existence of such an activity.  It may be
carried on in a public highway or other public place or upon the land of another."  Restatement
(Second) of Torts § 520 cmt. e.

1996), *aff'd sub nom. McCarthy v. Olin Corp.*, 119 F.3d 148 (2d Cir. 1997).  "Under New York's strict products liability jurisprudence, there is no cause of action for an unreasonably dangerous per se product."  *McCarthy*, 119 F.3d at 156.  Thus, it is not sufficient that a plaintiff alleges "a reasonable person would conclude that the danger of the product, whether foreseeable or not, outweighs its utility."  *Id.*  Courts are not to engage in such an "essentially . . . risk/utility analysis."  *Id.*

The Complaint fails to state a claim for abnormally dangerous activity against the Manufacturing Defendants.  Although Plaintiff alleges that its water systems were harmed as a result of contamination by industrial manufacturers and end-use consumers, it does not allege that the activity that those persons engaged in was abnormally dangerous.  In fact, the Complaint alleges widespread use of PFAS in "many consumer and industrial products."  Compl. ¶ 12.  The generalized, non-specific allegations of the Complaint do not support that the conduct of any industrial manufacturer or any consumer in disposing of PFAS was abnormally dangerous for the place that such conduct occurred.  More significantly, the Complaint does not allege that the Manufacturing Defendants "intentionally undert[ook] or join[ed] in that abnormally dangerous activity."  *Doundoulakis*, 42 N.Y.2d at 451.

Thus, Plaintiff is left with the allegation that manufacturing and selling PFAS was risky, and that harm was likely to result from the PFAS, and "that the risks inherent in the distribution of PFAS outweighed any utility of the products to consumers and the public as a whole."  Dkt No. 67 at 21.  But those allegations fail meaningfully to distinguish the sale of PFAS from the sale of firearms involved in *McCarthy v. Olin Corp.* or the sale of any other lawful product, the use of which can in many circumstances cause harm and whose risk may outweigh any perceived utility.  *McCarthy* instructs that those allegations are insufficient to make out a strict-liability tort

under New York law.  It cannot make a difference that the risk in *McCarthy* was to persons, whereas the risk Plaintiff argues here is to land.  Nor can it make a difference that Plaintiff alleges that the risk was aggravated by Defendants' failure to take "reasonable steps."  The ability to take "reasonable steps" to avoid a harm takes the conduct out of the arena of ultrahazardous activity and places it in the sphere of negligence and products liability.  *Cf.* Restatement (Second) of Torts § 520 cmt. h (noting that an "important factor to be taken into account in determining whether the activity is abnormally dangerous is the impossibility of eliminating the risk by the exercise of reasonable care").  Those conclusions, if accompanied by sufficient allegations of fact, might make out one of the three claims for strict liability the *McCarthy* court explained that New York recognizes.  But they cannot be sufficient to create a new font of tort liability, unconstrained by the rules and principles that constrain the existing three bases of strict liability.[17]

### 2.    Defective Design

Defendants contend that Plaintiff's design-defect claim should be dismissed because Plaintiff failed to plead facts identifying how the item is defectively designed or whether there is a feasible alternative design.  Plaintiff responds that it does not need to plead a specific alternative design at this stage of the litigation.  Dkt. No. 67 at 22.

---

[17] Plaintiff relies on the district court opinion in *Abbatiello*, 522 F. Supp. 2d at 531, but that case is distinguishable.  There, the court sustained a claim that the defendant Monsanto engaged in an abnormally dangerous activity within the meaning of the Restatement (Second) of Torts § 520 when it "release[ed] and "dispers[ed]" hazardous PCBs "with the potential to cause 'cancer, liver disease . . . heart dysfunction, hypertension, diabetes, nervous system disorders'" and various other health problems, *Abbatiello*, 522 F. Supp. 2d at 533, into the work environment of the plaintiff employees causing them injury, *id.* at 532.  The court stated, "[e]ven where the manufacture or sale of a hazardous material does not constitute an abnormally dangerous activity, the manner in which it is transported, used, or disposed of may meet the standard."  *Id.* Notably, the court did not address *McCarthy* or identify any law that called into question its holding that the manufacture and lawful sale of a lawful product cannot itself constitute abnormally hazardous activity sufficient to give rise to liability.

