UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------------X
                                        :

SUEZ WATER NEW YORK INC.,         :

                         :

              Plaintiff,      :

                         :              20-cv-10731 (LJL)

         -v-                :

                         :           OPINION AND ORDER

E.I. DU PONT DE NEMOURS AND    :
COMPANY and THE CHEMOURS      :
COMPANY,                  :

                         :

              Defendants.    :

                         :
----------------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 03/22/2023

LEWIS J. LIMAN, United States District Judge:

       On January 4, 2022, the Court dismissed without prejudice the first amended complaint,

Dkt. No. 51 ("First Amended Complaint" or "FAC"), of plaintiff SUEZ Water New York Inc.

("SUEZ" or "Plaintiff") against defendants E.I. du Pont de Nemours and Company, Inc. ("Old

DuPont") and The Chemours Company ("Chemours," and together with Old DuPont,

"Defendants").[1]  Dkt. No. 94 ("January 2022 Opinion").  The FAC alleged various tort claims

related to contamination of Plaintiff's water systems.  Plaintiff subsequently filed a second

amended complaint against Defendants in an attempt to redress the gaps that the Court identified

in the First Amended Complaint.  Dkt. No. 95 ("Second Amended Complaint" or "SAC").  Old

DuPont and Chemours now move to dismiss the Second Amended Complaint under Federal

Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted.

Dkt. No. 98.

---

[1] The Court denied Old DuPont's and Chemours's motion to dismiss for lack of jurisdiction, but
granted Corteva, Inc.'s and DuPont De Nemours, Inc.'s motion to dismiss for lack of
jurisdiction.  Dkt. No. 94.

For the following reasons, Defendants' motion to dismiss for failure to state a claim is granted in part and denied in part.

## BACKGROUND

Familiarity with the facts of the case and of the Court's January 2022 Opinion is assumed.  The Court accepts as true the well-pleaded allegations of the Second Amended Complaint.  This Opinion and Order first summarizes the key allegations of the Second Amended Complaint, focusing on Plaintiff's new allegations.  In the Discussion section, it then reiterates the principal holdings from the January 2022 Opinion and discusses whether any of these new allegations redress the shortcomings that the Court identified in the First Amended Complaint.

Per- and polyfluoroalkyl substances ("PFAS") are a class of man-made chemicals.  SAC ¶ 9.  Perfluorooctanoic acid ("PFOA") is one of the most prevalent PFAS used in the United States.  *Id.*  PFOA and other PFAS are used as a processing aid in the production of numerous fluoropolymer and fluorotelomer chemical solutions and materials—including Defendants' name-brand chemical additives and coatings, such as Stainmaster®, Teflon®, Viton®, Tyvek® and Zonyl®.  *Id.* ¶¶ 10, 59, 62.  Defendants have sold and licensed their brand-name chemical solutions and PFOA and other PFAS-containing products to industrial manufacturers.  *Id.* ¶¶ 10–11.  Beginning in the 1950s, Defendant Old DuPont began using PFOA and other PFAS to manufacture, *inter alia*, fluorotelomers and fluoropolymers and began licensing its name-brand chemical additives and materials.  *Id.* ¶¶ 59, 63.  In or around 2015, Old DuPont spun-off and transferred its Teflon and Zonyl product lines to Chemours.  *Id.* ¶ 64.  Chemours continues to license Teflon and Zonyl to industrial manufacturers.  *Id.*  During this time, Defendants have had a controlling share of the fluoroproducts market.  *Id.* ¶ 67.  In an investor presentation, Chemours

boasted being a "[g]lobal market leader in [f]luroproducts" and owning "one of the largest patent portfolios in the fluorine derivatives injury." *Id.*

The United States Environmental Protection Agency ("EPA") has found that PFOA, which is water soluble, can be released during the manufacturing process through spills, emission vectors, and runoff, and as a component of industrial wastewater and solid waste. *Id.* ¶¶ 15, 21. The EPA has also found that certain of the fluorotelomers sold by Defendants can degrade into PFOA when released into the environment. *Id.* ¶ 16. Conventional wastewater treatment processes are ineffective at removing PFOA from the water column. *Id.* ¶ 17. PFOA and other PFAS can leach from solid waste directly into the environment, and leachate is usually sent to wastewater treatment plants. *Id.* ¶¶ 18–19. As a result, the EPA has identified widespread PFOA and PFAS contamination in surface and groundwater resources. *Id.* ¶ 13.

Scientific evidence indicates that PFOA may be hazardous to public health and the environment, *id.* ¶¶ 22, 27, and both the EPA and the New York State Department of Environmental Conservation ("NYSDEC") have taken action to address risks that PFOA poses to the public, *id.* ¶¶ 23–25, 27–31. The EPA issued guidance that PFOA and perfluorooctanesulfonic acid ("PFOS"), another closely related PFAS, in excess of 70 parts per trillion ("ppt") could pose adverse health risks. *Id.* ¶ 23. In 2020, the New York State Department of Health's Public Health and Health Planning Committee approved the adoption of Maximum Contaminant Levels ("MCLs") for PFOA in New York State's public water systems of ten ppt. *Id.* ¶¶ 29, 31. If a water system exceeds this MCL, it must take corrective action. *Id.* ¶ 31.

Old DuPont has known about the risks of PFOA for decades. In 1975, an internal memorandum identified the risks that Teflon scraps could pose to the water supplies near waste

disposal facilities and, as a result, elected not to deposit Teflon waste at the local landfill, which

was adjacent to underground water supplies for the Old DuPont plant and surrounding areas. *Id.*

¶¶ 34–35. By 1980, Old DuPont had identified the environmental contamination risks posed by

the manufacture and use of PFOA and PFOA-containing products in industrial processes and

understood that PFOA contamination could spread beyond a manufacturing facility's boundaries.

*Id.* ¶ 36. Further, Defendants knew or reasonably should have known that conventional

wastewater treatment methods were insufficient to remove PFOA from the water column,

because they operated on-site wastewater treatment facilities at several of their manufacturing

facilities in New Jersey. *Id.* ¶ 54. In 2005, Old DuPont conducted a series of studies of the

breakdown of its fluorotelomer products, including Zonyl, into PFOA as part of a settlement with

the EPA. *Id.* ¶ 40. These studies indicated that Old DuPont fluorotelomer products could break

down into PFOA in the environment, findings that were confirmed by the EPA's own studies.

*Id.* ¶¶ 40, 41, 43. By 2007, Old DuPont acknowledged that PFOA could be found "in trace

amounts" in its fluorotelomer products. *Id.* ¶ 43. In or around 2002, 3M, the company that had

sold PFOA to Old DuPont for its manufacturing processes, phased out the production of PFOA

after recognizing its environmental and health risks; at that point, Old DuPont began

manufacturing its own PFOA to use in the manufacturing processes of its PFOA-generated

products and to sell as source material to other manufacturers. *Id.* ¶¶ 32, 60.

      Old DuPont's knowledge of the risks of PFOA and how PFOA spread when released into

the environment was in tension with information that Old DuPont provided its customers. Old

DuPont was required by federal law to provide its customers with Safety Data Sheets ("SDSs")

(formerly known as, Material Safety Data Sheets or "MSDSs"). *Id.* ¶ 46. Among other

information, at least some of Old DuPont's MSDSs and SDSs contained instructions regarding

the appropriate disposal methods for PFOA and PFAS-containing products. *Id.* A 1989 MSDS, for example, advised industrial manufacturers that they could dispose of PFOA-containing fluoropolymer Teflon "via normal sanitary landfill by burying" because Teflon "is a very inert solid." *Id.* ¶ 47. These instructions were reiterated in two 1998 MSDSs, which indicated that Teflon was insoluble in water and that it was "best to dispose of such scrap [Teflon] in a landfill dump." *Id.* ¶ 48. A 1996 MSDS advised industrial manufacturers that the "preferred" method for disposal of Teflon and PFOA-containing aqueous dispersions was to "[s]eperate solids from liquid by precipitation and decanting or filtering. Dispose of dry solids in a landfill that is permitted, licensed or registered by a state to manage industrial solid waste. Discharge liquid filtrate to a wastewater treatment system." *Id.* ¶ 49. Old DuPont provided disposal instructions for Zonyl fluorotelomers, which break down into PFOA when released into the environment, indicating that Zonyl could be recycled. *Id.* ¶¶ 10, 43, 50. SUEZ suggests that these MSDSs and SDSs are indicative of the instructions that Old DuPont provided customers nationally, including in New York. *Id.* ¶ 51.

Defendants have sold and licensed their PFOA and PFAS-containing materials, including Zonyl and Teflon, to industrial manufacturers within SUEZ's watersheds and near SUEZ's treatment infrastructure since at least the late 1950s. *Id.* ¶ 68. In its Second Amended Complaint, Plaintiff identifies six manufacturers within SUEZ's watershed who purchased or licensed Defendants' products:

1.  Aalborg Instruments & Controls, Inc. ("Aalborg") has purchased Defendants' fluorochemical products, including Teflon, since 1972. *Id.* ¶ 69. Aalborg's manufacturing facility is located within the capture zone and/or drainage area of seven of SUEZ's potable water supply wells, within approximately three miles of the former Clarkstown Town Landfill, and within approximately four miles of SUEZ's Lake DeForest Water Treatment Plant. *Id.*

2.  Plastic-Craft Products Corp., whose manufacturing facility is located within one-half mile of SUEZ's Lake DeForest Water Treatment Plant, within approximately

one-half mile of the former Clarkstown Town Landfill, and within the capture
zone and/or drainage area of more than ten of SUEZ's potable water supply wells,
has purchased or licensed Defendants' fluorochemical products, including Teflon,
since the late 1950s. *Id.* ¶ 70.

3. Aremco Products, Inc., whose manufacturing facility is located within
approximately one-half mile and within the drainage area of Lake DeForest,
SUEZ's privately-owned reservoir that feeds into SUEZ's Lake DeForest Water
Treatment Plant, and within approximately three miles of the former Clarkstown
Town Landfill, has purchased or licensed Defendants' fluorochemical products,
including Teflon, since 1965. *Id.* ¶ 71.

4. Praxair Surface Technologies, Inc., whose manufacturing facility is located within
approximately one-half mile and within the capture zone and/or drainage area of
one of SUEZ's potable water supply wells, within approximately three miles of an
additional nine of SUEZ's potable water supply wells, within approximately three
miles of SUEZ's Lake DeForest Water Treatment Plant, and within
approximately three miles of the former Clarkstown Town Landfill, has
purchased or licensed Defendants fluorochemical products, including Teflon,
since 1988. *Id.* ¶ 72.

5. Between 1989 and 2000, Old DuPont sold or licensed fluorochemical products,
including Teflon to Atlantic Tubing Co. ("Atlantic Tubing"). Atlantic Tubing's
manufacturing facility is located within approximately three miles and within the
capture zone and/or drainage area of more than twelve of SUEZ's potable water
supply wells. *Id.* ¶ 73.

6. Finally, since 1972, Defendants have sold or licensed fluorochemical products to
Takasago International Corp. ("Takasago"), who has publicly acknowledged that
it stores and uses PFOA and/or PFOS at and disposes of PFOA- and/or PFAS-
containing materials from its manufacturing facility. Takasago's manufacturing
facility is located within approximately three miles of more than twelve of
SUEZ's potable water supply wells and adjacent to the OCSD #1 Harriman
Sewage Treatment Plant. The OCSD #1 Harriman Sewage Treatment Plant treats
industrial wastewater and discharges it into the Ramapo River, upriver of and
hydraulically connected to ten additional SUEZ potable water supply wells. *Id.*
¶ 74.

These manufacturers are reasonably representative of the industrial manufacturers to whom

Defendants sold and licensed PFOA, PFOA-produced, and other PFAS-containing materials. *Id.*

¶ 76. Although Plaintiff only identified manufacturers within SUEZ's watershed who purchased

fluoropolymer products, including Teflon, upon information and belief, Defendants also

regularly sold and licensed the use of their fluorotelomer products, including Zonyl, to numerous industrial manufacturers within SUEZ's watershed.  *Id.* ¶ 75.