"[A] defectively designed product is one which, at the time it leaves the seller's hands, is in a condition not reasonably contemplated by the ultimate consumer and is reasonably dangerous for its intended use; that is one whose utility does not outweigh the danger inherent in its introduction into the stream of commerce." *Robinson v. Reed-Prentice Div. of Package Mach. Co.*, 59 N.Y.2d 102, 107 (1980) (citing the Restatement (Second) of Torts § 402A). "To state a claim for defective design under New York strict products liability law, a plaintiff must allege that: (1) the product as designed posed a substantial likelihood of harm; (2) it was feasible to design the product in a safe manner; and (3) the defective design was a substantial factor in causing plaintiff's injury." *S.F. v. Archer Daniels Midland Co.*, 594 Fed. App'x 11, 12 (2d Cir. 2014) (summary order) (internal quotation marks omitted).

Generally, "[i]t will be for the jury to decide whether a product was not reasonably safe in light of all of the evidence presented by both the plaintiff and defendant." *Voss*, 59 N.Y.2d at 108 (citations omitted). But the plaintiff must present evidence that it was feasible to design the product in a safer manner. *Id.* Where a plaintiff does not plead a safer design alternative for the allegedly defective design, dismissal is required. *See, e.g.*, *Archer Daniels Midland Co.*, 594 Fed. App'x at 12 ("S.F's claims . . . based in design defects fail because she did not allege a safer alternative design."); *Reed v. Pfizer*, 839 F. Supp. 2d 571, 578 (E.D.N.Y. 2012) (holding that design-defect claim was subject to dismissal because "Plaintiffs do not plead facts alleging the existence of a feasible alternative design that would make the product safer, as is required to establish a design defect, under . . . New York law"); *Koublani v. Cochlear Limited*, 2021 WL 2577068, at *10 (E.D.N.Y. June 23, 2021) (dismissing design defect claim because "no allegations suggest a feasible, safer alternative design" and rejecting plaintiff's contention that

"the pleadings are at too early a stage to demand allegations identifying the existence of feasible

alternative design" (internal quotation marks omitted)).

Plaintiff does not allege that there was a safer alternative design or that such a design

would serve the same function as the PFAS-containing products.[18]  *See Adamo v. Brown &*

*Williamson Tobacco Corp*, 11 N.Y.3d 545, 551 (2008) (affirming dismissal of design-defect

claim where plaintiffs failed to show that there was an alternative, safer design that served the

same function).  Instead, Plaintiff simply alleges that "[t]he evidence in this case will show that

at the time the Manufacturing Defendants designed the PFAS and PFAS-containing products and

solutions . . . the Manufacturing Defendants knew, or reasonably should have known, that

feasible alternatives to PFAS existed and that it was feasible for the Manufacturing Defendants

to design their products and solutions in a safer manner."  Compl. ¶ 137.  Essentially, Plaintiff

recites one of the elements of its cause of action without pleading any facts to render it non-

conclusory.  "Simply asserting that a feasible alternative design exists—without pleading any

supporting facts—is not sufficient to plead a defective design claim or to put Defendant on

notice as to what that design might be."  *Green v. Covidien*, 2019 WL 4142480, at *3 (S.D.N.Y.

Aug. 30, 2019).  Courts in this District have found conclusory allegations as to an alternative

design like those made here to be insufficient to withstand a motion to dismiss.  *See, e.g.*,

*Kennedy v. Covidien, LP*, 2019 WL 1429979, at *3–4 (S.D.N.Y. Mar. 29, 2019) (evaluating a

complaint that alleged that "[a]lternative designs for hernia mesh products and/or procedures

---

[18] To the extent that Plaintiff is asserting a defective-design claim on the PFAS made by
Manufacturing Defendants, rather than their PFAS-containing products, Plaintiff's allegations
appear to be that the design was defective because PFAS should not have been used at all.  *See,
e.g.*, Compl. ¶ 137.  "As courts in this circuit have noted, 'alleging that the product should not be
used at all is insufficient to satisfy the feasible alternative design element.'"  *Cosh v. Atrium
Med. Corp.*, 2020 WL 583826, at *3 (S.D.N.Y. 2020) (quoting *Green v. Covidien LP*, 2019 WL
4142480, at *3 (S.D.N.Y. Aug. 30, 2019)).