Plaintiff alleges that Defendants' customers and licensees have discharged PFOA and other PFAS-containing materials that degrade into PFOA into SUEZ's watershed.  *Id.* ¶ 81. First, as instructed by Defendants' MSDSs and SDSs, Defendants' customers and licensees have disposed of PFOA and other PFAS-containing solid waste in landfills and solid waste treatment facilities, which has leached into its watershed.  *Id.* ¶ 82.  Second, Defendants' customers and licensees have discharged PFOA and other PFAS-containing wastewater into wastewater treatment facilities that were incapable of removing PFOA.  *Id.* ¶ 83.  This wastewater was then further discharged into lakes, streams, and rivers that feed into SUEZ's potable water system.  *Id.* Finally, Defendants' customers and licensees have discharged PFOA and PFAS byproducts through spills, emission vectors, and runoff.  *Id.* ¶ 84.

A study conducted by the NYSDEC of the groundwater in nearly 1,900 inactive landfills across New York State found that 77% of inactive landfills contained PFOA and/or PFOS levels exceeding ten ppt and 45% contained PFOA and/or PFOS levels exceeding 70 ppt.  *Id.* ¶¶ 95–96. The NYSDEC detected PFOA at five inactive landfill facilities upstream of, within the capture zone of, or otherwise adjacent to SUEZ's water supply wells, including the Carmel Landfill in Putnam County, the Fair Street Landfill in Putnam County, the Cross-County Sanitary-Kessman Landfill in Putnam County, the Mayer Landfill in Orange County, and the Ramapo Town Landfill in Rockland County.  *Id.* ¶¶ 97–102.  PFOA measurements of groundwater at four of these landfill facilities exceeded the ten ppt MCL, *id.* ¶¶ 98–101, and downgradient drinking water supply sampling at two of the landfill facilities exceeded at least the ten ppt MCL, *Id.* ¶¶ 98–99.  Upon information and belief, several of the current and former solid waste and

wastewater facilities located within the immediate vicinity of SUEZ's water protection area and the buffer zones surrounding SUEZ's potable water supply wells received PFOA-containing waste from Defendants' customers and licensees. *Id.* ¶ 88. The Second Amended Complaint alleges that, as a result of Defendants' actions, Defendants directly and proximately caused contamination of SUEZ's water sources; testing of SUEZ's water systems has revealed PFOA levels near or exceeding New York's MCL of ten ppt. *See id.* ¶¶ 106–10.

Plaintiff alleges that the contamination of its water systems could have been mitigated by Defendants for an independent reason: Defendants had developed alternatives to PFOA. By 1980, Old DuPont had developed hexafluoropropylene oxide dimer acid, known by the tradename GenX, an alternative to PFOA to facilitate the creation of fluoropolymers. *Id.* ¶¶ 38, 154. However, Old DuPont did not begin phasing out PFOA in the production of fluoropolymers until at least 2009 and did not complete the transition until at least 2015. *Id.* ¶¶ 39, 155. Old DuPont also developed Capstone® in 2010, an alternative fluorotelomer, which, unlike Zonyl, is designed not to degrade into PFOA and eliminates some trace PFOA impurities. *Id.* ¶ 42.

Based on these allegations, the Second Amended Complaint repleads five of the original seven causes of action against Old DuPont and Chemours: (1) public nuisance (First Cause of Action), *id.* ¶¶ 119–124; (2) private nuisance (Second Cause of Action), *id.* ¶¶ 125–32; (3) negligence (Third Cause of Action), *id.* ¶¶ 133–40; (4) trespass (Fourth Cause of Action), *id.* ¶¶ 141–49; and (5) defective design (Fifth Cause of Action), *id.* ¶¶ 150–61. Plaintiff seeks damages for remediating Defendants' allegedly tortuous activity. *Id.* at 42–43.

## PROCEDURAL HISTORY

Plaintiff initiated this action by complaint accepted for filing on December 21, 2020.

Dkt. No. 16.[2]  On February 12, 2021, Defendants, Corteva, Inc. and DuPont De Nemours, Inc.

jointly moved to dismiss the complaint for lack of jurisdiction and for failure to state a claim.

Dkt. Nos. 45, 47.  In response, Plaintiff filed the First Amended Complaint on February 25,

2021.  Dkt. No. 51.  On March 25, 2021, Defendants, on the one hand, and Corteva, Inc. and

DuPont De Nemours, Inc., on the other, moved separately to dismiss the First Amended

Complaint for lack of jurisdiction under Federal Rule of Civil Procedure 12(b)(2), Dkt. Nos. 57,

61, and jointly to dismiss the First Amended Complaint for failure to state a claim under Federal

Rule of Civil Procedure 12(b)(6), Dkt. No. 63.  In an Opinion and Order dated January 4, 2022,

the Court denied Defendants' motion to dismiss for lack of jurisdiction but granted Corteva,

Inc.'s and DuPont De Nemours, Inc.'s motion to dismiss for lack of jurisdiction.  Dkt. No. 94.

The Court, however, granted the joint motion to dismiss for failure to state a claim without

prejudice to Plaintiff's filing of a second amended complaint.  *Id.*

On February 3, 2022, Plaintiff filed the Second Amended Complaint.  Dkt. No. 16.

Defendants filed a motion to dismiss the Second Amended Complaint for failure to state a claim

under Federal Rule of Civil Procedure 12(b)(6) along with a supporting memorandum of law and

affidavit on March 17, 2022.  Dkt. Nos. 98, 99.  On May 2, 2022, Plaintiff filed a memorandum

of law in opposition to Defendants' motion to dismiss, Dkt. No. 104, to which Defendants

replied on May 19, 2022, with a memorandum of law and a supporting affidavit, Dkt. No. 107.

The Court held oral argument in this matter on November 29, 2022.  *See* Dkt. No. 110.  Before

---

[2] Plaintiff first attempted to file its complaint on December 18, 2020.  The complaint was
rejected by the Clerk of the Court for a filing error.  Dkt. No. 1.

oral argument, Plaintiff submitted a letter motion for leave to strike Paragraphs 56 and 57 of the Second Amended Complaint.  Dkt. No. 109.

## LEGAL STANDARD

To survive a Rule 12(b)(6) motion to dismiss, a complaint must include "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*  This "does not impose a probability requirement at the pleading stage" but rather "calls for enough fact to raise a reasonable expectation that discovery will reveal evidence [supporting the claim]." *Twombly*, 550 U.S. at 556.  A complaint need not allege "detailed factual allegations," but "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555.  "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.  "[A]t the outset of a lawsuit," a plaintiff ordinarily must plead "what the plaintiff must prove in the trial at its end." *Lively v. WAFRA Inv. Advisory Grp., Inc.*, 6 F.4th 293, 303 (2d Cir. 2021) (quoting *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 140 S. Ct. 1009, 1014 (2020)).

## DISCUSSION

Defendants argue that Plaintiff's Second Amended Complaint fails to cure the deficiencies the Court identified in its January 2022 Opinion.  Dkt. No. 99 at 1.  They argue that the Second Amended Complaint has failed to add sufficient factual allegations to adequately plead substantial factor causation against each Defendant, a necessary element of each of

Plaintiff's claims.  *Id.* at 2.  They further argue that each of Plaintiff's five claims suffer from additional pleading defects that require this Court to dismiss the entire Second Amended Complaint.  *Id.*

After concluding that Plaintiff has adequately pleaded substantial factor causation, the Court reviews each of Plaintiff's five claims in turn.

## I.    Causation

As a threshold matter, to prevail on any of its five claims, Plaintiff must plead causation. *See, e.g.*, *Hamilton v. Beretta U.S.A. Corp.*, 750 N.E.2d 1055, 1067 (N.Y. 2001) (negligence); *Voss v. Black & Decker Mfg. Co.*, 450 N.E.2d 204, 208 (N.Y. 1983) (defective design); *Copart Indus., Inc. v. Consolidated Edison Co.*, 362 N.E.2d 968, 971–72 (N.Y. 1977) (public and private nuisance); *Phillips v. Sun Oil Co.*, 121 N.E.2d 249, 251 (N.Y. 1954) (trespass).  Defendants again challenge the sufficiency of Plaintiff's allegations of legal causation.  *See* Dkt. No. 99 at 13.  Thus, the Court reviews whether Plaintiff has pleaded sufficient facts to establish legal causation before analyzing each of Plaintiff's five claims.[3]

The Court's January 2022 Opinion reviewed the necessary elements of legal causation under New York law and surveyed how courts in this Circuit have applied the test for substantial factor causation to groundwater contamination cases.  Dkt. No. 94 at 30–35.  Substantial factor causation recognizes that many acts can contribute to an injury.  *Id.* at 32.  The Second Circuit has stated that the relevant test is whether the act "had such an effect in producing the injury that

---

[3] There is an argument that "[t]he boundary [of proximate causation] will be extended as the dangers to be protected against increase."  *NAACP v. AcuSport, Inc.*, 271 F. Supp. 2d 435, 497 (E.D.N.Y. 2003).  Thus, the greater the alleged harm may be, the less that is required in terms of a direct connection between the defendant and the harm caused.  Here, although Plaintiff asserts multiple common law causes of action against Defendants, it alleges the same harm from each cause of action: PFOA infiltration of its wells.  *See* SAC ¶¶ 123, 131, 138, 148, 160.  For that reason, the Court need not consider whether a different standard of proximate causation is required for any of Plaintiff's five claims.

reasonable people would regard it as a cause of the injury." *Id.* (quoting *In re Methyl Tertiary Butyl Ether (MTBE) Prod. Liab. Litig.*, 725 F.3d 65, 116 (2d Cir. 2013)).  The act need not be the primary contributing factor to the injury, but it cannot be "slight or trivial." *Id.* (citation omitted).  "In ascertaining whether the defendant's conduct constitutes a substantial factor in bringing about the harm of which the plaintiff complains, consideration should be given to (1) the aggregate number of factors involved which contribute towards the harm and the effect which each has in producing it, (2) whether the defendant has created a continuous force active up to the time of harm, or whether the situation was acted upon by other forces for which the defendant is not responsible, and (3) the lapse of time." *Mack v. Altmans Stage Lighting Co.*, 470 N.Y.S.2d 664, 667 (2d Dep't 1984) (citing, *inter alia*, Restatement (Second) of Torts § 433); *see also In re MTBE Prod. Liab. Litig.*, 739 F. Supp. 2d 576, 596 (S.D.N.Y. 2010) (same).  A court should also consider other principles of proximate causation, including foreseeability, when analyzing whether a defendant's actions are a substantial factor in the plaintiff's injuries. *See Hain v. Jamison*, 68 N.E.3d 1233, 1237 (N.Y. 2016) (noting that whether an act is a "substantial cause of the plaintiff's injuries . . . turns upon questions of foreseeability"); *see also Henrietta D. v. Bloomberg*, 331 F.3d 261, 278–79 (2d Cir. 2003) (collecting cases) ("In assessing whether one cause among many constitutes proximate cause, courts have engaged in inquiries such as whether a cause is a substantial factor in bringing about the harm, or whether the cause is 'too remotely or insignificantly related to the' harm to be a legal basis for liability." (citations omitted)).  Although causation is generally a question of fact for the jury, a complaint still must allege adequate facts for the factfinder to conclude that the defendant's contribution was more than trivial.  *See* Dkt. No. 94 at 34, 38.