existed that were and/or are less dangerous and equally, if not more, effective," *Kennedy v. Covidien, LP*, 18-cv-1907, ECF No. 1-1 ¶ 59, and identified alternative procedures that would obviate the need for hernia mesh, *id.* ¶ 28, and concluding that the "conclusory allegation alluding to a safer alternative design is not pleaded in sufficient detail to support a reasonable inference that there are indeed feasibly alternative products"); *Cosh*, 2020 WL 583826, at *3 (considering allegations similar to that in the *Kennedy* complaint but possessing more detail as to alternatives and concluding that the existence of a feasible alternative design was not sufficiently pleaded).

Plaintiff tries to salvage its design-defect claim by arguing that any obligation to plead facts about a specific alternative design impermissibly imposes an evidentiary burden at the pleading stage. Dkt. No. 67. In support, Plaintiff cites *Ohuche v. Merck & Co.*, 2011 WL 2682133 (S.D.N.Y. July 7, 2011), where the court denied a motion to dismiss a *pro se* plaintiff's design-defect claim, explaining that it would be unfair "[t]o penalize plaintiff for not being more specific about the possible design defects" of a vaccine. *Id.* at *3. In so holding, the court explained that requiring a plaintiff to establish or allege facts regarding the feasibility of designing the vaccine in a safer manner "would require a plaintiff to possess technical, scientific knowledge," *id.* at *2, but also recommended that the *pro se* plaintiff amend her complaint to provide more supporting detail, *id.* at *3. The *Ohuche* court also explained that the submissions of the plaintiff, as a *pro se* litigant, "should be held to less stringent standards than formal pleadings drafted by lawyers." *Id.* at *2 (internal quotation marks omitted) (quoting *Hughes v, Rowe*, 449 U.S. 5, 9 (1980)).

*Ohuche* has been rejected implicitly and explicitly by numerous courts, and this Court now joins them. Since *Ohnuche*, the Second Circuit, following the Supreme Court, has

71

explained that "at the outset of a lawsuit," a plaintiff ordinarily must plead "what the plaintiff

must prove in the trial at its end." *WAFRA Inv. Advisory Grp., Inc.*, 6 F.4th at 303 (quoting

*Comcast Corp.*, 140 S. Ct. at 1014).  There is no reason why that requirement would not apply to

the element of a feasible alternative design, just as it applies to every other element of a claim

that a plaintiff must plead to open the doors to discovery in federal court.  The existence of a

feasible alternative design is not some fact that would uniquely be in the possession of a

defendant—the evidence and the allegation can come from an expert of Plaintiff or from the

conduct of a competitor.  Nor is the requirement to plead an alternative feasible design one that

of which a plaintiff should be lightly relieved.  Every product has the potential to cause injury.  It

is the design of the product in a dangerous manner when a less dangerous manner was feasible

that makes the conduct tortious and that, as pertains to allegations, justifies the cost and burden

of discovery.  *Cf. Twombly*, 550 U.S. at 559 (noting the costs associated with discovery and

cautioning that a court should "tak[e] care to require allegations that reach the level" of

plausibility in light of "the potentially enormous expense of discovery").  Plaintiff fails to

persuasively explain why, if it believes that an alternative feasible design was available it should

not be required to plead facts that—if established—would make that allegation plausible.  As

pleaded, Plaintiff's "design defect" claim is simply an impermissible backdoor attempt to make

Defendants liable for what Plaintiff claims to be abnormally dangerous activity without pleading

any facts to establish that there was an alternative means to create the product (with its benefits)

without the accompanying costs and risks.

### 3. Failure to Warn

"[A] plaintiff may recover in strict products liability or negligence when a manufacturer

fails to provide adequate warnings regarding the use of its product." *Rastelli v. Goodyear Tire &*

*Rubber Co.*, 79 N.Y.2d 289, 297 (1992).  "[F]ailure-to-warn claims grounded in strict liability

and negligence are functionally equivalent, as both forms of a failure-to-warn claim depend on the principles of reasonableness and public policy at the heart of any traditional negligence action." *In re N.Y.C. Asbestos Litig.*, 27 N.Y.3d at 787.  "In order to recover under a failure to warn theory, a claimant must show: '(1) that a manufacturer has a duty to warn; (2) against dangers resulting from foreseeable uses about which it knew or should have known; and (3) that the failure to do so was the proximate cause of harm.'" *Quintana v. B. Braun Medical, Inc.*, 2018 WL 3559091, at *5 (S.D.N.Y. July 24, 2018) (quoting *Am. Guarantee & Liab. Ins. Co. v. Cirrus Design Corp.*, 2010 WL 5480775, at *3 (S.D.N.Y. Dec. 30, 2010)).