Courts in this Circuit have sustained claims for groundwater contamination against causation challenges if the plaintiff has plausibly alleged that an upstream manufacturing defendant (1) marketed or sold the product to customers who used the product near the contaminated groundwater; (2) held a significant percentage of the relevant market; and (3) contributed to the contamination, either directly by releasing the contaminants into the environment, or indirectly by advising persons who purchased from it the contaminating products to release the contaminants into the environment with knowledge that the recommended disposal methods would likely lead to contamination. *Id.* at 33–35. In its January 2022 Opinion, the Court concluded that Plaintiff's First Amended Complaint had failed to allege sufficient facts to meet this threshold. The Court identified three primary and interrelated deficiencies in Plaintiff's pleadings. First, Plaintiff's allegations most closely associated with the contamination of its water system were focused on PFAS generally, not PFOA or PFOS, the relevant contaminating chemical compounds. *Id.* at 37. Second, Plaintiff failed to present any allegations that would enable the court to conclude that Defendants' contribution to the contamination was "anything but miniscule." *Id.* at 38. Finally, Plaintiff did not allege that Defendants sold the offending compounds to manufacturers near SUEZ's facilities, or that the manufacturers released the offending compounds into SUEZ's water systems. *Id.* at 38–39. The Court stated, "Plaintiff does not allege facts, based on either the chemicals the [ ] Defendants sold, their market share of the polluting chemicals, or the location to which [ ] Defendants sold and delivered the chemicals, that would establish that the conduct of the [ ] Defendants was a substantial factor in the alleged injury." *Id.* at 36.

Defendants argue that the Second Amended Complaint has not cured these deficiencies. Dkt. No. 99 at 13–15. Specifically, Defendants argue that Plaintiff continues to rely on

allegations that Defendants distributed PFAS as a class and not PFOA, and that Plaintiff has

failed to allege facts with sufficient specificity to establish that Defendants' contribution to the

contamination was anything but insignificant. *Id.* at 14–15. Plaintiff counters that the Second

Amended Complaint alleges sufficient facts to establish that Defendants' actions were a

substantial factor in Plaintiff's injuries and that Defendants' arguments seek to impose an

"evidentiary burden on SUEZ that is inappropriate at the motion to dismiss stage." Dkt. No. 104

at 6, 10. The Court agrees with Plaintiff.

The Second Amended Complaint cures the defects in the First Amended Complaint with

respect to substantial factor causation; as a result, the Court must consider whether Plaintiff has

pleaded the other elements of its claims. Plaintiff alleges that it "sold and licensed their PFOA

and PFAS-containing materials . . . to industrial manufacturers within SUEZ's source watersheds

and drinking water treatment infrastructure in New York." SAC ¶ 68. The Second Amended

Complaint identifies by name six of Defendants' customers to whom they sold Teflon, one of

which currently uses PFOA and/or PFOS, and the SAC alleges that all six are located within the

capture zones or drainage areas of SUEZ's wells or near water- and sewage-treatment plants and

landfills.[4] *Id.* ¶¶ 69–74. Plaintiff further alleges that these customers "are reasonably

---

[4] In their reply in further support of their motion to dismiss, Defendants present data collected by
the NYSDEC suggesting that three of these customers have never used, stored, manufactured, or
discharged PFOA- or PFOS-containing material. Dkt. No. 107 at 6; Dkt. No. 107-2. This
evidence, however, is not properly before the Court. "Courts may take notice of public
information in adjudicating a motion to dismiss without converting that motion to a summary
judgment motion." *United States ex rel. Hart v. McKesson Corp.*, 602 F. Supp. 3d 575, 591
(S.D.N.Y. 2022) (citing *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 426 (2d Cir.
2008)). Under Federal Rule of Evidence 201, a court "may judicially notice a fact that is not
subject to reasonable dispute because it . . . can be accurately and readily determined from
sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2). "[W]hen a
court takes judicial notice of a document on a motion to dismiss, it should generally do so only to
determine what statements the documents contain not for the truth of the matters asserted."
*Lateral Recovery, LLC v. Cap. Merch. Servs., LLC*, 2022 WL 4815615, at *20 (S.D.N.Y. Sept.

representative of the industrial manufacturers to whom Defendants sold and/or licensed their

PFOA, PFOA-produced, and other PFAS-containing materials during the relevant time period."

*Id.* ¶ 76.  Additionally, Plaintiff alleges "[u]pon information and belief"[5] that "Defendants also

regularly sold and/or licensed the use of their fluorotelomer products, including but not limited to

Zonyl®, to numerous industrial manufacturers within SUEZ's source watersheds and drinking

water treatment infrastructure in New York."  *Id.* ¶ 75.

These allegations make the SAC's claims as to causation plausible.  The SAC identifies

facts supporting the inference that Defendants sold PFOA-containing materials to customers

within SUEZ's watershed that contributed to the PFOA contamination of SUEZ's water systems;

it contains facts that the relevant market includes PFOA and products that degrade into PFOA;

and it contains facts that Defendants have a significant share of this market.  Together, these

facts make it plausible that Defendants had a more than "miniscule" role in the contamination of

Plaintiff's wells.  Specifically, the Second Amended Complaint contains factual allegations as to

how Defendants' sales to industrial manufacturers could have polluted Plaintiff's water systems:

---

30, 2022) (internal quotation marks and citations omitted); *see also Staehr*, 547 F.3d at 425
(stating that it is proper to take judicial notice of regulatory filings at the motion-to-dismiss stage
as long as it is not for the truth of the matter asserted).  Thus, the Court can take judicial notice of
the fact that the survey exists, but not the contents of the survey for the proposition that the three
manufacturers have never used PFOA-containing materials.
[5] Notably, "[a] plaintiff may satisfy the plausibility standard by pleading facts upon information
and belief . . . when the facts are peculiarly within the possession and control of the defendant or
where the belief is based on factual information that makes the inference of culpability
plausible."  *Evergreen E. Coop. v. Whole Foods Mkt., Inc.*, 2023 WL 545075, at *2 (2d Cir. Jan.
27, 2023) (summary order) (internal quotation marks omitted) (quoting *Citizens United v.
Schneiderman*, 882 F.3d 374, 384–85 (2d Cir. 2018)).  A plaintiff, however, "cannot merely plop
upon information and belief in front of a conclusory allegation and thereby render it non-
conclusory."  *Id.* (internal quotation marks omitted) (quoting *Citizens United*, 882 F.3d at 384–
85).  Here, this allegation is both supported by specific factual allegations (*e.g.*, that Defendants
were selling at least one other of their products, Teflon, to industrial manufacturers in SUEZ's
watershed) and reflect facts uniquely within the control of Defendants (*i.e.*, their sales patterns).

it alleges that PFOA is used in the production of Teflon, a fluoropolymer. *Id.* ¶ 10. Once the production process is complete, Teflon contains small amounts of PFOA. *Id.* ¶ 34. Zonyl, a fluorotelomer, also may contain trace amounts of PFOA and it degrades into PFOA once released in the environment. *Id.* ¶¶ 43, 50. When liquid Teflon waste is disposed of through waste-water treatment facilities incapable of removing PFOA, the PFOA in Teflon seeps into groundwater and can reach Plaintiff's wells. Likewise, when solid Teflon and Zonyl are disposed of in landfills and is discharged via leachate, PFOA contained in those products can reach Plaintiff's wells. *See, e.g.*, *id.* ¶¶ 18, 35, 49, 54, 77, 83.[6] Plaintiff also alleges, upon information and belief, that Defendants' customers have sent waste to several inactive landfill facilities upstream of, within the capture zone of, or otherwise adjacent to SUEZ's water supply wells and that PFOA contamination above New York's MTC has been detected in those landfill facilities. *Id.* ¶¶ 88, 95–102. Finally, Plaintiff alleges that Defendants' customers discharged PFOA, PFOA-containing, and other PFAS byproducts through spills, emission vectors, and runoff. *Id.* ¶ 84. Plaintiff's assertions that Defendants' sales of PFOA-containing and PFAS materials to customers within SUEZ's watershed was a substantial factor in the resulting contamination of SUEZ's water systems—including its wells, surface water intakes, and drinking water treatment and supply systems—are further supported by the fact that PFOA is soluble and mobile in water, allowing it to spread beyond its initial source and from soil into groundwater, and that Plaintiff knew of these properties by the early 1980s. *Id.* ¶¶ 21, 37.

---

[6] Plaintiff also alleges, in a conclusory fashion, that Defendants also sold and distributed PFOA directly to its customers in SUEZ's watershed. *See id.* ¶¶ 58, 74. In fact, the specific factual allegations undermine the conclusory allegations concerning Defendants' sale and distribution of PFOA. *See infra* note 10.

Finally, the Second Amended Complaint alleges that Defendants knew of the risks posed by their distribution of PFOA, PFOA-produced, and PFAS-containing compounds as early as the early 1960s. *Id.* ¶ 33. In 1975, Plaintiff alleges that Old DuPont stopped sending Teflon to the local landfill because of its proximity to underground water sources and the potential for PFOA to be present. *Id.* ¶¶ 34–35. By the early 1980s, Old DuPont discovered that PFOA could be released by air, soil, and groundwater emissions at manufacturing facilities that use PFOA and PFOA-containing materials and that the emissions could "travel beyond the manufacturing facilities' boundaries." *Id.* ¶¶ 36–37. And by the mid-2000s, Old DuPont was aware that fluorotelomers could degrade into PFOA in the environment. *Id.* ¶¶ 41–42. The SAC also alleges that Defendants operated wastewater treatment facilities at their manufacturing facilities in New Jersey, and thus "became aware, or reasonably should have become aware . . . that conventional wastewater treatment methods were insufficient to remove PFOA from the water column." *Id.* ¶ 54. Further, Plaintiff alleges that Defendants instructed its customers that fluorotelomer and fluoropolymer liquid and solid waste could be disposed of through standard wastewater, landfill, and recycling channels. *Id.* ¶¶ 46–51. It is thus plausible that Plaintiff marketed or sold Teflon, Zonyl, and other products containing PFOA to manufacturers within SUEZ's watershed and near its wells, that those manufacturers, in turn, disposed of the products in landfills within or adjacent to SUEZ's water systems and thus contaminated the water systems, and that the actions taken by Defendants' industrial customers and the resulting contamination of SUEZ's water systems was foreseeable.[7]

---

[7] In the January 2022 Opinion, the Court found that Plaintiff's "allegations of injury caused through the agency of the end users is even more speculative and attenuated." Dkt. No. 94 at 39. The Court concluded that these allegations amounted to a theory that Defendants "could be said to have 'caused' SUEZ's injury if it sold PFAS to an industrial manufacturer anywhere in the world who then applied the PFAS to a product again anywhere in the world who then brought

For this reason, Defendants' argument that the Second Amended Complaint again impermissibly relies on allegations regarding PFAS as a class—as opposed to PFOA and PFOS, the offending chemicals—has less force than it did when made with respect to the First Amended Complaint.  Dkt. No. 99 at 14.  Although Plaintiff makes allegations concerning PFAS as a class, it focuses on two specific PFAS-containing compounds, Teflon and Zonyl, and the Second Amended Complaint contains specific factual allegations as to how these compounds degrade into PFOA and thus can contaminate groundwater.  It is no longer the case, as it was in with the First Amended Complaint, that "almost all the allegations most closely associated with the complained-of-contamination reference third-party actions with respect to PFAS generally—not with respect to PFOA or PFOS," Dkt. No. 94 at 37; the allegations now relate to specific PFAS-containing compounds that are vectors for PFOA contamination.

Defendants also argue that the Second Amended Complaint has not alleged that Defendants' sales of PFOA are "anything but insignificant."  Dkt. No. 99 at 14 (citation omitted).  However, this contention ignores the allegations that the manufacturers identified in the SAC are reasonably representative of other manufacturers that Defendants sold and marketed PFOA and PFOA-derived products to within SUEZ's watershed.  SAC ¶ 76.  It also ignores the allegations with respect to Defendants' market share during the relevant time period.  The

---

that product into the State of New York at any time from the 1950s forward and prior to the customer disposing of the product in a landfill in New York and that PFAS—that may or may not contain PFOA or PFOS—somehow made its way into SUEZ's water systems." *Id.* at 40. Plaintiff attempts to redress these deficiencies by alleging that "Defendants' fluorotelomer products, including but not limited to Zonyl®, have been continuously sold in retail stores across the country, including in New York." SAC ¶ 77; *see also id.* ¶ 78. These allegations, however, are identical to Plaintiff's allegations in the First Amended Complaint, if more artfully pleaded. Fluorotelomers, including Zonyl, are not sold in retail stores; rather, they are applied to products by manufacturers and then sold by those manufacturers into retail channels. Thus, Plaintiff's allegations with respect to end-use customers in the Second Amended Complaint are no less speculative and attenuated than its allegations in the First Amended Complaint.