In failure-to-warn cases, a court must decide whether an applicable legal duty—"a duty to warn owed by the manufacturer to the injured party"—exists.  *In re N.Y.C. Asbestos Litig.*, 27 N.Y.3d at 787.  In setting this duty:

> the court must settle upon the most reasonable allocation of risks, burdens and costs among the parties and within society, accounting for the economic impact of a duty, pertinent scientific information, the relationship between the parties, the identity of the person or entity best position to avoid the harm in question, the public policy served by the presence or absence of a duty and the logical basis of a duty.

*Id.* at 788.  "[I]n determining whether a duty exists, 'courts must be mindful of the precedential, and consequential, future effects of their rulings, and "limit the legal consequences of wrongs to a controllable degree."'"  *Beretta*, 96 N.Y.2d at 232 (quoting *Lauer v. City of N.Y.* 95 N.Y.2d 95, 100 (2000)).  A major determinant of the existence of a duty to warn is "whether the manufacturer is in a superior position to know of and warn against . . . hazards."  *In re N.Y.C. Asbestos Litig.*, 27 N.Y.3d at 791.

Plaintiff does not allege facts that make it plausible that the failure to warn was a proximate cause of Plaintiff's harm.  *See Quintana*, 2018 WL 3559091, at *6 (granting motion to dismiss failure-to-warn claim because plaintiff did not allege facts giving rise to an inference that the injury would not have occurred if there was a warning).  Plaintiff alleges, in a conclusory

manner, that "[a]s a direct and proximate result of the Manufacturing Defendants' failures to provide warnings or precautionary instructions sufficient to notify foreseeable users of the inherent environmental dangers posed by the use and disposal of PFAS and PFAS-containing products and solutions, . . . customers and licensees used and disposed of such products in a reasonably foreseeable manner," resulting in contamination of SUEZ's wells.  Compl. ¶ 150. Plaintiff does not allege any facts regarding what warnings should have been given, *see Black v. Covidien, PLC*, 2018 WL 573569, at *3 (W.D.N.Y. Jan. 26, 2018) (dismissing failure-to-warn claim where plaintiffs did not identify how the warnings given were inadequate or what warnings should have been given); *Reed*, 839 F. Supp. 2d at 576 ("[A]ssertions that warnings were not 'adequate' or 'sufficient' are nothing more than legal conclusions unsupported by factual content."), suggesting that the warning would have been heeded, *cf. Raney v. Owens-Illinois, Inc.*, 897 F.2d 94, 96 (2d Cir. 1990) (suggesting that whether a warning would have been heeded determines whether the failure to warn was the proximate cause of the injury), or that the warning would have ameliorated the harm, *cf.* Compl. ¶ 147 (referring to the environmental hazards "inherent" in the use and disposal of their products).  Nor does Plaintiff allege how, if the warnings were given, the industrial manufacturers or the end-users would have responded or how the harm to Plaintiff would have been averted.  Because Plaintiff does not allege facts from which it can be reasonably inferred that the failure to warn was a proximate cause of its harm, its failure-to-warn claim must be dismissed.

## CONCLUSION

The motion to dismiss for lack of jurisdiction by Corteva, Inc. and Dupont De Nemours, Inc. is GRANTED.  The motion to dismiss for lack of jurisdiction by Chemours Company and E.I. DuPont De Nemours and Company is DENIED.  The motion to dismiss for failure to state a claim upon which relief can be granted is GRANTED without prejudice to Plaintiff's filing of an

amended complaint.  Plaintiff must file any amended complaint within 30 days of the date of this Opinion and Order.

The Clerk of Court is respectfully directed to close Dkt. Nos. 57, 61, and 63.


SO ORDERED.

Dated: January 4, 2022
      New York, New York

                                      LEWIS J. LIMAN
                         United States District Judge