Second Amended Complaint alleges that Defendants had a "controlling" share of the fluoroproducts market. *Id.* ¶ 67. To support this allegation, Plaintiff points to a "recent" Chemours investor presentation, which boasted being a "[g]lobal market leader" of the fluoroproducts market with "one of the largest patent portfolios." *Id.* Because Chemours inherited Old DuPont's Teflon and Zonyl product lines in its 2015 spinoff, it is reasonable to conclude that Old DuPont was also a market leader in these categories. *See id.* ¶ 64. The relevant market is, of course, much narrower, *see In re MTBE Prod. Liab. Litig.*, 725 F.3d at 116 (indicating that relevant market share analysis was the percentage of MTBE gasoline that defendant sold in Queens, the location of the contaminated water wells), but at this stage, these facts are sufficient to support an inference that Defendants' customers in SUEZ's watershed foreseeably contributed to the PFOA-contamination of SUEZ's water systems, *see Locust Valley Water Dist. v. Dow Chem. Co.*, 465 F. Supp. 3d 235, 238, 240 (E.D.N.Y. 2020) (finding allegations that defendant was the primary manufacturer and market leader of relevant contaminant sufficient); Motion to Dismiss Transcript at 7, *Suffolk Cty. Water v. Dow Chem. Co.*, No. 17-cv-6980 (E.D.N.Y. Dec. 13, 2018), Dkt. No. 67-2 ("SCWA Transcript") (Bianco, J.) (same). Because of the relatively low limits set by New York State for PFOA contamination—ten parts per trillion, Dkt. No. 94 ¶ 31—it is reasonable to conclude that the PFOA-containing materials that Defendants sold to their customers made a more than slight or trivial contribution to Plaintiff's alleged injury and that this contribution was foreseeable.

Defendants argue that these allegations leave "too much to assumption and speculation to 'nudge [Plaintiff's] claims across the line from conceivable to plausible.'" Dkt. No. 99 at 14 (quoting *Twombly*, 550 U.S. at 570). Defendants would require that Plaintiff plead, *inter alia*, "(1) a specific customer of Defendants (2) using a specific product of Defendants (3) improperly

disposed of any PFOA-containing waste following its specific incorporation of Defendants'

product into its own (4) in a manner that infiltrated a specific water source from which Plaintiff

draws." *Id.* at 15.  However, Defendants, as Plaintiff argues, seek to impose an evidentiary

burden on Plaintiff that is inappropriate at this stage of the litigation.  As the Court emphasized

in its January 2022 Opinion, Federal Rule of Civil Procedure 8(a)(2) does not "require detailed

factual allegations" or "specific evidence or extra facts beyond what is needed to make the claim

plausible."  Dkt. No. 94 at 35–36 (first quoting *Iqbal*, 556 U.S. at 678, and then quoting *Arista

Recs., LLC v. Doe 3*, 604 F.3d 110, 120–21 (2d Cir. 2010)).  Here, Plaintiff has pleaded

sufficient facts to state a claim as to causation:  It has pleaded facts to support that Defendants

sold or licensed specific PFOA and PFOA-derived products to industrial manufacturers in the

immediate vicinity of SUEZ's source watersheds and drinking water treatment plants and that

these products were disposed of in landfills and through wastewater treatment plants near

SUEZ's water protection areas and the buffer areas surrounding SUEZ's potable water supply

wells; it has pleaded facts that Defendants had a controlling share of the national market for

fluoroproducts during the relevant time periods; and it has pleaded facts that support that

Defendants both knew of the risks that PFOA and PFOA-derived products, including Teflon and

Zonyl, posed to watersheds and advised industrial manufacturers on disposal methods that would

heighten these risks.  Taken together, and when all reasonable inferences are drawn in favor of

the Plaintiff as this Court must do, the Second Amended Complaint pleads sufficient allegations

for a jury to assign at least "a relatively small percentage of fault to" Defendants.  *N.Y. Am.

Water Co., Inc. v. Dow Chem. Co.*, 2020 WL 9427226, at *5 (E.D.N.Y. Dec. 11, 2020) (noting

that "an act or omission may be considered a 'substantial factor' in causing an injury even if a

jury 'assigns a relatively small percentage of fault to it,' so long as the alleged cause is not 'slight

20

or trivial.'" (citation and alteration omitted)); *see* SCWA Transcript at 6–7 (holding that causation was sufficiently pleaded when the plaintiff water district alleged that (1) each defendant marketed, sold, and distributed the contaminant to customers in county of the water district; (2) the defendants are the "primary producers" and "hold dominant shares" of the contaminants; and (3) the defendants advised purchasers "to dispose of the [contaminant] waste to the environment"); *see also Locust Valley Water Dist.*, 465 F. Supp. 3d at 240 (holding that causation adequately pleaded when "plaintiffs have set forth nearly identical allegations regarding causation as the plaintiff in the *SCWA* case did"); *cf. In re MTBE Products Liability Litigation*, 725 F.3d at 82, 116 (upholding jury verdict as to causation when there was evidence that MTBE-contaminated gasoline from the defendant was placed in storage tanks in the same geographic area as the contaminated wells, that the gasoline leaked from the storage tanks and MTBE was water soluble, and that the defendant controlled roughly 25% of the relevant market).

## II.      Public and Private Nuisance Claims

Plaintiff again brings claims for public and private nuisance.  Defendants move to dismiss both claims on similar grounds as they did in their motion to dismiss the First Amended Complaint:  Defendants argue that Plaintiff has not adequately alleged that Defendants substantially participated in the nuisance-creating activity, Dkt. No. 99 at 15–19, that SUEZ has suffered a "special injury" such that it can maintain a claim for public nuisance, *id.* at 19–21, and that the harm to SUEZ's water systems was discrete enough to constitute a private nuisance, *id.* at 22–24.  The SAC fails to state claims for public and private nuisance, because it does not adequately allege that Defendants substantially participated in the nuisance-creating activity with the requisite knowledge and intent.

Public and private nuisance are distinct theories of liability.  *See Copart Indus. Inc.*, 362 N.E.2d at 971 (noting that Professor William Prosser observed that public and private nuisances

"have almost nothing in common" apart from causing inconvenience to someone). However, their reach is similar: "One is subject to liability for a nuisance caused by an activity, not only when he carries on the activity but also when he participates to a substantial extent in carrying it on." Restatement (Second) of Torts § 834 & cmt. a (stating that this rule applies to both private nuisance and public nuisance); *see also Penn Ctr. Transp. Co. v. Singer Warehouse & Trucking Corp.*, 447 N.Y.S.2d 265, 267 (1st Dep't 1982) ("Everyone who creates a nuisance or participates in the creation or maintenance thereof is liable for it.").

The Court's January 2022 Opinion examined the "question of [nuisance] liability of an upstream manufacturer who introduces a dangerous or toxic substance into the stream of commerce" in depth. *See* Dkt. No. 94 at 43–54. The Court observed that many courts apply "an almost absolute rule": "A manufacturer who produces a substance that, after being sold, creates or contributes to a nuisance cannot be liable for the nuisance-causing activity after the sale unless the manufacturer somehow controls or directs the activity." *Id.* at 44; *see also id.* at 44–47. New York courts, however, have applied a more flexible standard. "Those courts have held that the Restatement language requiring that the defendant have 'participated to a substantial extent' in the nuisance-creating activity was also satisfied when there was evidence that the defendant, having sold a toxic or dangerous substance to an identified third party, continued to sell the same product to the third party for a profit knowing that that third party would continue to use it in a manner that maintained the nuisance." *Id.* at 47; *see also* Restatement (Second) of Torts § 834 cmt. d (explaining that the substantial-participation component of liability derives from the substantial-factor test for legal causation). Critical to each water-contamination case where a court applying New York law has found that an upstream manufacturer substantially participated in a nuisance was not only that "the defendant-manufacturer . . . had knowledge that its product

would be used in a manner that would create a nuisance, but [that] it also sold the product directly and continuously to the person engaged in the nuisance-creating activity even after acquiring the knowledge that that person was creating a nuisance." *Id.* at 49.  Notably, the Court held that allegations of foreseeability—the standard for a negligence cause of action—would be insufficient for Plaintiff to state a claim against Defendants for nuisance. *See id.* at 53.

The Court's conclusion follows from the very nature of a nuisance claim, and its distinction from a negligence cause of action.  Nuisance is a unique form of tort liability.  Under New York law, a defendant who does not owe a duty to another and who does not engage in otherwise tortious conduct can still be liable for the harm caused to third parties if the defendant's actions were intentional and unreasonable.  Restatement (Second) of Torts §§ 821B cmt. e, 822 & cmt. a; *see also Copart Indus., Inc.*, 362 N.E.2d at 971; *NAACP v. AcuSport, Inc.*, 271 F. Supp. 2d 435, 448 (E.D.N.Y. 2003).[8]  "'Intent' [in tort law] . . . has reference to the consequences of an act rather than the act itself."  Restatement (Second) of Torts § 8A cmt. a. "A defendant acts intentionally if it acts or fails to act with the purpose of interfering with a public [or private] right, knew that such interference was resulting or was substantially certain to result from its conduct, or became aware that its conduct was causing such interference and

---

[8] A defendant is also liable for a nuisance if the interference is "actionable under the principles controlling liability for negligent or reckless conduct or for abnormally dangerous activities." Restatement (Second) of Torts §§ 821B cmt. e, 822 & cmt. a.  Because Plaintiff does not allege that Defendants owed a duty of care to the public at large (in the case of Plaintiff's public nuisance claim) or to SUEZ specifically (in the case of its private nuisance claim), or that Defendants actions were reckless or constituted abnormally dangerous activities, the Court focuses on whether Defendants' allegedly nuisance-creating conduct was intentional. *See City of New York v. Beretta U.S.A. Corp.*, 315 F. Supp. 2d 256, 279 (E.D.N.Y. 2004) ("Where a nuisance is based on negligence, a plaintiff must still prove a duty of care and subsequent breach, but the duty at issue is to the public or to a substantial number of persons."); *Copart Indus., Inc.*, 362 N.E.2d at 972 ("[W]henever a nuisance has its origin in negligence, negligence must be proven." (internal quotation marks and citations omitted)).

nevertheless continued it." *NAACP*, 271 F. Supp. 2d at 449. "It is the knowledge that the actor has at the time he acts or fails to act that determines whether the invasion resulting from his conduct is intentional or unintentional. . . . He must either act for the purpose of causing [the nuisance] or know that it is resulting or is substantially certain to result from his conduct." Restatement (Second) of Torts § 825 cmt. c. It is not enough that the defendant "realizes or should realize that his conduct involves a serious risk or likelihood of causing the invasion." *Id.* Nor does "[a] general awareness that harm is resulting or likely to result . . . satisfy the intentionality requirement." *Beretta U.S.A. Corp.*, 315 F. Supp. 2d at 278. A defendant is also deemed to have acted intentionally if the defendant, previously unaware of the nuisance, learns that an invasion of a public right or interference with the use and enjoyment of another's land is resulting from defendant's conduct and continues in the conduct. Restatement (Second) of Torts § 825 cmt. d. And it is insufficient that the defendant's actions were intentional; in the absence of a duty, they must also be unreasonable, *see* Restatement (Second) of Torts §§ 821B cmt. e; 822 & cmt. a—that is, "the gravity of the harm [of the action must] outweigh[] the utility of the actor's conduct," *id.* § 826 & cmt. a.

The intent, unreasonableness, and substantial participation requirements for public and private nuisance are related to one another. "Intent may be proven by circumstantial evidence, that is, by inferences reasonably drawn from the facts established." *NAACP*, 271 F. Supp. 2d at 488. Thus, the extent of the defendant's invasion of a public or private right can support an inference both that the defendant knew it was causing the invasion and that it intended that invasion. Similarly, the "gravity of the harm" caused by the actor, and thus the unreasonableness of the action, is related to the degree to which the actor participated in the nuisance.

These factors are related to one another in a second sense.  The degree to which an actor

can be said to participate in a nuisance with the requisite intent is associated with the actor's

knowledge of the participation of others in the nuisance.  A defendant whose conduct, viewed in

isolation, would not by itself interfere with a public or private right is not—by virtue of that fact

alone—immune from an equitable action seeking relief against all persons whose conduct, in the

aggregate, create a nuisance.  *See NAACP*, 271 F. Supp. 2d at 493 ("Where multiple actors

contribute to a public nuisance, equity can reach actors whose conduct standing alone might not

be actionable."); *see also Warren v. Parkhurst*, 92 N.Y.S. 725 (Sup. Ct. Montgomery Cnty.

1904), *aff'd* 93 N.Y.S. 1009 (3d Dept. 1905), *aff'd* 78 N.E. 579 (N.Y. 1906); Restatement

(Second) of Torts § 840E cmt. b ("Situations may arise in which each of several persons

contributes to a nuisance to a relatively slight extent, so that his contribution taken by itself

would not be an unreasonable one and so would not subject him to liability; but the aggregate

nuisance resulting from the contributions of all is a substantial interference, which becomes an

unreasonable one."); *id.* § 840E cmt. a (indicating that Section 840E applies to both public and

private nuisance).  However, in order to reach the conduct of each individual participant, there

must be evidence that the actor knew that others were engaging in similar conduct such that a

nuisance would arise.  As the Restatement concludes,

> [T]he liability of each contributor may depend upon whether he is aware of what
> the others are doing, so that his own conduct becomes negligent or otherwise
> unreasonable in the light of that knowledge.  It may, for example, be unreasonable
> to pollute a stream to only a slight extent, harmless in itself, when the defendant
> knows that pollution by others is approaching or has reached the point where it
> causes or threatens serious interference with the rights of those who use the water.

Restatement (Second) of Torts § 840E cmt. b.  On a going-forward basis, the requisite notice can

be provided by the lawsuit itself; the lawsuit would make all of those involved in the nuisance

aware of the conduct of others and the collective impact of their actions.  Thus, a government

authority, in the case of a public nuisance, or a private party, in the case of a private nuisance, could maintain an action for an abatement.  However, in order to impose liability for damages on a backward-looking basis, additional allegations are necessary to reach the actions of relatively minor participants in the nuisance.  In the absence of such allegations, each defendant would, in essence, be held strictly liable for its actions—responsible for engaging in conduct that is otherwise lawful (*i.e.*, that is not individually "unreasonable" or otherwise tortious) when there is no knowledge or intent that such conduct would rise to the level where it would interfere with a public or private right.

In its January 2022 Opinion, the Court found that Plaintiff had failed to allege that Defendants substantially participated in the nuisance.  The First Amended Complaint failed to plead that Defendants knew that their customers were disposing of the contaminating substance into SUEZ's source watersheds, Dkt. No. 94 at 53; Defendants' customers neither told Defendants how they would use or dispose of the products, nor did they solicit the Defendants' advice on disposal, *id.* at 52.  It is not enough, the Court found, that Defendants could *foresee* that their customers actions would lead to contamination and that Defendants knew the products were contaminants.  *Id.* at 53.

Defendants argue that the SAC has not overcome these deficiencies.  Under Defendants' reading, the SAC neither alleges that Defendants had knowledge of the nuisance-creating activity or that Defendants continued to sell the contaminating substances to these customers after they acquired knowledge of the nuisance-creating activity.  Dkt. No. 99 at 16–17.  Plaintiff counters that it has sufficiently alleged Defendants' substantial participation in the creation and maintenance of the nuisance:  The SAC alleges that, despite knowing that their PFAS-containing substances either broke down into or contained trace amounts of PFOA, Defendants continued to

sell, license, and distribute these products to industrial customers within or near SUEZ's watershed and drinking-water infrastructure and advised customers to dispose of these products through normal waste disposal methods, without warning them of the subsequent risks of doing so.  Dkt. No. 104 at 11–12.

Plaintiff has failed to allege that Defendants substantially participated in the creation or maintenance of the nuisance and that they did so intentionally.  Plaintiff's allegations and its arguments confuse the foreseeability of contamination (that PFOA that originated with Defendants would enter SUEZ's water systems) with Defendants' knowledge that its actions, either individually or in combination with the actions of others, would enter SUEZ's water systems and interfere with a public or private right.  To start, there is nothing in the Second Amended Complaint that would support the allegation that Defendants' conduct alone created a nuisance, either by unreasonably interfering with a public right or with SUEZ's use and enjoyment of its water systems.  As previously discussed in detail, the SAC alleges that (1) Teflon, one of Defendants' branded products, contains trace amounts of PFOA, which can leach into water adjacent to landfills, and which cannot be removed by normal wastewater treatment facilities, SAC ¶¶ 34–35, 17; (2) that Zonyl could degrade into PFOA when released into the environment, *id.* ¶¶ 43, 50; (3) that Defendants advised their manufacturing customers that they could dispose of Teflon through normal wastewater and landfill channels, *id.* ¶¶ 47–49, and Zonyl could be recycled, *id.* ¶ 50; and (4) that at least six of Defendants' customers were located within SUEZ's watershed and near SUEZ's drinking water facilities, *see id.* ¶¶ 68–76, and that some of the inactive landfills in SUEZ's watershed contain high levels of PFOA, *see id.* ¶¶ 95–103.[9]  But there are no allegations that recycling Zonyl causes the release of PFOA into the

---

[9] The SAC also alleges that Defendants had license agreements that gave Defendants "ongoing

environment—and thus that Defendants would know that their distribution of Zonyl to their customers would lead to the contamination of SUEZ's water systems—or other than conclusory allegations that Defendants sold PFOA directly to manufacturers in SUEZ's water basin.[10]  What remains of the SAC's allegations in relation to Defendants' substantial participation in the nuisance-creating activity is that Defendants instructed their industrial customers to dispose of Teflon in landfills and to dispose of aqueous dispersion through normal wastewater treatment methods.[11]  Teflon, however, only contains "small amounts" of PFOA.  *Id.* ¶ 34.

_____

control over the customers' and licensees' use of their products" and suggests that these license agreements included provisions for the proper disposal of the licensed products.  *See* SAC ¶¶ 55–57.  However, Plaintiff moves to "strike Paragraphs 56 and 57 from Plaintiff's Second Amended Complaint and [to] disregard any reference to those Paragraphs in the parties' briefing . . . [because] Plaintiff learned that there is an error associated with the allegations."  Dkt. No. 109 at 1 (citations omitted).  The Court grants Plaintiff's motion to strike.  Absent the allegations in Paragraphs 56 and 57, the SAC merely alleges that the license agreements exist and gave Defendants control over how the licensees could use their products; there are no allegations, and no reasonable inference can be drawn, that an intellectual property agreement likely gave Defendants control over how their licensees disposed of these products.  *See Iqbal*, 556 U.S. at 679 (2009) ("Determining whether a complaint states a plausible claim for relief . . . requires the reviewing court to draw on its judicial experience and common sense.").  Thus, the Court need not consider whether these additional allegations of control over how Defendants' licensees dispose of the licensed products would have tipped Plaintiff's allegations with respect to substantial participation over the line of plausibility.  *See* Dkt. No. 94 at 44–47 (collecting cases where courts find substantial participation when an entity has control over the nuisance creating activity).

[10] The SAC does allege that Defendants "regularly sold and/or licensed the use of their fluorochemical products to Takasago" and that Takasago acknowledged that it stores and currently uses PFOA and/or PFOS at its manufacturing facility.  SAC ¶ 74.  However, the SAC does not directly allege that Defendants sold PFOA to Takasago.  And, in context, there is some doubt that they did:  For the other five manufacturers that the SAC identifies, Plaintiff alleges that Defendants sold a specific fluorochemical product to each manufacturer, Teflon.  *See id.* ¶¶ 69–73.  Even assuming that this allegation can be understood to suggest that Defendants sold PFOA directly to this one manufacturer, Plaintiff has still not pleaded sufficient facts to conclude that it was anything but an insignificant seller of PFOA to manufacturers in the SUEZ watershed.

[11] Defendants argue that "Plaintiff does not allege that any of the six proffered customers in fact received . . . these vague instructions."  Dkt. No. 99 at 18.  However, the SAC does allege that "Defendants . . . are required by law to provide [MSDSs] to downstream users."  *Id.* ¶ 46.  This allegation is sufficient to infer that the customers did in fact receive the instructions.

Taken together, these allegations do not suggest that Defendants' participation in the nuisance was "substantial" or that Defendants' conduct was unreasonable;[12] the SAC is devoid of any allegations that the impact of the PFOA contamination in Teflon alone was sufficient to create a nuisance.  It may be that Defendants could have foreseen contamination of SUEZ's water systems, but knowledge of the likelihood of contamination alone would not give rise to a plausible inference that Defendants' conduct created a nuisance.  The nuisance, in this case, arises from contamination that interferes with the public's right to clean drinking water, *see In re Nassau Cnty. Consol. MTBE Prod. Liab. Litig.*, 2010 WL 4400075, at *6 (N.Y. Sup. Ct. 2010) (collecting cases), or with SUEZ's right to use and enjoy its land.  The SAC does not allege that either Plaintiff or the public would be a victim of a nuisance by the dissemination of miniscule amounts of PFOA incapable of interfering with the right to clean drinking water or SUEZ's enjoyment of its land; there is no allegation that water needs to be pure to be clean.  The point when activity reaches a nuisance is when the contamination poses a hazard to the health of the public and requires remediation.  *See State of New York v. Fermenta ASC Corp.*, 656 N.Y.S.2d 342, 346 (2d Dep't 1997) (noting that a plaintiff must establish that the level of contamination in groundwater "presented a health hazard" in order to prevail on a public nuisance claim); Restatement (Second) of Torts § 821D cmt. d ("In private nuisance an intentional interference with the plaintiff's use or enjoyment is not of itself a tort, and unreasonableness of the interference is necessary for liability.").  There is no basis to conclude from Plaintiff's allegations that Defendants' conduct alone caused the degree of harm necessary to maintain a public or private nuisance claim or that Defendants knew that their conduct, in combination with

---

[12] In fact, the SAC is replete with allegations suggesting the industrial benefits of Teflon and Zonyl.  *See* SAC ¶¶ 10, 65, 69–74.

the conduct of others, would cause that level of harm.  *Compare In re MTBE Products Liability Litigation*, 725 F.3d at 116, 121 (concluding that Exxon's participation in the nuisance was "substantial" based on evidence that Exxon owned or controlled service stations near the effected wells, supplied approximately 25% of the gasoline sold in the relevant geographic area, and that gasoline from different manufacturers was comingled so each storage tank that leaked contained some Exxon MTBE gasoline).  These facts might support a claim for forward-looking equitable relief against Defendants and others whose contamination of SUEZ's water systems collectively create the actionable harm; the lawsuit has put Defendants on notice that their actions, at the very least, contributed to the nuisance.  But the allegations do not support a claim for retrospective damages based on Defendants' conduct and their knowledge of the conduct of upstream manufacturers.

Plaintiff also has not alleged facts that would support the plausible inference that Defendants knew or were substantially certain that their conduct would result in contamination of SUEZ's water systems.  Though the SAC alleges that Defendants delivered PFAS-containing substances to customers located within SUEZ's watershed, the SAC does not allege that Defendants knew or were substantially certain that these customers were located in SUEZ's watershed.  Similarly, although the SAC alleges that Defendants knew that landfilling Teflon could result in contamination of groundwater and that there are contaminated landfill facilities within SUEZ's watershed, it does not allege that Defendants knew or were substantially certain that Teflon was placed in the landfill facilities within SUEZ's watershed.  And the SAC again fails to allege that Defendants knew or were substantially certain that the PFOA in SUEZ's source watershed would inevitably end up in its water systems, rather than migrating outside of SUEZ's capture zones.  Nor does the SAC allege that Defendants learned that any of these

activities were occurring or that PFOA was seeping into and contaminating SUEZ's water systems and that they continued to supply their products to customers located near SUEZ's wells.  Tellingly, Plaintiff only alleges that the industrial manufacturers' disposal of PFAS-containing products into landfills and aqueous dispersion into wastewater treatment facilities was "foreseeable" or "reasonably anticipated" to Defendants, not that Defendants knew or were substantially certain such contamination would occur.  *See, e.g.*, SAC ¶¶ 44, 45, 80.  The SAC's allegations may be sufficient to support the conclusion that Defendants had a "general awareness" that the sale of their products might result in contamination *somewhere* in the United States, because of the near certainty that some of Defendants' many industrial customers were located near or deposited scrap Teflon into landfill facilities directly adjacent to water-drinking systems.  The SAC, however, does not contain adequate factual allegations from which the Court can infer that Defendants were substantially certain that, as a result of their actions, *SUEZ's* water systems would be contaminated and that this contamination would be sufficient to cause a public or private nuisance in any of the five New York counties where SUEZ operates.  *See Prosser and Keeton on the Law of Torts* § 8 (5th ed. 1984) ("[T]he mere knowledge and appreciation of a risk—something short of substantial certainty—is not intent."); *cf. Town of Islip v. Datre*, 245 F. Supp. 3d 397, 428 (E.D.N.Y. 2017) (Bianco, J.) ("[T]he Complaint is devoid of any allegation from which it could be inferred that the . . . defendants knew the material dumped . . . was hazardous.  Accordingly, it cannot be said that they intentionally contributed to the nuisance created by the[se] . . . defendants.").  Thus, Defendants' actions cannot be said to be intentional.

In *In re MTBE Products Liability Litigation*, the Second Circuit held that Exxon's conduct as a supplier was not too remote from the nuisance-creating activity because the

evidence at trial showed that (1) "Exxon manufactured gasoline containing MTBE and supplied

that gasoline to service stations in Queens" proximate to the plaintiffs' water wells; (2) "Exxon

knew station owners would store this gasoline in underground tanks that leaked, and . . . knew

specifically that tanks in the New York City area leaked"; and (3) Exxon was "aware of MTBE's

tendency to spread quickly once released into the groundwater." 725 F.3d at 121.  The jury

could thus conclude that Exxon was "substantially certain that [its] gasoline containing MTBE

would leak from the gasoline distribution system and enter groundwater, including the

groundwater in the capture zone of the Station 6 wells." *Id.* at 120 (jury instruction for trespass

claim).  In contrast, the most that the SAC can be said to allege is that Defendants should have

realized that their sale of PFAS-containing products and their instructions that it was permissible

to landfill Teflon and dispose of aqueous Teflon dispersions through wastewater treatment

facilities "involve[d] a serious risk or likelihood of causing" contamination and that such

contamination would, in turn, create a nuisance.  Restatement (Second) of Torts § 825 cmt. c.

These allegations, however, are insufficient to state a claim that Defendants substantially

participated in the nuisance. *Id.*; *see Sahu v. Union Carbide Corp.*, 650 F. App'x 53, 58–59 (2d

Cir. 2016) ("[I]n contrast to the defendant in *MTBE*, there is no indication on this record that [the

defendant] had knowledge that the . . . plant's waste management system would leak, or that

such leaks would lead to local contamination.").  To be sure, the new allegations in the SAC go

some of the way to addressing the deficiencies that the Court identified in the FAC, but the

allegations still do not overcome the fundamental flaw that the Court identified in its January

2022 Opinion:  There, like here, "Plaintiff's allegations, taken as true, demonstrate simply that

the [ ] Defendants could foresee that their customers, through manufacturing processes and/or

disposal, could release PFAS, including PFOA or PFOS, in a way that could ultimately lead to

contamination of groundwater and that the [ ] Defendants knew PFAS were dangerous."  Dkt. No. 94 at 53.

Perhaps recognizing the potential flaw in its allegations, Plaintiff argues that it was not just that Defendants directed their customers to dispose of Teflon in landfills, but that Defendants failed to warn these "customers to avoid landfills near water treatment facilities." Dkt. No. 104 at 12.  There is language in certain cases from courts in this District—which Plaintiff does not cite—that suggests that concealing knowledge of a product's risks is sufficient for a court to find that a defendant substantially participated in a nuisance.  In sustaining the plaintiffs' public nuisance claim against a motion to dismiss, the district court in *In re MTBE Products Liability Litigation* found that the defendants had knowledge of the dangers of MTBE and failed to warn their downstream customers, the government, and well owners of these dangers.  *See* 175 F. Supp. 2d 593, 628–29.  The failure to warn of the risk of a product, however, cannot alone give rise to a claim in nuisance in the absence of evidence that the failure to warn, combined with the defendant's other conduct, gives rise to a serious interference with the rights of the public or a private landowner.  Were it otherwise, every claim of failure to warn could be pleaded in the alternative as one for nuisance, without any of the requisite allegations of a duty to warn.  In *In re MTBE*, the plaintiffs alleged that the defendants did more than fail to warn their customers; they also "actively conspired to conceal the threat caused by MTBE."  *Id.*; *see also Abbatiello v. Monsanto Co.*, 522 F. Supp. 2d 524, 541 (S.D.N.Y. 2007) (citing *In re MTBE*, 175 F. Supp. 2d at 629) (refusing to dismiss plaintiffs' nuisance claim against upstream manufacturer because plaintiffs alleged that, despite knowing of the risks of PCBs, upstream manufacturer worked "to suppress and conceal these facts from" plant owner).  Allegations that a defendant worked to conceal the potential harm of its products can speak to both the defendant's

participation in the nuisance and whether the defendant had the requisite intent to be held liable for the nuisance (*i.e.*, whether the defendant was at least substantially certain that the nuisance would result from its downstream customers' actions); a court may be able to infer that the defendant had knowledge of the harm it was causing from the fact that the defendant acted to conceal the potential for harm.  The SAC here, however, contains no allegations that Defendants worked to conceal from their industrial customers, SUEZ, or the government the facts that Teflon and Zonyl could release PFOA into the environment, that PFOA was water soluble, or that PFOA was damaging to the environment and to human health.  Thus, Defendants failure to warn their industrial manufacturers about the risks of disposal of Teflon and Zonyl does not support an inference that Defendants substantially participated in the nuisance-creating activity.

Finally, Plaintiff argues that its nuisance claims should survive dismissal because the SAC's allegations with respect to Defendants' substantial participation in the nuisance are "analogous to the allegations that the courts found to be sufficient in *Locus Valley Water District* [*v. Dow Chemical Co.*] and *Suffolk County Water* [*v. Dow Chemical Co.*]."  Dkt. No. 104 at 11. However, both cases only analyzed whether the plaintiffs had pleaded substantial factor causation.  *See Locust Valley Water*, 465 F. Supp. 3d at 237 (noting that the defendants' motion to dismiss was predicated solely "on the basis that plaintiffs have failed to sufficiently allege causation and alternative theories of liability"); SCWA Transcript at 6–7, 9.  As the Court noted in its January 2022 Opinion, the tests for substantial factor causation and substantial participation in a nuisance are similar.  *See* Dkt. No. 94 at 44, 50.  But they are not identical.  Substantial factor causation applies across tort claims.  It is satisfied by allegations or evidence that the defendant's conduct contributed to the plaintiff's injury in more than a slight or trivial fashion and that the resulting injury was foreseeable.  *See supra* pp. 11–13.  Substantial participation is

an element of a claim of nuisance.  It requires both intent and unreasonableness.  Although

Plaintiff has adequately alleged that the contamination of SUEZ's wells was foreseeable to

Defendants—and thus is sufficient to allege legal causation—*see supra* pp. 14–21, the

Defendants' conduct must also be tortious.  The SAC does not allege facts from which a jury

could conclude that Defendants knew, or were substantially certain, that the nuisance would

occur as a result of their actions.

Because Plaintiff has failed to allege that Defendants substantially participated in the

creation or continuance of the nuisance with the requisite *mens rea*, Plaintiff's public and private

nuisance claims must also fail.[13]

## III.    Negligence Claim

In the January 2022 Opinion, the Court dismissed Plaintiff's negligence claim because

the FAC failed to allege a duty of care that Defendants owed to Plaintiff.  The January 2022

Opinion identified two potential exceptions to the rule that "[a] defendant generally has no duty

to control the conduct of third persons so as to prevent them from harming others":  (1) the

defendant is in a position where it can control the actions of the third-party tortfeasor; and

(2) there exists a relationship between the defendant and plaintiff that requires the defendant to

protect the plaintiff.  Dkt. No. 94 at 56 (quoting *D'Amico v. Christie*, 518 N.E.2d 896, 901 (N.Y.

1987)).  The Court, noting that the FAC was devoid of allegations that (1) "Defendants'

relationship with the third-person tortfeasor (the industrial manufacturers) was such that the [ ]

Defendants could control their activities" and (2) Defendants and Plaintiff had a relationship that

---

[13] Because the SAC does not adequately allege that Defendants substantially participated in the
nuisance-creating activity with the requisite intent, the Court does not address Defendants'
arguments that Plaintiff has not adequately pleaded a special injury such that it can maintain a
public nuisance claim, *see* Dkt. No. 104 at 19–21, or that the alleged harm is too widespread for
Plaintiff to maintain a private nuisance claim, *see id.* at 22–24.

would require Defendants to protect SUEZ from the conduct of others, held that Plaintiff could not maintain its negligence claim. *Id.* at 56–57.

Plaintiff argues that the SAC cures these deficiencies by alleging that Defendants had control over their industrial manufacturing customers. As Plaintiff construes it, the SAC alleges that the license agreements between Defendants and its industrial customers "provided Defendants with ongoing control over their customers' and licensees' use and disposition of Defendants' products, thereby creating a duty to exercise due care in directing the activities of these customer[s] and licensees." Dkt. No. 104 at 20 (citing SAC ¶¶ 134, 136). However, as discussed, Plaintiff expressly disclaimed the specific allegations related to the licensing agreements. *See* Dkt. No. 109; *supra* note 9. At oral argument, counsel for Plaintiff maintained that the SAC, even after granting the motion to strike Paragraphs 56 and 57, alleges sufficient facts for the Court to infer that Defendants owed a duty of care to Plaintiff. *See* Dkt. No. 110 at 35–36. Specifically, counsel for Plaintiff suggested that because license agreements are designed to control the use of a product after its sale and because Defendants' MSDSs and SDSs advised customers that they could dispose of Defendants' products in specific ways, it is a plausible inference that Defendants also controlled their customers' disposal of PFOA-containing waste through their license agreements. *See id.*

This argument lacks merit. What remains after granting Plaintiff's motion to strike Paragraphs 56 and 57 is an allegation that "Defendants [had] license agreements with their respective customers and licensees [that] provided Defendants with ongoing control over the customers' and licensees' use of their products." SAC ¶ 55. The SAC, however, suggests that these license agreements contained "trademark use rules and licensee standards." *Id.* Though it might be conceivable that a license and trademark agreement would contain provisions

concerning the disposal of waste created through the use and manufacturing of the licensed product, it is far from plausible. *See Twombly*, 550 U.S. at 570. License and trademark agreements tend to focus on ensuring brand standards and quality (*i.e.*, customer-facing activities) and thus protecting the licensor's brand and trademark. *See* 4 *Callmann on Unfair Competition, Trademarks and Monopolies* § 20:55 (4th ed. 1995) ("[I]f a . . . license is without quality control by the licensor, the license is invalid and may result in abandonment of the mark." (footnotes omitted)). They are less concerned with decisions—including how to dispose of waste created through the manufacturing and use of the licensed product—unrelated to the brand's perception in the marketplace, if they are concerned with those decisions at all. Thus, without more, it is not plausible to conclude that the license agreements would contain provisions regarding the disposal of Defendants' PFOA-containing products. Nor does the fact that Defendants gave instructions on the disposal of Teflon and Zonyl through MSDSs and SDSs, which Defendants were required by federal law to provide to downstream customers, *see* SAC ¶ 46, provide that something "more." All chemical manufacturers are required by Occupational Safety and Health Administration regulation "to develop a safety data sheet for each hazardous chemical they produce." *See* 29 C.F.R. § 1910.1200(g)(1). The purpose of these regulations is to protect employees. *See, e.g.*, *id.* § 1910.1200(a)(2) (identifying the "[p]urpose" of the regulations as "intended to address comprehensively the issue of classifying the potential hazards of chemicals, and communicating information concerning hazards and appropriate protective measures to employees"); *id.* § 1910.1200(b)(2) ("This section applies to any chemical which is known to be present in the workplace in such a manner that employees may be exposed under normal conditions of use or in a foreseeable emergency."). Thus, manufacturers are required to "ensure that distributors and employers are provided an appropriate safety data sheet

with their initial shipment, and with the first shipment after a safety data sheet is updated." *Id.*
§ 1910.1200(g)(6)(i). It cannot follow that manufacturers of hazardous chemicals inherit a duty
of care to third parties through the provision of federally mandated SDSs to their customers. The
most the Defendants' provision of MSDSs and SDSs suggests is that Defendants sought to fulfill
their federal regulatory obligations, not that they were particularly concerned with how their
customers disposed of their licensed products or that they had control over these actions. Thus,
Plaintiff has again failed to allege that it owed a duty of care to SUEZ and to state a claim for
negligence.

## IV.    Trespass Claim

The Court's January 2022 Opinion reviewed the standard for trespass under New York
state law. The Court stressed that trespass is an intentional tort:

> "The requisite elements for a claim of trespass are (1) the intentional entry by
> defendants on to plaintiffs' land and (2) the wrongful uses without justification or
> consent." *Kaplan v. County of Orange*, 528 F. Supp. 3d 141, 171 (S.D.N.Y. 2021)
> (quoting *Matthews v. Malkus*, 377 F. Supp. 2d 350, 359 (S.D.N.Y. 2005)). For one
> to be liable in trespass, "the trespasser 'need not intend or expect the damaging
> consequences of his intrusion;' rather, he need only 'intend the act which amounts
> to or produces the unlawful invasion.'" *Scribner v. Summers*, 84 F.3d 554, 557
> (2d Cir. 1996) (alterations adopted) (quoting *Phillips*[, 121 N.E.2d at 250–51]).
> However, "[t]he intrusion itself 'must at least be the immediate or inevitable
> consequence of what he willfully does, or which he does so negligently as to
> amount to willfulness.'" *Id.* (quoting *Phillips*, [121 N.E.2d at 251]). With respect
> to the intent element in water contamination cases, "the appropriate standard is
> whether [the defendant] (i) 'intend[ed] the act which amounts to or produces the
> unlawful invasion,' and (ii) had good reason to know or expect that subterranean
> and other conditions were such that there would be passage [of the contaminated
> water] from defendant's to plaintiff's land." *Id.* at 558 (quoting *Phillips*, [121
> N.E.2d at 251]); *see also In re MTBE*, 725 F.3d at 120 ("In a trespass cases
> involving the 'underground movement of noxious fluids,' a plaintiff must show that
> the defendant 'had good reason to know or expect that subterranean and other
> conditions were such that there would be passage [of the pollutant] from
> defendant's to plaintiff's land.'" (quoting *Phillips*, [121 N.E.2d at 251])).

Dkt. No. 94 at 60–61.

The Court found that the FAC had failed to state a claim for trespass. Specifically, the Court observed that the FAC did not plausibly allege that the intrusion into SUEZ's water systems was either the immediate or the inevitable consequence of Defendants' actions. *Id.* at 62. There were insufficient allegations to conclude that the intrusion was not the "immediate consequence" of Defendants' willful actions, because "[a]t worst" the FAC only alleged that Defendants were "indifferent to what the industrial manufacturers did with the PFAS or how the end use consumers disposed of products that contained the chemical." *Id.* "On Plaintiff's theory," the Court concluded, "it was the conduct of the industrial manufacturers or the end-use consumers—not the [ ] Defendants—that was the immediate source of SUEZ's injury." *Id.* at 63. Similarly, the FAC failed to plausibly allege that the intrusion was not the "inevitable consequence" of Defendants' conduct, because it lacked allegations that Defendants were substantially certain that PFAS would end up in Plaintiff's water systems. *Id.*

In the SAC, Plaintiff alleges a different theory of trespass liability. The FAC's trespass claim was premised on Defendants' sale of PFOA and PFAS-containing materials to industrial manufacturers and the release of PFOA into SUEZ's watersheds by the industrial manufacturers. *See id.* at 62–63. That is, the FAC alleged that the contamination of SUEZ's water systems was the immediate and inevitable consequence of Defendants' sales of its products to industrial manufacturers within its watershed. Now, Plaintiff argues that Defendants' liability for trespass rests in the disposal directions that Defendants gave their customers.[14] *See* Dkt. No. 104 at 23; SAC ¶ 143 ("Defendants' acts and omissions, including Defendants' sale, licensing, and

---

[14] Plaintiff contends that "Defendants also do not address at all SUEZ's allegations that Defendants' fluorotelomer products . . . have been continuously sold in retail stores." Dkt. No. 104 at 23. The Court found that the SAC does not allege legal causation with respect to the sale of products containing Defendants' fluorotelomers to end users. *See supra* note 7. Thus, Plaintiff's trespass claim cannot rest on those actions.

distribution of PFOA and PFAS-containing products and materials to purchasers and licensees in New York *with explicit instructions regarding the use and disposal of such products . . .* were a substantial factor in causing the release of significant amounts of PFOA into the environment and natural resources of New York State." (emphasis added)).  Defendants counter that Plaintiff has again failed to maintain a claim for trespass because Defendants lacked the requisite control over its customers' actions.  *See* Dkt. No. 99 at 33–34.

New York courts recognize secondary liability for trespass. *See Bigio v. Coca-Cola Co.*, 675 F.3d 163, 172 (2d Cir. 2012).  "[T]o be held liable for the trespass of another, a defendant 'must have . . . caused or directed another person to trespass.'"  *Id.* (quoting *Golonka v. Plaza at Latham LLC*, 704 N.Y.S.2d 703, 706 (3d Dep't 2000)).  It is of no moment whether the defendant had actual control over the person; "where a trespass has been committed upon the rights or property of another, by the advice or direction of a defendant, it is wholly unimportant what contractual or other relation existed between the immediate agent of the wrong and the person sought to be charged." *Ketcham v. Newman*, 36 N.E. 197, 198 (N.Y. 1894); *see also* Restatement (Second) of Torts § 158 cmt. j. ("If, by any act of his, the actor intentionally causes a third person to enter land, he is as fully liable as though he himself enters.  Thus, if the actor has commanded or requested a third person to enter land in the possession of another, the actor is responsible for the third person's entry if it be a trespass.").  However, in order to be liable for trespass on a theory of secondary liability, the defendant still must have acted with intent.  *See Fermenta ASC Corp.*, 656 N.Y.S.2d at 346 (noting that manufacturer who directed third party to apply herbicide that contaminated the plaintiff's wells must have been "substantially certain" that the trespass would result); *cf. In re MTBE Prod. Liab. Litig.*, 725 F.3d at 119–20.  Nor is the plaintiff relieved from the obligation of demonstrating that the action was the "immediate or

inevitable consequence" of the third person's action. *See* Restatement (Second) of Torts § 877 & cmt. a (indicating that to be subject to liability for the conduct of another, the conduct of another must itself be tortuous and the defendant "has or should have knowledge of the conditions under which [the conduct] is to be done"); *see also Phillips*, 121 N.E.2d at 251.

The SAC contains sufficient allegations that Defendants directed Plaintiff's actions with respect to the disposal of Teflon. The SAC alleges that Defendants were required to send MSDSs to downstream customers. SAC ¶ 46. These MSDSs contained instructions on disposing of Teflon. An MSDS in 1989 advised recipients that Teflon could be "disposed of via normal sanitary landfill by burying." *Id.* ¶ 47. In 1998, another MSDS reiterated that "landfill" was a "[p]referred option[] for disposal." *Id.* ¶ 48 (first alteration in original). That same year, Old DuPont indicated that Teflon AF amorphous fluoropolymer resins "presents no special problem to the user" and "[i]t is best to dispose of such scrap in a landfill dump." *Id.* A 1996 MSDS also advised Old DuPont's customers that aqueous Teflon dispersions should be separated into their solid and liquid components and the dry solids should be "dispose[d] . . . in a landfill that is permitted, licensed or registered by a state to manage industrial solid waste" while the "[d]ischarge liquid filtrate [should be sent] to a wastewater treatment system." *Id.* ¶ 49. Based on these allegations, it is plausible to infer both that Defendants' customers received the MSDSs that Defendants were obligated to provide and that Defendants' customers complied with their disposal instructions.[15] *Cf. Shepard v. United States*, 290 U.S. 96, 105 (1933). Moreover, unlike with respect to nuisance, Defendants cannot escape liability by arguing that their trespass did not interfere with the public's right to clean drinking water or with SUEZ's

---

[15] Old DuPont also indicated through an SDS that Zonyl could be recycled. *Id.* ¶ 50. However, because there are no allegations that the process of recycling Zonyl contaminated SUEZ's water systems, Zonyl is not relevant to the trespass analysis.

right to enjoy and use its land.  In an action for trespass, a defendant does not get a free pass to

deposit a small amount of pollutants on the property of another, even if such actions could not

have caused harm.  *See Kronos, Inc. v. AVX Corp.*, 612 N.E.2d 289, 292 (N.Y. 1993)

("[N]ominal damages have been recognized in tort to protect a landowner's right to be free of

trespass."); Restatement (Second) of Torts § 163 ("One who intentionally enters land in the

possession of another is subject to liability to the possessor for a trespass, although his presence

on the land causes no harm to the land, its possessor, or to any thing or person in whose security

the possessor has a legally protected interest.").

Plaintiff has again failed to plead sufficient facts to plausibly allege either that the

intrusion into SUEZ's water systems was the "immediate or [the] inevitable consequence" of the

industrial manufacturers' actions or that Defendants acted with the requisite intent.  The SAC

alleges that several of Defendants' customers were located within SUEZ's watershed and near its

water system, SAC ¶¶ 68–74, and that several landfill facilities were "upstream of, within the

capture zone of, or otherwise adjacent to SUEZ's potable water supply wells," *id.* ¶¶ 97–103.

However, the SAC does not allege, in other than a conclusory manner, that Defendants'

customers deposited waste in these landfill facilities.  *See id.* ¶ 88 ("Upon information and belief,

several of these current and former solid waste and wastewater facilities received PFOA-

containing waste during the relevant time period that can be traced directly back to Defendants'

PFOA and other PFAS-containing products that constitute or degrade into PFOA." (cleaned up)).

*See Abbatiello*, 522 F. Supp. 2d at 542 (dismissing trespass claim where "the presence of PCBs

on [plaintiffs'] properties can not [*sic*] be said to be the 'immediate or inevitable consequence' of

[defendant's] manufacture, sale, and delivery of PCB-containing products to [nearby industrial

site]").  Similarly, the SAC does not allege that Defendants were substantially certain that their

42

directions to deposit Teflon in landfills would contaminate SUEZ's water systems; it merely alleges that Defendants directed their customers to place Teflon scrap in landfill facilities, without any allegations related to Defendants' knowledge that these facilities were located within the capture zone of SUEZ's water system.  The SAC's allegations may be sufficient to establish that the entry of SUEZ's water systems was a foreseeable result of Defendants' conduct—that Defendants reasonably should have perceived of the risk that once they distributed PFOA-containing products with the instruction that it be deposited in landfill facilities that some of it might end up invading SUEZ's property.  *See Sanchez v. State of New York*, 784 N.E.2d 675, 678 (N.Y. 2002) (noting that in a negligence cause of action, "the scope of the duty owed by the defendant is defined by the risk of harm reasonably to be perceived"); *Di Ponzio v. Riordan*, 679 N.E.2d 616, 618 (N.Y. 1997) ("regarding the scope of an individual actor's duty, the courts look to . . . [*inter alia*] whether the accident was within the reasonably foreseeable risks" (citations omitted)).  But those allegations do not support the plausible inference that Defendants intended the invasion of SUEZ's property or that the invasion was inevitable such that Defendants, acting with knowledge of the near-certain result, could be deemed to have intended that result.  *See Prosser and Keeton on the Law of Torts* § 8 ("The line [between negligence and intent] has been drawn by the courts at the point where the known danger ceases to be only a foreseeable risk which a reasonable person would avoid, and becomes in the mind of the actor a substantial certainty."); *cf. In re MTBE Prod. Liab. Litig.*, 725 F.3d at 119 (upholding trespass verdict where the jury found that it "was substantially certain that Exxon's gasoline containing MTBE would leak from the gasoline distribution system and enter groundwater, including the groundwater in the capture zone of [the plaintiff's] wells" (internal quotation marks omitted)).

Accordingly, Plaintiff has failed to state a claim for trespass.

V.      **Strict Liability: Defective Design Claim**

Plaintiff again brings a design defect claim against Defendants.  "A manufacturer who places into the stream of commerce a defective product which causes injury may be held strictly liable."  *McCarthy v. Olin Corp.*, 119 F.3d 148, 154 (2d Cir. 1997).  As the Court explained in its January 2022 Opinion, "[A] defectively designed product is one which, at the time it leaves the seller's hands, is in a condition not reasonably contemplated by the ultimate consumer and is unreasonably dangerous for its intended use; that is one whose utility does not outweigh the danger inherent in its introduction into the stream of commerce."  Dkt. No. 94 at 69 (quoting *Robinson v. Reed-Prentice Div. of Package Mach. Co.*, 403 N.E.2d 440, 443 (N.Y. 1980)). Thus, "[t]o state a claim for defective design under New York strict products liability law, a plaintiff must allege that: (1) the product as designed posed a substantial likelihood of harm; (2) it was feasible to design the product in a safe manner; and (3) the defective design was a substantial factor in causing plaintiff's injury."  *S.F. v. Archer Daniels Midland Co.*, 594 F. App'x 11, 12 (2d Cir. 2014) (summary order) (internal quotation marks and citation omitted).

The Court dismissed Plaintiff's design defect claim because the FAC failed to allege a safer alternative design.  The Court rejected Plaintiff's contention that at the motion-to-dismiss stage, it was sufficient to allege that a safer alternative design exists and held that a "plaintiff must present evidence that it was feasible to design the product in a safer manner" by "plead[ing] a safer design alternative for the allegedly defective design."  Dkt. No. 94 at 69–71.  Plaintiff attempts to remedy these deficiencies by alleging two alternative designs for Defendants' fluoropolymer and fluorotelomer products.  First, the SAC alleges that no later than 1980, Old DuPont developed GenX, a hexafluoropropylene oxide dimer acid, which could be used instead of PFOA to produce fluoropolymers like Teflon.  SAC ¶¶ 38, 154–155.  Despite knowing that Teflon contained trace amounts of PFOA, *id.* ¶ 34, Old DuPont did not begin phasing out the use

of PFOA in its production of fluoropolymers until at least 2009 and did not complete the transition until at least 2015, *id.* ¶¶ 39, 155.  Second, the SAC alleges that Old DuPont developed Capstone, an alternative to fluorotelomers, including Zonyl, in 2010, at which point it stopped manufacturing and distributing Zonyl.  *Id.* ¶¶ 42, 156.  Capstone had fewer trace PFOA impurities than Zonyl and unlike Zonyl, does not degrade into PFOA when released into the environment.  *Id.* ¶¶ 42–43.  Defendants only challenge whether Plaintiff has adequately pleaded a feasible alternate design.  Specifically, Defendants argue that Plaintiff's design defect claim must fail because GenX is not a feasible alternative design to PFOA; it is an entirely different product.  Dkt. No. 99 at 36–38.

Defendants point to a line of cases from this Circuit that have held that alleging a defendant could have manufactured a different product instead of the allegedly defective one is insufficient to state a claim for design defect.  *See* Dkt. No. 99 at 37–38 (collecting cases); Dkt. No. 107 at 17–18 (same).  These holdings can be traced to the risk/utility analysis used by New York courts in design defect cases "to determine whether the risk of injury might have been reduced or avoided if the manufacturer had used a feasible alternative design."  *McCarthy*, 119 F.3d at 155; *see, e.g.*, *Archer Daniels Midland Co.*, 594 F. App'x at 12 (citing *Adamo v. Brown & Williamson Tobacco Corp.*, 900 N.E.2d 966, 969–70 (2008)).  Among the factors weighed in the risk/utility analysis is "the potential for designing and manufacturing the product so that it is safer but remains functional."  *Black & Decker Mfg. Co.*, 450 N.E.2d at 208–09.  If the only alternative design for a product is a different product entirely, then, these courts appear to be reasoning, the old product does not "remain functional" because, once it is discontinued, it serves no function at all.  *Cf. Archer Daniels Midland Co.*, 594 F. App'x at 12 (2d Cir. 2014) ("[A]

design-defect claim will not stand if the only alternative is an outright ban.").[16]  The essence of the claim would not then be design defect—it would be that the defendant should not have sold the product at all.

Though Defendants state a valid proposition of law, they stretch the facts of this case too far to fit within its limited reach.  Defendants contend that the relevant unit of analysis is PFOA.  *See* Dkt. No. 99 at 37.  As a result, Defendants argue, GenX is an inadequate alternative design because it is an acknowledgement that "PFOA should not have been sued at all."  Dkt. No. 107 at 17.  However, this argument abstracts away how Old DuPont used PFOA: as a polymerization agent in the manufacture of Teflon and other fluoropolymers, a fact that Defendants acknowledge in their reply.  *See id.* at 17 (noting the PFOA and GenX are "different polymerization processing aid[s]").  Once PFOA is appropriately situated within the manufacturing process for Teflon, it necessarily follows that Plaintiff has adequately stated a claim for design defect.

There is some question as to whether Plaintiff's claim sounds in design defect or manufacturing defect.  The SAC alleges that PFOA is used as a polymerization agent to aid in the manufacture of Teflon.  *See* SAC ¶¶ 38, 59, 154.  There is superficial appeal to the argument that a cause of action seeking recovery for a defect in the *manufacturing* process should be pleaded as a manufacturing defect, not a design defect, claim.  The New York Court of Appeals and courts applying New York law, however, have suggested that design defect claims reach

---

[16] Tellingly, neither party addresses the SAC's allegations that suggest that Capstone is a reasonable alternative design for Zonyl.  That is likely because the SAC contains no allegations that would suggest that Capstone is anything but a different product from—and not a feasible alternative design for—Zonyl.  Thus, under the principles described in this section, the allegations related to Capstone as an alternative to Zonyl are tantamount to "alleging that [Zonyl] should not be used at all [which] is insufficient to satisfy the feasible alternative design element." *Green v. Covidien LP*, 2019 WL 4142480, at *3 (S.D.N.Y. Aug. 30, 2019) (citation omitted).

defects in how manufacturing processes are designed and thus that a design defect claim is the appropriate cause of action in this case. "Where a product presents an unreasonable risk of harm, notwithstanding that it was meticulously made according to detailed plans and specifications, it is said to be defectively designed." *Robinson*, 403 N.E.2d at 443. In contrast, "a manufacturing defect . . . results when a mistake in manufacturing renders a product that is ordinarily safe dangerous so that it causes harm." *McCarthy*, 119 F.3d at 154 (citing *Victorson v. Bock Laundry Mach. Co.*, 335 N.E.2d 275 (N.Y. 1975)); *see also Dunham v. Covidien, LP*, 498 F. Supp. 3d 549, 556 (S.D.N.Y. 2020) ("[A] manufacturing defect claim will be dismissed if a plaintiff has not alleged that the specific product that allegedly caused the plaintiff's injuries was defective as compared to other products manufactured by the defendant."). "Design defects, then, unlike manufacturing defects, involve products made in the precise manner intended by the manufacturer." *Id.*; *see also Black & Decker Mfg. Co.*, 450 N.E.2d at 208–09 (noting that the relevant analysis in the risk/utility test is "the potential for designing *and manufacturing* the product so that it is safer but remains functional" (emphasis added)). Were it otherwise, and were design defect claims not able to reach the specified method by which products are manufactured, there would be a yawning gap in the law of strict liability: so long as the manufacturing processes were consistent and produced uniform products, defects introduced by the manufacturing process alone would not be compensable.

   Thus, Plaintiff has adequately stated a design defect claim for Teflon. As discussed, the SAC suggests that the use of PFOA as a polymerizing agent leads to trace amount of PFOA in Teflon.[17] *See* SAC ¶¶ 34, 38, 154–55. The SAC further alleges that by 1980, Old DuPont had

---

[17] The SAC does not suggest that only some Teflon contains PFOA or that a mistake in the manufacturing process introduces PFOA into the end product, as would be required to state a manufacturing defect claim.

developed a replacement polymerizing agent that presumably did not leave trace amounts of PFOA on Teflon. *Id.* Thus, the SAC alleges that there was a feasible alternative design for the production of Teflon that would result in the same product without the contaminating impurities introduced by following Old DuPont's manufacturing specifications.[18] Accordingly, Plaintiff can maintain a claim for design defect against Old DuPont.

The same cannot be said for the design defect claim against Chemours. Although the SAC contains conclusory allegations that "*Defendants*" manufactured the defectively designed fluorochemical products, including Teflon, and sold these products to customers in SUEZ's watershed, *see, e.g.*, SAC ¶¶ 158–59 (emphasis added), the specific factual allegations all relate to Old DuPont. The SAC suggests that the transition to GenX in the Teflon manufacturing process was completed while Old DuPont still owned the rights to Teflon. *See id.* ¶ 39 (stating that Old DuPont "complete[d] this transition [to GenX]" in 2015). There are no facts that suggest that Chemours ever used anything but GenX in the manufacture of Teflon or that there were feasible alternative designs for other of Chemours's allegedly contaminating products. *See id.* ¶ 155 (indicating that "Old DuPont," and not Chemours, "failed to utilize a feasible alternative design to produce its fluoropolymers, including but not limited to Teflon®"). Thus, the design defect claim against Chemours must fail. *See Hymowitz v. Eli Lilly & Co.*, 539 N.E.2d 1069, 1073 (N.Y. 1989) ("In a products liability action, identification of the exact defendant whose product injured the plaintiff is, of course, generally required.").

---

[18] Defendants do not challenge that liability for Old DuPont's defectively designed product would run to SUEZ, even though SUEZ never purchased or used Old DuPont's products. New York courts have long held "that, under a doctrine of strict products liability, the manufacturer of a defective product is liable to any person injured or damaged if the defect was a substantial factor in bringing about his injury or damages." *See Codling v. Paglia*, 298 N.E.2d 622, 628 (N.Y. 1973).

**CONCLUSION**

The motion to dismiss for failure to state a claim upon which relief can be granted is GRANTED IN PART and DENIED IN PART.  Specifically, the Court GRANTS Defendants' motion to dismiss Counts One, Two, Three, and Four of the Second Amended Complaint with prejudice and GRANTS The Chemours Company's motion to dismiss Count Five of the Second Amended Complaint with prejudice.  *See Loughlin v. Goord*, 558 F. Supp. 3d 126, 155 (S.D.N.Y. 2021) ("Because Plaintiffs already had the opportunity to amend their complaint after Defendant's first motion to dismiss and because Plaintiffs identify no facts that could cure the defects in their pleading, dismissal with prejudice is appropriate."), *aff'd*, 2022 WL 9575656 (2d Cir. Oct. 17, 2022) (summary order) (holding that district court "acted well within its discretion" when it dismissed the complaint with prejudice because "[p]laintiffs already amended their pleadings once in response to [defendant's] earlier motion to dismiss . . . [and] in their opposition to [defendant's motion to dismiss], [p]laintiffs did not seek leave from the District Court to correct any substantive deficiencies in their Complaint").   The Court, however, DENIES Defendant E.I. du Pont de Nemours and Company, Inc.'s motion to dismiss Count Five of the Second Amended Complaint.

The Clerk of Court is respectfully directed to close Dkt. Nos. 98 and 109.

SO ORDERED.

Dated: March 22, 2023
       New York, New York

LEWIS J. LIMAN
United States District Judge